IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

BEN LEWIS, AARON NORRID, BILLY JO
QUISENBERRY and FRED ROMERO, by and
through their legal guardian and next of friend
THE ARC OF NEW MEXICO, BREANNE
LIDDELL, by and through her parent and legal
guardian JUDY LIDDELL, MATTHEW ALLEN,
by and through his parents and legal guardians
JIM and ANGELA ALLEN, FAY MORGAN,
DEBORAH EMINGER and PROTECTION AND
ADVOCACY SYSTEM, INC.,

       Plaintiffs,

vs.                                          No. CIV 99-0021 MV/RLP

NEW MEXICO DEPARTMENT OF HEALTH,
NEW MEXICO DEPARTMENT OF HUMAN
SERVICES, J. ALEX VALDEZ, Secretary of the
Department of Health and Secretary Designee of the
Department of Human Services in his official
capacities, and GOVERNOR GARY JOHSON
in his official capacity,

       Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** is before the Court on Defendant's Motion to Dismiss Based on

Sovereign Immunity, filed June 14, 1999 **[Doc. No. 25]**; Defendants' Motion to Dismiss Pursuant

to Rule 12(b)(6), filed June 14, 1999 [**Doc. No. 20**]; and Defendants' Motion to Dismiss

Governor Gary Johnson, filed June 14, 1999 [**Doc. No. 12**]. The Court, having considered the

motions, responses, replies, relevant law and being otherwise fully informed, finds that the Motion

to Dismiss Based on Sovereign Immunity and Motion to Dismiss Governor Gary Johnson are well-taken in part and will be denied in part and granted in part and that the Motion to Dismiss Pursuant to Rule 12(b)(6) is not well-taken and will be denied.

## BACKGROUND

Plaintiffs are individuals who are eligible to participate in Medicaid programs because they have physical or developmental disabilities or because of their advanced age, and Protection and Advocacy – an agency that advocates for the rights of persons with disabilities.  Medicaid is a cooperative federal-state program under which participating states obtain federal funds for their programs and must comply with the requirements of the Medicaid Act,  42 U.S.C. §§ 1396 *et seq*., and its implementing regulations.  Under the Medicaid Act, participating states can apply to the Secretary of Health and Human Services for a waiver of certain requirements so that they can use Medicaid funds to pay for home and community-based health services.  42 U.S.C. § 1396n(c).  New Mexico is a participating state that has developed two waiver programs at issue in this case – the Developmental Disabilities Home and Community-Based Services Waiver ("DD Waiver") and the Disabled and Elderly Home and Community-Based Services Waiver ("D&E Waiver") (together "waiver programs" or "waiver services").  Plaintiffs allege that pursuant to the Medicaid Act, they are entitled to less restrictive home and community-based services with "reasonable promptness," 42 U.S.C. § 1396a(a)(8), instead of the institutional care they now receive, but that they have been on waiting lists to receive these less restrictive waiver services for as many as seven years.

According to Plaintiffs' Amended Complaint, Defendants New Mexico Department of Health ("DOH") and New Mexico Department of Human Services ("HSD") are the departments responsible for implementing the waiver program for persons with disabilities and for

administering New Mexico's Medicaid program, respectively. Defendant J. Alex Valdez is named

in his official capacities as Secretary of DOH and Secretary-Designee of HSD. Lastly, Gary

Johnson, Governor of New Mexico, is sued in his official capacity. Plaintiffs aver that the

Governor must uphold the Constitution and other laws; is responsible for appointing and

supervising executive department heads, including Valdez; is responsible for proposing a budget

adequate to fund DOH and HSD; and has authority for applying for federal funds for the waiver

programs at issue.

Plaintiffs complain that Defendants have failed to provide people with disabilities with the

Medicaid waiver programs to which they are entitled, in violation of the Medicaid Act, 42 U.S.C.

§§ 1396 *et seq.* and implementing regulations; the Americans with Disabilities Act ("ADA"), 42

U.S.C. §§1201 *et. seq.* and implementing regulations; and procedural and substantive due process

under the Fifth and Fourteenth Amendments, in violation of 42 U.S.C. § 1983. Specifically,

Plaintiffs allege that Governor Johnson has directed Valdez and his predecessors not to plan for

increases in the DOH and HSD budgets which has prevented Valdez from submitting budgets

with sufficient funds for the waiver programs. Moreover, Plaintiffs complain that Governor

Johnson directed that some persons with developmental disabilities who were receiving necessary

services be moved to waiver programs. According to Plaintiffs, Governor Johnson used the

resulting savings for the state general fund, which meant that fewer people received waiver

services. Plaintiffs allege that Governor Johnson and Valdez have not requested needed funds

for the waiver services and Governor Johnson vetoed additional funds, despite their knowledge

that several hundred persons are waiting for such services. Plaintiffs seek a declaration that the

current operation of the waiver programs violates federal law and injunctive relief directing

Defendants to comply with the Medicaid Act by providing waiver services with reasonable

promptness, and with the ADA by providing settings in the most integrated services possible given each Plaintiff's needs.

Defendants have moved to dismiss the action, claiming sovereign immunity under the Eleventh Amendment, and arguing that Plaintiffs cannot state a claim upon which relief can be granted. Defendant Governor Johnson has moved to dismiss for failure to state claim against him.

## ANALYSIS

### I. Eleventh Amendment Sovereign Immunity[1]

The Eleventh Amendment provides:

The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State or Subjects of any Foreign State.

The Eleventh Amendment has been interpreted as imposing a jurisdictional bar against individuals bringing suit against a state or its agencies in federal court. *See Port Auth. Trans-Hudson Corp. v. Feeney*, 495 U.S. 299, 304 (1990). However, sovereign immunity under the Eleventh Amendment is not absolute. A state may consent to be sued in federal court and Congress may abrogate Eleventh Amendment protections. *Id.* In *Ex parte Young*, 209 U.S. 123, 158-59 (1908), the Supreme Court created another exception of sorts, holding that the Eleventh Amendment does not bar a suit for prospective injunctive relief against a state official who violates federal law. Because both state agencies and officers are named as Defendants in this case, the Court will consider each set of Defendants in turn as they implicate different issues – Eleventh Amendment abrogation and the *Ex parte Young* doctrine.

---

[1]The Court must decide the Eleventh Amendment issue before reaching the merits of Plaintiffs' claims under the 12(b)(6) motion because the immunity issue is a challenge to the Court's subject matter jurisdiction. *See Martin v. Kansas*, 190 F.3d 1120, 1126 (10th Cir. 1999)(citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998)).

## A.    Abrogation of State Sovereign Immunity Under the ADA

Plaintiffs concede that the Eleventh Amendment precludes section 1983 claims against state agencies, but point out that the only claims they have brought against the agencies are under the ADA.  These claims, Plaintiffs assert, can properly be maintained because Congress abrogated the states' Eleventh Amendment sovereign immunity when it enacted the ADA.  Defendants contend that DOH and HSD must be dismissed because the ADA creates new rights not guaranteed by the Constitution and is consequently an invalid exercise of Congressional power which  did not validly abrogated state sovereign immunity.  Moreover, Defendants argue that Congress did not clearly declare its intent to abrogate the immunity when it enacted the ADA.

In *Seminole Tribe of Florida v. Florida*, 517 U.S. 44 (1996), the Supreme Court developed a two-prong test for determining whether Congress has properly abrogated a state's sovereign immunity:  "first, whether Congress has 'unequivocally expressed its intent to abrogate the immunity;' and second, whether Congress has acted 'pursuant to a valid exercise of power.'" *Id.* at 55 (quoting *Green v. Mansour*, 474 U.S. 64, 68 (1985)).  Congress may abrogate state sovereign immunity under § 5 of the Fourteenth Amendment, *id.* at 57; *see also Fitzpatrick v. Bitzer*, 427 U.S. 445, 456 (1976), but may not do so pursuant to its powers under Article I.  *See Kimel v. Florida Bd. of Regents*, __ U.S. __, 120 S.Ct. 631, 643 (1999); *Seminole Tribe* at 66 (overruling *Pennsylvania v. Union Gas Co.*, 491 U.S. 1 (1989), and holding that Congress may not abrogate state sovereign immunity pursuant to the Interstate Commerce Clause).

Turning to the first part of *Seminole Tribe*, the Court finds that Congress unmistakably expressed its intent to abrogate state sovereign immunity under the ADA.  *Accord Clark v. State of California*, 123 F.3d 1267, 1269 (9th Cir. 1997).  The statute expressly provides, "[a] State shall not be immune under the eleventh amendment . . . from an action in Federal or State court of

competent jurisdiction for a violation of this chapter."  42 U.S.C. § 12202.

Applying the second portion of the *Seminole Tribe* test, the Court must assess whether Congress acted pursuant to a valid exercise of power when it enacted the ADA.  Most Circuits have held that Congress did properly abrogate state sovereignty as to the ADA.  *Compare Martin v. Kansas*, 190 F.3d 1120, 1125-29 (10th Cir. 1999) (holding that the enactment of the ADA is a valid exercise of Congress's Fourteenth Amendment powers); *Dare v. California*, 191 F.3d 1167, 1174-75 (9th Cir. 1999) (same) *petition for cert. filed* (Feb. 24, 2000) (No. 99-1417); *Muller v. Costello*, 187 F.3d 298, 308-11 (2d Cir. 1999) (same); *Amos v. Maryland Dept. of Pub. Safety and Correctional Servs.*, 178 F.3d 212, 216-23 (4th Cir. 1999) (same) *reh'g en banc granted*; *Coolbaugh v. Louisiana*, 136 F.3d 430, 432-38 (5th Cir.) (same), *cert. denied*, 525 U.S. 819 (1998); *Crawford v. Indiana Dept. of Corrections*, 115 F.3d 481, 487 (7th Cir. 1997) *with Alsbrook v. City of Maumelle*, 184 F.3d 999, 1005-09 (8th Cir. 1999) (en banc) (holding that Title II of the ADA is not a valid exercise of Congress's § 5 enforcement powers) *cert. granted*, __ U.S. __, 120 S.Ct. 1003 (2000), *and cert. dismissed*, __ U.S. __, 120 S.Ct. 1265 (2000); *Brown v. North Carolina Div. of Motor Vehicles*, 166 F.3d 698, 702-10 (4th Cir. 1999) (holding that regulation prohibiting public entities from charging fee for costs of accessibility program is not a constitutionally valid exercise of § 5 power) *petition for cert. filed*, 68 U.S.L.W. 3164 (Sept. 8, 1999 (No. 99-424).  Though the weight of authority, and the authority in the Tenth Circuit holds that the ADA did validly abrogate state sovereignty, because a recent Supreme Court case, *Kimel v. Florida Bd. of Regents*, __, U.S. __, 120 S.Ct. 631 (2000) has further developed this area of jurisprudence, the Court feels it necessary to apply this and other recent precedent in determining the sovereign immunity issue in this case.

In *City of Boerne v. Flores*, 521 U.S. 507 (1997), the Supreme Court clarified the scope

of Congress's power to enforce the Fourteenth Amendment pursuant to § 5.  While acknowledging that § 5 is a "positive grant of legislative power' to Congress," *id.* at 517 (quoting *Katzenbach v. Morgan*, 384 U.S. 641, 651 (1966)), the Court explained that Congress's power under § 5 is limited to enacting remedial or preventative measures, and does not permit Congress to substantively expand Fourteenth Amendment rights.  *Id.* at 519.  It is the province of the Court to determine the scope of constitutional rights.  The Court was careful to note that distinguishing between remedial and substantive legislation is a difficult line to draw and that Congress must be granted "wide latitude in determining where it lies." *Id.* at 519-20.  The Court crafted the "congruence and proportionality" test for assessing the bounds of Congress's legislative scope under § 5, explaining that for legislation to be valid, "there must be a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end." *Id.* at 520.  The Court has applied this test several times, further elucidating its meaning.

In *City of Boerne* itself, the Court held that the Religious Freedom Restoration Act of 1993 (RFRA), 42 U.S.C. §2000bb *et seq.*, exceeded Congress's power.  *Id.* at 511.  RFRA required that all laws which burden religion, even neutral laws of general applicability, be narrowly tailored and required by a compelling interest.  The Court struck down the law on several bases.  First, the Court noted that it was important to assess legislation and the wrongs they seek to remedy in their historical context.  *Id.* at 525.  For example, much legislation protecting voting rights has been upheld in part because it was designed in response to a shameful history of widespread and lasting voting discrimination and was crafted expressly to remedy and prevent that discrimination.  *Id.* at 525-26.  By contrast, the Court found that "RFRA's legislative record lacks examples of modern instances of generally applicable laws passed because of religious bigotry." *Id.* at 530.  The Court found that the focus in enacting RFRA was on generally

applicable laws which incidentally burden religion. *Id.* Second, the Court held that RFRA failed the "congruence and proportionality" test because it extended so broadly, "ensur[ing] instrusion at every level of government, displacing laws and prohibiting official actions of almost every description and regardless of subject matter." *Id.* Further, the Court found that RFRA was not remedial or preventative. Rather, it impermissibly expanded constitutional rights by imposing a high standard of review for any laws which incidentally burden religion, though most such laws were not enacted out of religious animosity. This very broad scope of laws impacted would unduly burden states. *Id.* at 534-35.

The Supreme Court further clarified the scope of Congress's enforcement powers under the Fourteenth Amendment in *Kimel* and *Florida Prepaid Postsecondary Educ. Expense Bd. v. College Savings Bank*, 527 U.S. 627, 119 S.Ct. 2199 (1999). In *Florida Prepaid*, the Court held that Congress did not have authority under the Fourteenth Amendment to abrogate state sovereign immunity from suits under the Patent and Plant Variety Protection Remedy Clarification Act (Patent Remedy Act). The Court found that the Patent Remedy Act failed the "congruence and proportionality" test in part because Congress failed to identify systematic patent infringement by the states when it enacted the statute. *Id.* at 2207-08. Infringement of a patent by a state alone is not unconstitutional. *Id.* at 2208. Rather, a state violates the Constitution only if it "provides no remedy, or only inadequate remedies, to injured patent owners for its infringement of their patent." *Id.* (citing *Parratt v. Taylor*, 451 U.S. 527, 539-31 (1981); *Hudson v. Palmer*, 468 U.S. 517, 532-33 (1984)). Congress did not make findings indicating that the Patent Remedy Act was aimed at such unconstitutional infringement. "The legislative record thus suggests that the Patent Remedy Act does not respond to a history of 'widespread and persisting deprivation of constitutional rights' of the sort Congress has faced in enacting proper prophylactic § 5

legislation." *Id.* at 2210 (quoting *City of Boerne*, 521 U.S. at 526). Further, the Court found that there was little likelihood that the acts of infringement covered by the Patent Remedy Act were unconstitutional. Rather, the statute's goal was to "provide a uniform remedy for patent infringement and to place States on the same footing as private parties under the regime." *Id.* at 2211.

Recently, in *Kimel*, __ U.S. __, 120 S.Ct. at 650, the Supreme Court held that Congress's intent to abrogate states' immunity in the Age Discrimination in Employment Act of 1967 (ADEA) was unmistakably clear, but that Congress could not validly abrogate states' immunity to suits under the ADEA pursuant to § 5 of the Fourteenth Amendment. Applying the "congruence and proportionality" test in *Kimel*, the Court held that the ADEA was not "appropriate legislation" under the enforcement clause of the Fourteenth Amendment. *Id.* at 645. The Court based this holding on findings about age discrimination, distinguishing it in several important ways from race and sex discrimination. First, it noted that classifications based on age "cannot be characterized as 'so seldom relevant to the achievement of any legitimate state interest that laws grounded in such considerations are deemed to reflect prejudice and antipathy.'" *Id.* (quoting *Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 440 (1985)). The Court went on to note that there is not the same history of age discrimination as race and sex discrimination. Further, the Court reasoned that older persons are not a discrete and insular minority because anyone who lives long enough will experience old age. The Court found that the ADEA's broad prohibition against age classifications goes far beyond the standard for age discrimination under the Equal Protection Clause, and that the ADEA could not be construed as responding to constitutional violations. *Id.* at 647. However, this was not determinative. As the Court stated, "that the ADEA prohibits very little conduct likely to be held unconstitutional, while significant, does not

alone provide the answer to our § 5 inquiry." *Id.* at 648.  Rather, the Court assessed whether the ADEA was remedial or substantive, looking to the legislative record to identify the "evil" the legislation aimed to abolish.  The Court found that Congress did not identify any systematic age discrimination by the states when it extended the ADEA to the states, nor did it identify instances of unconstitutional age discrimination.  *Id.* at 649.   On these bases, the Court held that the ADEA did not validly abrogate state sovereign immunity.

This Court now turns to apply this precedent to the ADA, remembering the Court's admonition that "[i]t is for Congress in the first instance to 'determin[e] whether and what legislation is needed to secure the guarantees of the Fourteenth Amendment,' and its conclusions are entitled to much deference." *City of Boerne*, 521 U.S. at 536 (quoting *Katzenbach v. Morgan*, 384 U.S. 641, 651 (1966)).   First, the Court must identify the "constitutional wrong or evil" at which the ADA was aimed.  *Florida Prepaid*, 119 S.Ct. at 2210.  Congress made clear in its extensive legislative findings and record that the ADA was designed to remedy the longstanding, purposeful discrimination against persons with disabilities.  Congress's findings include the following:

> (2) historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem;
>
> (3) discrimination against individuals with disabilities persists in such critical areas as  . . . institutionalization, health services, . . . and access to public services; . . . .
>
> (5) individuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion, the discriminatory effects of . . . barriers, overprotective rules and policies, failure to make modifications to existing facilities and practices, exclusionary qualification standards and criteria, segregation, and relegation to lesser services, programs activities, benefits, jobs or other opportunities;

(6) census data, national polls, and other studies have documented that people with disabilities, as a group, occupy an inferior status in our society, and are severely disadvantaged socially, vocationally, economically, and educationally;

(7) individuals with disabilities are a discrete and insular minority who have been faced with restrictions and limitations, subjected to a history of purposeful unequal treatment, and relegated to a position of political powerlessness in our society, based on characteristics that are beyond the control of such individuals and resulting from stereotypic assumptions . . .

42 U.S.C. § 12101(a).  Moreover, the legislative record includes references to much intentional discrimination against individuals with disabilities, by both public and private actors.  *See* H.R. Rep. 101-485(II), at 29-30 (1989), *reprinted in* 1990 U.S.C.C.A.N. 903, 311-12 (testimony of Judith Heumann recounting being repeatedly excluded: from public school because her wheelchair might be a fire hazard, from living in a college dormitory, from teaching, and from an auction house because she and her disabled friend were "disgusting to look at"); *id.* at 30 (referring to *Alexander v. Choate*, 469 U.S. 287 (1985), as a case example of disability discrimination in which a court ruled that a cerebral palsied child should be excluded from public school because his teacher felt his appearance "'produced a nauseating effect' on his classmates"); *id.* at 40 (testimony regarding town hall and public school's failure to be accessible to people with disabilities); *id.* at 41 (testimony about paralyzed people being excluded from school and jobs and being deemed unfit parents); *id.* at 85 (case of a deaf woman who died because of the police's failure to respond when her husband tried to call 911 using his telecommunication device for the deaf (TDD)); H.R.  Rep. 101-485(III), at 50 (1989), *reprinted in* 1990 U.S.C.C.A.N. 445, 473 (persons with epilepsy are frequently wrongly arrested and then denied their medication in jail). In short, this record tells a vivid story of people with disabilities being excluded from or mistreated in a range of public services because of prejudice, malice, and ignorance about the needs and abilities of people with disabilities.

Many of the wrongs the ADA seeks to remedy are constitutional violations.  In *Cleburne*, 473 U.S. at 446, the Supreme Court held that arbitrary discrimination against persons with disabilities violates the Equal Protection Clause.  As noted, the ADA's legislative record includes numerous examples of arbitrary, intentional disability discrimination including excluding children from public schools and wrongly arresting persons with epilepsy.  Accordingly, the Court finds that the ADA is aimed at remedying, at least in part, constitutional wrongs.  This is all that is required.  Importantly, legislation enacted under Congress's Fourteenth Amendment power is not restricted so narrowly that it need remedy only constitutional violations.  As the Supreme Court has noted, "[l]egislation which deters or remedies constitutional violations can fall within the sweep of Congress' enforcement power even if in the process it prohibits conduct which is not itself unconstitutional and intrudes into 'legislative spheres of autonomy previously reserved to the States."  *City of Boerne* at 518 (quoting *Fitzpatrick v. Bitzer*, 427 U.S. 445, 455 (1976)).

The legislative record of the ADA stands in stark contrast to RFRA, the Patent Remedy Act, and the ADEA.  None of the latter three had legislative records documenting systematic constitutional violations.  The ADA, however, was crafted to remedy specific, substantiated problems of disability discrimination – isolation and segregation, discrimination in employment and in the provision of public services, stereotypic assumptions, physical barriers, and overprotective rules.  *See* 42 U.S.C. § 12101(a).  Moreover, much of the Supreme Court's reasoning in *Kimel* regarding age discrimination does not apply to disability discrimination.  The *Kimel* Court found that older persons have not suffered from systematic, historic discrimination and that the group protected by the ADEA – persons over the age of forty years, is not a discrete and insular minority, in part because anyone who lives long enough will become part of the group.  By contrast, the ADA's legislative findings and record makes clear the history of purposeful,

pervasive discrimination against persons with disabilities.  Though persons with disabilities are a diverse group including those with physical, mental and developmental disabilities, those born with a disability and those disabled later in life, Congress aptly demonstrated that they are a group who have suffered from longstanding, widespread exclusion and mistreatment because of their disability.  *See Coulbaugh v. State of La.*, 136 F.3d 430, 435-37 ( 5th Cir.) (detailing the numerous studies upon which Congress relied in concluding that disability discrimination is a pervasive and severe problem needing a comprehensive solution), *cert. denied*, 525 U.S. 819 (1998).

Next, the Court must assess whether the remedy enacted is proportional to the wrong of pervasive disability discrimination.  At the outset, the Court notes that Congress is owed great deference in determining how best to remedy disability discrimination.  As the Supreme Court has stated, "[h]ow this large and diversified group is to be treated under the law is a difficult and often a technical matter, very much a task for legislators guided by qualified professions and not by the perhaps ill-informed opinions of the judiciary."  *Cleburne*, 473 U.S. at 442-42.  In enacting the ADA, Congress noted the widespread nature of disability discrimination, identifying specific problems such as segregation and lack of access to public services that it sought to address. Congress then crafted the statute to address the particular areas of discrimination it had identified – employment discrimination addressed in Title I, discrimination in public services and transportation covered by Title II, and discrimination in public accommodations and in services operated by private entities confronted by Title III.  At issue in this case is Title II which provides that, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  The ADA only

requires pubic entities to provide services to "qualified individual[s] with a disability" – persons who meet the essential eligibility requirements of the program with or without modifications. 42 U.S.C. § 12131(2). This protects persons with disabilities from being excluded because of stereotypes, animus, or overprotective rules, while not requiring public entities to alter their essential eligibility requirement under the ADA. This is proportional to the widespread discrimination against persons with disabilities at which the ADA is aimed, and stands in contrast to provisions which the Court has held violate the proportionality requirement. In *Kimel*, for example, the Court held that the ADEA was not appropriate legislation under the Fourteenth Amendment in part because, while the Constitution only required that age classifications must be rationally related to a legitimate state interest, under the ADEA, "the State's use of age is prima facie unlawful." *Kimel*, 120 S.Ct. at 647. Because Congress had not identified a history of invidious discrimination based on age, the Court held that this broad prohibition was disproportional to the wrong identified. *Id.* The ADA, by contrast, is based on findings of pervasive disability discrimination and has important limits on its scope – such as the "qualified individual with a disability" provision. Accordingly, the Court holds that Title II of the ADA is a valid exercise of Congress's § 5 powers.

The ADA claims in this case are brought pursuant to the "integration mandate," which provides, "[a] public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d). The "integration mandate" is limited by another regulation providing that a public entity need not modify its programs to prevent discrimination based on disability if such modification would "fundamentally alter" service or program. 28 C.F.R. § 35.130(b)(7). Having determined that the Title II of the ADA was a constitutional exercise of power, the Court will not

invalidate this regulation. Formal agency regulations are given deference and receive "controlling weight unless arbitrary, capricious or manifestly contrary to the statute." *Martinez v. Flowers*, 164 F.3d 1257 (10th Cir. 1998) (quoting *Chevron U.S.A., Inc., v. Natural Resources Defense Council, Inc*., 467 U.S. 837, 844 (1984)). Given that Congress identified segregation as one of the issues at which the ADA was aimed, the regulation requiring the provision of services in the most integrated setting possible unless this would require a fundamental change in the program, is certainly not arbitrary, capricious, or contrary to the statute.

For the foregoing reasons, the state agency defendants – DOH and HSD, do not have a state sovereign immunity defense from the ADA claims.

### B. State Official Defendants: *Ex Parte Young* Doctrine

In *Ex parte Young* the Supreme Court announced an exception of sorts to the Eleventh Amendment – a plaintiff may obtain prospective equitable relief against a state official in federal court. *See Ex parte Young*, 209 U.S. 123, 158-59 (1908); *see also Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 288 (1997) (O'Connor, J., concurring) ("The *Young* doctrine recognizes that if a state official violates federal law, he is stripped of his official or representative character and may be personally liable for his conduct; the State cannot cloak the officer in its sovereign immunity"). The *Ex parte Young* doctrine has several important limits. Federal courts do not have jurisdiction over suits seeking to require state official to comply with state law. The *Ex parte Young* rule applies only to alleged violations of federal law. *See Pennhurst State School and Hospital v. Halderman*, 465 U.S. 89, 106 (1984) ("[I]t is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law. . . . We conclude that *Young* and *Edelman* are inapplicable in a suit against state officials on the basis of state law"). Second, *Ex parte Young* applies only to ongoing

violations – not suits seeking retroactive or compensatory wrongs. *See Papasan v. Allain*, 478 U.S. 265, 277-78 (1986) ("*Young* has been focused on cases in which a violation of federal law by a state official is ongoing as opposed to cases in which federal law has been violated at one time or over a period of time in the past"). Further, though the doctrine will allow injunctive relief with a substantial ancillary effect on state funds, it does not permit an award for relief that is the practical equivalent of money damages, even if it is characterized as equitable. *See Edelman v. Jordan*, 415 U.S. 651, 668 (1974).

Although the Supreme Court does not "question the continuing validity of the *Ex parte Young* doctrine," *see Coeur d'Alene Tribe*, 521 U.S. at 269, the decisions in *Coeur d'Alene Tribe* and *Seminole Tribe* have narrowed the doctrine. *See ANR Pipeline Co. v. LaFaver*, 150 F.3d 1178, 1189 (10th Cir. 1998) (citing *V-1 Oil Co. v. Utah State Dep't of Public Safety*, 131 F.3d 1415, 1421 n.2 (10th Cir. 1997)) *cert. denied*, 525 U.S. 1122 (1999). The Tenth Circuit has interpreted *Coeur d'Alene Tribe* as requiring courts to assess the following factors in determining whether the *Ex parte Young* doctrine applies: 1) whether the action is against the state officials or the state itself; 2) whether the alleged conduct by the state officials constitutes a violation of federal law; 3) whether the relief sought is permissible prospective relief or analogous to a retroactive award of damages;[2] and 4) whether the suit implicates "special sovereignty interests" and is the 'functional equivalent' of a form of legal relief against the state that would otherwise be barred by the Eleventh Amendment. *Elephant Butte Irr. Dist. v. Dept. of Interior*, 160 F.3d 602, 609 (10th Cir. 1998) (citations omitted) *cert. denied*, 526 U.S. 1019 (1999).

The Court finds that Plaintiffs' § 1983 claims against the state officials are covered by the

---

[2]These first three inquiries were established by the Court in *Florida v. Treasure Salvors, Inc.*, 458 U.S. 670 (1982), to assess whether a suit against a state official can be maintained in federal court.

*Ex parte Young* doctrine, as explained below. However, Defendants correctly argue that Plaintiffs cannot maintain ADA claims against state officials and therefore the first prong of the *Ex parte Young* exception – whether the suit is properly against state officials, cannot be met. Title II of the ADA prohibits discrimination in programs of a "public entity" or discrimination "by any such entity." 42U.S.C. § 12132. The ADA defines "public entity" as any state or local government or department, agency, special purpose district or other instrumentality of a state or local government. 42U.S.C. § 12131. This definition does not include individuals and therefore most courts have held that Title II claims cannot be maintained against individual defendants. *Compare Alsbrook v. City of Maunelle*, 184 F.3d 999, 1005 n.8 (8th Cir. 1999) (en banc) (holding individuals not liabile under Title II) *cert. granted*, __ U.S. __, 120 S.Ct. 1003 (2000), *and cert. dismissed*, __ U.S. __, 120 S.Ct. 1265 (2000); *Yeskey v. Pennsylvania Dept. of Corrections*, 76 F.Supp.2d 572, 575 (M.D.Pa. 1999) (same); *Montez v. Romer*, 32 F.Supp.2d 1235, 1240 (D.Colo. 1999) (same); *Randolph v. Rodgers*, 980 F.Supp. 1051, 1060 (E.D. Mo. 1997) (same), *vacated, rev'd, and remanded on other grounds*, 170 F.3d 850 (8th Cir. 1999); *with Niece v. Fitzner*, 922 F.Supp. 1208, 1218-19 (E.D. Mich. 1996) (holding Title II claim can be maintained against individual defendants); *Doe v. Marshall*, 882 F.Supp. 1504, 1507 (same). Accordingly, Plaintiffs' ADA claims against Defendants Valdez and Governor Johnson will be dismissed.

The Court now returns to the applicability of *Ex Parte Young* to Plaintiffs' § 1983 claims against the individual defendants. First, the § 1983 actions are properly against state officials Valdez and Governor Johnson who exert important control over the waiver services at issue. Defendants point to the rule that a federal court cannot, under *Ex parte Young*, interfere with state officials' discretionary acts. *See Elephant Butte*, 160 F.3d at 611. However, as the Tenth Circuit has held, this rule does not bar federal courts from reviewing discretionary acts that violate

federal law, as defendants in this case are accused of having done. *Id.* (citing *Ex parte Young*, 209 U.S. at 158-59).

Second, the Court finds that Plaintiffs have met their burden for Eleventh Amendment purposes, of stating a non-frivolous substantial claim for relief from a violation of federal law. *See Elephant Butte*, 160 F.3d at 610 (citing *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 690 n.10 (1949); *Tindal v. Wesley*, 167 U.S. 204, 216 (1897)). Defendants argue that Plaintiffs have not met this burden because there is neither a constitutional right nor a statutory right to participate in waiver programs. The Court finds this argument lacking in merit. Plaintiffs do not assert that they have an absolute right to waiver programs, but that they have a right to have their applications for public benefits processed with reasonable promptness. Accordingly, Plaintiffs have stated a non-frivolous, substantial claim for relief.

Under the third inquiry, the Court asks whether the relief sought is permissible prospective relief or analogous to a retroactive award of damages. Plaintiffs seek prospective injunctive relief requiring the state officials to comply with what they believe is required by federal law – the reasonably prompt provision of waiver services. Defendants argue that this action is essentially one for monetary damages, impermissibly requiring the state to spend additional money for waiver services. However, injunctive relief that could have "a substantial ancillary effect on a state treasury," *ANR Pipeline*, 150 F.3d at 1189, is allowed under *Ex parte Young*. *Edelman*, 415 U.S. at 668. The key determination is whether the requested relief seeks to remedy a past wrong or to enjoin future wrongdoing. *Coeur d'Alene Tribe*, 42 F.3d at 1252 ("An injunction that will in practical effect require payment of funds out of the state treasury is nonetheless permissible if it requires only that officials conform their future actions to federal law") (citations omitted). In this case, Plaintiffs clearly seek to remedy future wrongs – enjoining state officials from impermissibly

delaying the provision of waiver services.

Last, the Court considers whether this case implicates a "special sovereignty interest" such that, pursuant to *Coeur d'Alene Tribe*, it cannot be maintained against state officials. The Tenth Circuit has applied this new special sovereignty interest test in several cases. In *ANR Pipeline*, the court held that the Eleventh Amendment barred the federal court from granting prospective injunctive relief regarding the manner in which a state tax was calculated. 150 F.3d at 1191. The court observed, "[w]e do not doubt . . . that a state's interests in the integrity of its property tax system lie at the core of the state's sovereignty. Indeed, while it is possible to imagine a state government continuing to maintain its sovereignty despite the lack of any ownership of land, it is impossible to imagine that a state government could continue to exist without the power to tax." *Id.* at 1193 (citation omitted).

In *Elephant Butte*, the court considered the application of Eleventh Amendment immunity in a case by an irrigation district and water improvement district against, *inter alia*, New Mexico state officials, claiming that the defendants impermissibly kept profits under a recreational land lease to which the districts were entitled under federal land reclamation laws. The Tenth Circuit held that the state's property interests in the lease profits did not implicate special sovereignty interest precluding the application of the *Ex parte Young* doctrine. *Elephant Butte*, 160 F.3d at 612-13. Distinguishing New Mexico's interests in the lease profits at issue in *Elephant Butte* from Idaho's interests in the submerged lands in *Coeur d'Alene Tribe*, and Kansas's interest in the property tax scheme in *ANR Pipeline*, the court found that "this case presents the possibility of a readjustment of priorities for the distribution of profits from certain uses of Project lands, not an impermissible affront to New Mexico's political authority." *Id.* at 613.

In a case similar to the instant case, *J.B. ex re. Hart v. Valdez*, 186 F.3d 1280 (10th Cir.

1999), the Tenth Circuit held that an action by children with mental and developmental disabilities against various state officials seeking improved protections and therapeutic services was not barred by the Eleventh Amendment. The court found that "[a] state's interest in administering a welfare program at least partially funded by the federal government is not such a core sovereign interest as to preclude the application of *Ex parte Young*." 186 F.3d at 1287 (citing cases). Similarly, the Court finds that though states certainly have a special interest in administering their own social services programs, when they accept federal funding for a program they cannot escape suit against state officials for failure to comply with federal law governing that program under *Ex parte Young*. The state of New Mexico's interests in administering the waiver services at issue in this case do not outweigh the "interest in vindicating the federal rights and answering the federal questions" in this case. *Elephant Butte*, 160 F.3d at 613.

For the foregoing reasons, the Court finds that Plaintiffs' § 1983 claims are proper under the *Ex parte Young* doctrine, and that the state official defendants are not entitled to Eleventh Amendment immunity from these claims. However, because individuals cannot be held liable under Title II of the ADA, Plaintiffs' ADA claims against Valdez and Johnson will be dismissed.

## II. Motion to Dismiss for Failure to State a Claim

### A. Standard of Review

A court may not dismiss a cause of action under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts supporting the complaint's claims that would entitle him or her to relief. *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 249-50 (1989). In considering a Rule 12(b)(6) motion, the court must assume as true all well-pleaded facts, and must draw all reasonable inferences in favor of the plaintiff. *Housing Auth. of the Kaw Tribe v. City of Ponca City*, 952 F.2d 1183, 1187 (10th Cir. 1991). The

issue in reviewing the sufficiency of a complaint is not whether the plaintiff will ultimately prevail, but whether the plaintiff is entitled to offer evidence to support his or her claim. *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974). These deferential rules, however, do not allow the court to assume that a plaintiff "can prove facts that [he or she] has not alleged or that the defendants have violated the . . . laws in ways that have not been alleged." *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 526 (1983). "[G]ranting a motion to dismiss is 'a harsh remedy which must be cautiously studied, not only to effectuate the spirit of the liberal rules of pleading but also to protect the interests of justice.'" *Cayman Exploration Corp. v. United Gas Pipe Line Co.*, 873 F.2d 1357, 1359 (10th Cir. 1989) (quoting *Morgan v. City of Rawlins*, 792 F.2d 975, 978 (10th Cir. 1986)).

**B. Section 1983 Claims**

Plaintiffs seek relief pursuant to § 1983 for Defendants' alleged failure to provide waiver services with "reasonable promptness" as required by the Medicaid Act, 42 U.S.C. § 1396a(a)(8), and for violations of Plaintiffs' due process rights. Defendants aver that these claims should be dismissed because Plaintiffs do not have the right to waiver services under either the Medicaid Act or the Due Process Clause.

**1) Medicaid Act**

Defendants argue that Plaintiffs cannot maintain their § 1983 action for violations of the Medicaid Act because the Act does not create a federal statutory right to waiver services. Defendants assert that the provision of waiver services is optional and that the "reasonable promptness" provision, 42 U.S.C. § 1396a(a)(8), does not apply to waiver services. Moreover, according to Defendants, there is a limit on the number of persons who can receive waiver services and, therefore,

there can be no right to such services.[3]  Plaintiffs counter that once Defendants decided to offer waiver services, they had to comply with the Medicaid Act, including the "reasonable promptness" requirement in the provision of those services.  Further, the Plaintiffs aver they do have a federal right to receive waiver services  with "reasonable promptness" which is enforceable under § 1983.

Section 1983 imposes liability for "'the deprivation of any rights, privileges, or immunities secured by the Constitution and laws' of the United States." *Wilder v. Virginia Hospital Ass'n*, 496 U.S. 498, 508 (1990).  The Supreme Court has held that this provision provides a remedy for some rights granted by federal statutes.  *Maine v. Thiboutout*, 448 U.S. 1, 4-8 (1980).  Section 1983 does not provide a remedy for the violation of any federal law, but only for deprivations of federal rights.  *See Wilder*, 496 U.S.  at 509 ("We must therefore determine whether the Boren Amendment creates a 'federal right' that is enforceable under § 1983"); *Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 106 (1989).  In *Blessing v. Freestone*, 520 U.S. 329 (1997), the Supreme Court articulated the test for determining whether a statute created a federal right as follows:

> First, Congress must have intended that the provision in question benefit the plaintiff.  Second, the plaintiff must demonstrate that the right assertedly protected by the statute is not so "vague and amorphous" that its enforcement would strain judicial competence.  Third, the statute must unambiguously impose a binding obligation on the States.  In other words, the provision giving rise to the asserted right must be couched in mandatory rather than precatory terms.

*Id.* at 340-41 (citations omitted). If these three requirements are met, there is a rebuttable presumption "that the right is enforceable under § 1983."  *Id.* at 341.  This presumption of an enforceable right is rebutted by a finding that Congress prohibited a § 1983 remedy under the statute,

_____

[3]Defendants also reason that because waiver services must cost less than institutional services, 42 U.S.C. § 1396n(c)(2)(D), the State can only provide such services to a limited number of persons.  This does not stand to reason.  If the State were able to provide home- and community-based services for less than institutional services to all recipients this provision would not stand as a barrier to the former services.

either expressly or implicitly.  *Id.*

At issue in this case is whether the Medicaid Act's "reasonable promptness" requirement applies to waiver services, and if so, whether it creates a federal right enforceable under §1983. The first inquiry is whether Congress intended that the relevant provisions benefit Plaintiffs. *Blessing*, 520 U.S. at 340.  Pursuant to 42 U.S.C. § 1396n(c), states are permitted to apply for a waiver to use their federal Medicaid money to pay for home or community-based services, i.e. waiver services.  The statute refers to these services as "medical assistance."  Another provision of the Medicaid Act provides that "[a] State plan for medical assistance must . . . provide that all individuals wishing to make application for medical assistance under the plan shall have the opportunity to do so, and that such assistance shall be furnished with reasonable promptness to all eligible individuals."  42 U.S.C. § 1396a(a)(8).  Given that the latter provision requires that all medical assistance be provided with "reasonable promptness" and the waiver provision refers to waiver services as "medical assistance" the Court concludes that Congress intended the "reasonable promptness" requirement to apply to waiver services. *Accord Doe v. Chiles*, 136 F.3d 709, 715 (11th Cir. 1998) and *Sobky v. Smoley*, 855 F.Supp. 1123, 1146 (E.D. Cal. 1994).  As reasoned by the court in *McMillan v. McCrimon*, 807 F.Supp. 475, 482 (C.D.Ill. 1992), this determination is supported by the fact that the waiver provision expressly allows the Secretary to waive certain Medicaid Act requirements, 42 U.S.C. § 1396n(3)(3), but does not include the "reasonable promptness" provision in this list of exemptions.

Defendants argue that the Medicaid Act contemplates that waiver services will be limited to a certain number of individuals, relying on the fact that the State applies for the services for a set number of persons and on several provisions in the Act.  The most persuasive of these provisions states that, "[t]he Secretary shall not limit to fewer than 200 the number of individuals in the State who may receive home and community-based services under a waiver under this subsection."  42

U.S.C. § 1396n(c)(10). However, that the Act envisions a floor for waiver services – requiring that a state waiver program not be limited to a number less than 200, and that the State applies for a waiver for a certain number of individuals does not prevent the State from applying for a waiver to serve enough persons such that it can provide waiver services to all eligible applicants with "reasonable promptness." Therefore, the Court rejects Defendants assertion that the existence of a numerical floor defeats Plaintiffs' claim that they should receive waiver services with reasonable promptness.

The second finding needed for an enforceable federal right is that "the right assertedly protected by the statute is not so 'vague and amorphous' that its enforcement would strain judicial competence." *Blessing*, 520 U.S. at 340-41. The Supreme Court has on several occasions assessed whether a particular reasonableness requirement in a federal-state program such as Medicaid creates a binding obligation for which § 1983 provides a remedy. In *Wilder*, 496 U.S. 498, the Court considered a claim by plaintiff health care providers that the state had failed to comply with the Boren Amendment to the Medicaid Act which required that health care providers be reimbursed pursuant to rates found by the state to be "reasonable and adequate" to compensate "efficiently and economically operated facilities." The Court held that health care providers were clearly the intended beneficiaries of the Boren Amendment. *Id.* at 510. Moreover, the Court found that the Amendment created a federal right enforceable under § 1983 because its terms were framed in "mandatory rather than precatory terms." *Id.* at 512. The Court held that the terms "reasonable and adequate" were not too vague or amorphous to be enforced by the courts. *Id.* at 519. In making this determination the Court noted that the statute and regulations provided guidance to states regarding what factors to consider when adopting reimbursement rates. *Id.* The Court stated that though states had discretion in deciding how to calculate these rates, courts could still enforce the requirement of

"reasonable" rates.

> While there may be a range of reasonable rates, there are certainly *some* rates outside that range that no State could ever find to be reasonable and adequate under the Act. Although some knowledge of the hospital industry might be required to evaluate a state's findings with respect to the reasonableness of its rates, such an inquiry is well within the competence of the Judiciary.

*Id.* at 519-20.

Two years later, in *Suter v. Artist M.*, 503 U.S. 347 (1992), the Court reviewed a §1983 claim for violations of the Federal Adoption Assistance and Child Welfare Act ("Adoption Act"). Like the Medicaid Act, the Adoption Act creates a federal-state program under which the federal government reimburses participating states for some of their foster care adoption costs if the states submit a plan which complies with the statutory requirements. The Plaintiffs in *Suter* claimed that the state had violated the statutory provision requiring that state plans provide for "reasonable efforts" to prevent children from being removed from their homes and to reunify families after removal. The Court held that the plaintiffs could not enforce this provision under § 1983 because the Adoption Act required only that the state have a plan which complied with the statutory requirements, rather than a substantive mandate that the states comply with their plans. *Id.* at 358. Moreover, the Court found that the statute did not define the term "reasonable efforts" as the statute and regulations in *Wilder* had. *Id.* at 359-60.[4]

The Court finds that the Medicaid Act's "reasonable promptness" requirement is judicially enforceable. Though, as noted above, the Supreme Court has found some reasonableness

----

[4]Congress repudiated *Suter* by amending the Social Security Act to provide that a private right of action to enforce some provision of the Act should not be deemed unenforceable because the Act requires the state to submit a state plan. 42 U.S.C. § 1329a-2. In addition, several circuit courts have held that *Suter* should not be seen as a departure from the § 1983 caselaw such as *Wilder.  See, e.g., Wood v. Tompkins*, 33 F.3d 600, 606 (6th Cir. 1994) (*Suter* is "entirely consistent with *Wilder*"); *Doe v. District of Columbia*, 93 F.3d 861, 867 (D.C. Cir. 1996) (discussing how *Suter* and *Wilder* can be reconciled).

requirements enforceable and some not, the Court finds that this reasonable promptness provision is more akin to the reasonable reimbursement rates found enforceable in *Wilder* than the reasonable efforts to ensure family unification found unenforceable in *Suter*. As in *Wilder*, the relevant Medicaid statutes and regulations in this case provide guidance regarding what constitutes "reasonable promptness." One regulation provides that "[t]he agency must establish time standards for determining eligibility which may not exceed—(1) Ninety days for applicants who apply for Medicaid on the basis of disability; and (2) Forty-five days for all other applicants." 42 C.F.R. § 435.911(a). Another provision requires state agencies to "furnish Medicaid promptly without any delay caused by the agency's administrative procedures." 42 C.F.R. § 435.930(a). Therefore, as in *Wilder*, but unlike in *Suter*, there are regulations in this case which give courts some guidance about what is meant by "reasonable promptness." Also persuasive is the Supreme Court's statement in *Wilder* that "[w]hile there may be a range of reasonable rates, there are certainly *some* rates outside that range that no State could ever find to be reasonable." *Wilder*, 496 U.S. at 519-20. Similarly, though it may be difficult to determine exactly what is meant by "reasonable promptness" in the provision of Medicaid services, the facts alleged in this case – remaining on the waiting list for two to seven years – are egregious enough that the reasonableness requirement does not strain judicial competence. *Accord Doe*, 136 F.3d at 717 ("[w]e agree with the appellees' assertion that in this context, it is axiomatic that delays of several years . . . are far outside the realm of reasonableness") (internal quotation marks omitted). Whether being on the waiting list for services for several years complies with the reasonable promptness requirement is a determination more readily made than that which the Supreme Court found unenforceable in *Suter* – whether a state had made "reasonable efforts" to keep families unified. As explained by another court, "[w]hat constitutes 'reasonable' promptness in medical assistance is inherently more circumscribed and judicially ascertainable than the concept

of 'reasonable efforts' in the placement of foster children." *Sobky*, 855 F.Supp. at 1147. Accordingly, the Court finds that Plaintiffs' right to receive medical assistance, including waiver services, with "reasonable promptness" is not so vague and amorphous that it cannot be enforced by the courts. *See Doe*, 136 F.3d at 718; *Sobky*, 855 F.Supp. at 1147; *see also Wellington v. District of Columbia*, 851 F.Supp. 1, 5-6 (D.D.C. 1994) (holding that statute requiring state Medicaid plans to furnish medical assistance "with reasonable promptness to all eligible individuals" creates enforceable private right).

The third inquiry is whether the "reasonable promptness" provision unambiguously imposes a binding obligation on the states. *Blessing*, 520 U.S. at 341. In making this determination, courts assess whether the provision is stated in mandatory or precatory terms. *Id.* The provision at issue in this case is stated in mandatory terms. It states that medical assistance "*shall* be furnished with reasonable promptness to all eligible individuals." 42 U.S.C. § 1396a(a)(8). Defendants argue that the State is not obliged to provide waiver services with reasonable promptness because it is an optional program. The Eleventh Circuit's analysis on this matter in *Doe* is persuasive. There, the court held that plaintiffs could assert a right under § 1983 to the reasonably prompt provision of intermediate care facilities for the developmentally disabled ("ICF/DD"). Though this was an optional program, the Court held that "when a state elects to provide an optional service, that service becomes part of the state Medicaid plan and is subject to the requirements of federal law." *Doe*, 136 F.3d at 714 (quoting *Tallahassee Memorial Regional Medical Center v. Cook*, 109 F.3d 693, 698 (11th Cir. 1997)); *see also Weaver v. Reagen*, 886 F.2d 194, 197 (8th Cir. 1989). Similarly, in this case, now that the State of New Mexico has opted to provide waiver services it must comply with the requirements of the Medicaid Act, including the reasonable promptness requirement.

Having assessed each of the three requirements for a federal right, the Court finds that

Plaintiffs can maintain their § 1983 claim for Defendants' failure to provide waiver services with reasonable promptness as required by the Medicaid Act.

### 2) Due Process

Plaintiffs complain that Defendants Valdez and Johnson have violated their due process rights by Defendants' "arbitrary and unreasonable polices, practices and funding decisions, their failure to request and allocate sufficient funding for Medicaid waiver service programs" and their failure to staff DSD and DOH adequately to administer the Medicaid waiver program which have resulted in Plaintiffs' inability to receive waiver services. Amended Complaint, at ¶¶ 37, 39-41. Defendants argue that there is no constitutional right to waiver services that supports Plaintiffs' § 1983 due process claim and therefore it should be dismissed under Federal Rule of Civil Procedure 12(b)(6). Defendants' motion asserts that Plaintiffs have no substantive right to waiver services because the Constitution does not confer affirmative rights to governmental services, except to persons who are involuntarily committed. Plaintiffs respond that they are not asserting substantive due process claims, but rather procedural due process claims. They aver now that Defendants have adopted Medicaid waiver services, applicants for waiver services are protected against arbitrary action regarding their access to those benefits. Defendants counter that procedural due process protections only apply to recognized property or liberty interests and Plaintiffs have no property interest in services for which they have applied. The Court will not grant Defendants' motion to dismiss Plaintiffs' § 1983 claims for due process violations on this basis.[5]

The Due Process Clause of the Fourteenth Amendment provides, "nor shall any State deprive

---

[5]Because Defendant does not argue that the Medicaid provisions at issue do not create an entitlement protected by the Due Process Clause, but rely merely on the argument that Plaintiffs have no constitutionally protected interest in the waiver services as applicants, the Court will not address the former issue.

any person of life, liberty, or property, without due process of law." In order to state a claim for a violation of due process, the claimant must have a protect property or liberty interest. *Board of Regents v. Roth*, 408 U.S. 564, 569 (1972). Defendants argue that Plaintiffs have no protected property interests because they are merely applicants for government services. Though neither party cited any case law regarding whether an applicant for public services has a property interest protected by the Due Process Clause, the weight of authority holds that applicants do have a constitutionally protected interest in government benefits for which they have applied. A majority of the Supreme Court has never squarely addressed this issue. *See Lyng v. Payne*, 476 U.S. 926, 942 (1986) (noting that the Court has "never held that applicants for benefits, as distinct from those already receiving them, have a legitimate claim of entitlement protected by the Due Process Clause"); *Walters v. National Ass'n of Radiation Survivor*s, 473 U.S. 305, 320 n.8 (1985). However, Justice O'Connor, dissenting from a denial of certiorari stated, "[o]ne would think that where state law creates an entitlement to general assistance based on certain substantive conditions, there similarly results a property interest that warrants at least some procedural safeguards." *Gregory v. Town of Pittsfield*, 470 U.S. 1018, 1021 (1985) (O'Connor, J., dissenting from denial of certiorari). Moreover, several lower courts ruling on the issue have held that applicants do have a property interest in government benefits for which they have applied. *See, e.g., Mallette v. Arlington County Employees' Retirement System II*, 91 F.3d 630, 639-40 (4th Cir. 1996) ("We join our sister court in rejecting the mechanical and simplistic applicant/recipient distinction"); *National Ass'n of Radiation Survivors v. Derwinski*, 994 F.2d 583, 588 (9th Cir. 1992); *Haitian Refugee Ctr., Inc. v. Nelson*, 872 F.2d 1555, 1562 (11th Cir. 1989); *Daniels v. Woodbury County*, 742 F.2d 1128, 1132 (8th Cir. 1984); *Holbrook v. Pitt*, 643 F.2d 1261, 1278 n.35 (7th Cir. 1981); *Kelly v. Railroad Retirement Bd.*, 625 F.2d 486, 490 (3d Cir. 1980); *Griffeth v. Detrich*, 603 F.2d 118, 120-22 (9th Cir. 1979). Accordingly, the Court will not

grant Defendants' motion to dismiss Plaintiffs' due process claims.

**C. ADA Claims**

Plaintiffs complain that Defendants' failure to provide them with waiver services violates a regulation of the ADA, the "integration mandate," which states, "[a] public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d). Defendants move to dismiss Plaintiffs' ADA claims for failure to state a claim, arguing that the failure to provide home and community-based services is not discrimination "because of" Plaintiffs' disability and is therefore not covered by the ADA. Defendants assert that "integration" in the ADA regulation refers to situations where persons with disabilities sought admission to programs available to non-disabled persons. According to Defendants, the ADA prohibits treating persons with disabilities differently from able-bodied persons, but does not require a particular kind of care as Plaintiffs claim. These same arguments were recently rejected by the Supreme Court in *L.C. v. Olmstead*, __ U.S. __, 119 S.Ct. 2176 (1999).[6] In *Olmstead*, two mentally retarded women who were institutionalized brought suit against various state officials for failing to place them in community-based programs which their treatment professionals determined would provide appropriate care. As in this case, the State in *Olmstead* argued that the plaintiffs had not suffered from disability discrimination because they were not denied community-based services "by reason of" their disabilities. *Id.* at 2186. Disagreeing, the Court held that unnecessary institutionalization and isolation of persons with disabilities is a form of discrimination based on disability under the ADA.[7] *Id.* at 2185. After reviewing the legislative history of the ADA,

---

[6]The Supreme Court decided *L.C. v. Olmstead* after the parties filed their briefs in this case.

[7]While holding that unjustified institutionalization of persons with disabilities can constitute disability discrimination if those persons are able to receive community-based services,

the Court noted that its holding was based on two premises.

> First, institutional placement of persons who can handle and benefit from community settings perpetuates unwarranted assumptions that persons so isolated are incapable or unworthy of participating in community life. . . . Second, confinement in an institution severely diminishes the everyday life activities of individuals, including family relations, social contacts, work options, economic independence, educational advancement, and cultural enrichment.

*Id.* at 2187 (citations omitted). This Court wholeheartedly agrees that unjustified isolation of persons with disabilities is a form of disability discrimination prohibited by the ADA.

Defendants also argue that Plaintiffs' proposed interpretation of the ADA as requiring that they be placed in the least-restrictive setting possible would impermissibly require the State to expend funds, thereby violating established principles of federalism. A plurality of the Justices in *Olmstead* explored the limits of the "integration mandate," in particular the reasonable modifications regulation which provides,

> [a] public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.

28 C.F.R. § 35.130(b)(7). The plurality found that the fundamental-alteration portion of this regulation requires that states be given some flexibility in complying with the integration mandate and that courts consider the costs involved in a particular remedy. "If for example, the State were to demonstrate that it had a comprehensive, effectively working plan for placing qualified persons with mental disabilities in less restrictive settings, and a waiting list that moved at a reasonable pace not controlled by the State's endeavors to keep its institutions fully populated, the reasonable-

---

the Supreme Court in *Olmstead* was careful to note that the ADA and its regulations do not permit placing persons in community placements if they are not able to handle this less structured environment, nor is there any requirement that persons who do not wish to receive community-based services be forced into such programs. *Olmstead*, __ U.S. __, 119 S.Ct. at 2187-88.

modifications standard would be met." *Olmstead*, __ U.S. __, 119 S.Ct. at 2189 (plurality opinion). Under this analysis, states are not required to provide community-based services to all those who request them regardless of the cost. Rather, the courts must conduct a cost analysis in determining the appropriate remedy for a state's failure to comply with the ADA's integration mandate. Given the Supreme Court's holding that unjustified isolation does constitute disability discrimination under the ADA and that the right to integrated placements is a limited one, the Court finds Defendants' argument that the integration mandate impermissibly requires state expenditures premature at best.

For the foregoing reasons, Defendants' motion to dismiss Plaintiffs' ADA claim for failure to state a claim will be denied.

## III. Motion to Dismiss Governor Johnson

Defendants move to dismiss this action against Governor Johnson for failure to state a claim on several bases: that Plaintiffs have not alleged specific claims regarding actions or omissions by Governor Johnson; that Plaintiffs' generalized allegations regarding Governor Johnson's role in supervising state agencies' operation of the waiver programs are insufficient to support a § 1983 claim against him; that individuals are not liable under Title II of the ADA; and that the claims against Governor Johnson are barred by the Eleventh Amendment. The Court has already ruled that the ADA claim against Governor Johnson must be dismissed, so it will only consider the arguments regarding Plaintiffs' § 1983 claims. Moreover, the Court addressed the Eleventh Amendment issues above, finding that the *Ex Parte Young* doctrine applicable to the § 1983 claims.

The crux of Governor Johnson's motion to dismiss the § 1983 claims against him is that allegations about his generalized role as chief executive are insufficient to maintain a § 1983 action. Plaintiffs assert that they have stated sufficient claims against Governor Johnson to maintain their

claims against him. Plaintiffs' amended complaint alleges that as chief executive officer of New Mexico, Governor Johnson has a general duty to uphold the laws and Constitution of the United States, for supervising Defendants Valdez, DOH and HSD, and for ensuring that they comply with federal law. ¶ 19. Plaintiffs also allege that the Governor is responsible for proposing budgets and has repeatedly refused to approve department budgets with meaningful increases. ¶ 23. According to the amended complaint, Governor Johnson directed Valdez and his predecessors not to plan for growth in the DOH and HSD budgets, thereby preventing the Secretaries from submitting budgets sufficient to provide waiver services with reasonable promptness. ¶ 21. Though Valdez requested a $5.5 million for the waiver program for fiscal year 2000, Governor Johnson only requested $2 million despite his knowledge that additional funds were needed to provide waiver services with reasonable promptness. ¶ 25. In 1998, Governor Johnson vetoed a budget line item of approximately $1 million for additional DD waiver services. ¶ 27. Moreover, Plaintiffs allege that Governor Johnson at all material times has known that several hundred persons with disabilities have been on the waiting list for waiver services. ¶ 26. Plaintiffs allege that Governor Johnson caused to be removed persons with developmental disabilities receiving medically necessary services in state programs, moving those persons to waiver programs. The resultant savings were used for the general fund and caused delays in the provision of waiver services. ¶ 22. Plaintiffs also allege that Valdez and Johnson have failed to fill positions of employment in DOH and HSD and to create and fund new positions needed to administer the waiver program in accordance with federal law. ¶ 51.

The Court finds that these allegations, which it must assume are true for this 12(b)(6) motion, *Housing Auth. of the Kaw Tribe*, 952 F.2d at 1187, are sufficient to maintain Plaintiffs' §1983 claims against Governor Johnson for failing to provide waiver services. Plaintiffs cannot maintain their claims against Governor Johnson if his powers over waiver services are limited to general budget and

policy recommendations. *See L.A. Branch NAACP v. L.A. Unified School Dist.*, 714 F.2d 946, 953 (9th Cir. 1983) ("the Governor's general duty to enforce California law . . . does not establish the requisite connection between him and the unconstitutional acts alleged"). However, Plaintiffs in this case have alleged that Governor Johnson has taken specific acts which have led to them being denied waiver services with reasonable promptness. Plaintiffs allege that Governor Johnson vetoed funds for the DD waiver program, directed Valdez not to submit department budgets for increased funds, and submitted a $2 million budget instead of the $5.5 million requested for the waiver programs. This goes beyond the general budget recommendations found insufficient in *L.A. Branch NAACP*.

Governor Johnson correctly asserts that respondeat superior may not serve as the basis for imposing § 1983 liability. *Monell v. Department v. Department of Social Services*, 489 U.S. 658 (1978). To establish § 1983 liability for a supervisory defendant, plaintiffs must show a link between the individual's conduct and the constitutional liability. *Snell v. Tunnell*, 920 F.2d 673, 700 (10th Cir. 1990). An individual acting in a non-supervisory role can only be held liable under § 1983 if there is a causal connection between the individual's conduct and the deprivation of a federal right. *See id; Wulf v. City of Wichita*, 883 F.2d 842, 864 (10th Cir. 1983) (citing cases). This requirement can be satisfied by a showing that "the defendant set in motion a series of events that the defendant knew or should have reasonably have known would cause others to deprive the plaintiff of her constitutional rights." *Conner v. Reinhard*, 847 F.2d 384, 397 (7th Cir. 1988). The Court finds that the requisite causal connection between specific acts performed by Governor Johnson and the deprivation of Plaintiffs' right to waiver services with reasonable promptness has been met in this case. Governor Johnson, knowing that several hundred persons were on the waiting list for waiver programs, nonetheless vetoed funds for these program and submitted a budget for less than half of the funds requested for waiver services. Accordingly, his motion to dismiss the § 1983 claims will

be denied.

## CONCLUSION

**IT IS THEREFORE ORDERED** that Defendant's Motion to Dismiss Based on
Sovereign Immunity, **[Doc. No. 25]** is **denied in part and granted in part;** Defendants' Motion
to Dismiss Pursuant to Rule 12(b)(6) [**Doc. No. 20**] is **denied**; and Defendants' Motion to
Dismiss Governor Gary Johnson [**Doc. No. 12**] is **granted in part and denied in part**.  Counts
III and IV for violations of the ADA are **dismissed with prejudice** as to Defendants Valdez and
Governor Johnson.

**DATED** this 20th day of April, 2000.

_____
MARTHA VÁZQUEZ
UNITED STATES DISTRICT JUDGE

<u>Attorneys for Plaintiffs</u>:
Duff Westbrook
Michael C. Parks
V. Colleen Miller

<u>Attorneys for Defendants</u>:
Charles A. Pharris
Kurt Wihl
Margaret Davidson
Gary J. Van Luchene