IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

BEN LEWIS, AARON NORRID, BILLY JO
QUISENBERRY and FRED ROMERO, by and
through their legal guardian and next friend,
THE ARC OF NEW MEXICO, BREANNE
LIDDELL, by and through her parent and legal
guardian JUDY LIDDELL, MATTHEW ALLEN,
by and through his parents and legal guardians,
JIM and ANGELA ALLEN, FAY MORGAN,
DEBORAH EMINGER and PROTECTION
AND ADVOCACY SYSTEM, INC.,

        Plaintiffs,

vs.                                No. CIV 99-0021 MV/JHG

NEW MEXICO DEPARTMENT OF HEALTH,
NEW MEXICO  DEPARTMENT OF HUMAN
SERVICES, J. ALEX VALDEZ, Secretary of the
Department of Health and Secretary Designee of
the Department of Human Services in his official
capacities, and GOVERNOR GARY JOHNSON
in his official capacity,

        Defendants.

<u>MEMORANDUM OPINION AND ORDER</u>

    **THIS MATTER** is before the Court on Defendants' Motion to Dismiss Plaintiff New Mexico

Protection and Advocacy System, Inc. for Lack of Standing, filed March 13, 2000 **[Doc. 66]**;

Defendants' Motion for Summary Judgment on Claims of Plaintiffs Ben Lewis, Aaron Norrid, Fred

Romero, Faye Morgan and Deborah Eminger, filed March 2, 2000 **[Doc.58]**;  Plaintiffs' Motion for

Leave of Court to File Second Amended Complaint, filed March 14, 2000 **[Doc. 70]**; and the Parties

Unopposed Motion to Substitute Second Amended Complaint, filed November 27, 2001 **[Doc. No.**

**105]**.   Having considered the motions, the memoranda in support and in opposition, and the relevant

law and being otherwise fully informed, the Court finds that (1) Defendants' Motion to Dismiss Plaintiff New Mexico Protection and Advocacy System, Inc. for Lack of Standing is not well taken and will be denied; (2) Defendants' Motion for Summary Judgment on Claims of Plaintiffs Ben Lewis, Aaron Norrid, Fred Romero, Faye Morgan and Deborah Eminge is well taken and will be granted; (3) Plaintiffs' Motion for Leave of Court to File Second Amended Complaint is well taken and will be granted; and (4) the Parties Unopposed Motion to Substitute Second Amended Complaint is well taken and will be granted.

## I.  Factual Background

Plaintiffs filed this declaratory action against New Mexico Department of Health and the New Mexico Department of Human Services, alleging violations under both the Medicaid Act, 42 U.S.C. §§ 1396 *et seq.,* and the American with Disabilities Act (ADA), 42 U.S.C. §§ 1201 *et seq.*, as well as due process violations actionable under 42 U.S.C. § 1983.   Under the Medicaid Act, participating states can apply to the Secretary of Health and Human Services for a waiver of certain requirements so they can use Medicaid funds to pay for home and community-based health services.  42 U.S.C. § 1396n(c).  New Mexico is a participating state that has developed two waiver programs at issue in this case– the Developmental Disabilities Home and Community-Based Services Waiver (DD Waiver) and the Disabled and Elderly Home and Community-Based Services Waiver (D & E Waiver). Initially, the Plaintiffs in this case were individuals who were eligible to participate in Medicaid programs because of their physical or developmental disabilities or because of their advanced age and Protection and Advocacy(P&A), an advocacy group.  Plaintiffs alleged they were entitled to less restrictive home and community-based services with "reasonable promptness" instead of the institutional care they were receiving. Instead, they had been on waiting lists to receive these waiver services for as many as seven years.  Since the filing of the action, Plaintiffs have voluntarily dismissed

their ADA claim and some of the individually named Plaintiffs in the case have received the waiver services and others have passed away, leaving only the advocacy group as a party in the case. Consequently, Defendants filed their Motion to Dismiss Plaintiff P&A for Lack of Standing, and their Motion for Summary Judgment on Claims of Plaintiffs Ben Lewis, Aaron Norrid, Fred Romero, Faye Morgan and Deborah Eminge.  Plaintiffs have filed a Motion for Leave to File a Second Amended Complaint, intending to add several additional Plaintiffs and adding a claim under the Rehabilitation Act of 1973, 29 U.S.C. § 794.

## II.  Standard of Review

### A.  Motion to Dismiss

In ruling on a motion to dismiss, the court must accept the factual allegations of the complaint as true. *Jenkins v. McKeithen*, 395 U.S. 411, 421 (1969); *Liebson v. New Mexico Corrections Dep't*, 73 F.3d 274, 275 (10th Cir. 1996).  The court may dismiss only if it is clear that plaintiff cannot prove any facts entitling it to relief, or that the court could not grant relief under any set of facts plaintiff could prove consistent with its allegations.  *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984); *Buckley Constr., Inc. v. Shawnee Civic & Cultural Dev. Auth.*, 933 F.2d 853, 855 (10th Cir. 1991). The court construes the facts, and the reasonable inferences that might be drawn from them, in favor of the plaintiff.  *Beard v. City Northglenn, Colo.*, 24 F.3d 110, 115 (10th Cir. 1994).

### B.  Motion for Summary Judgment

This Court will grant summary judgment when there is no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(c).  The movant carries the burden of establishing there are no genuine issues of material fact, *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970), but may discharge its burden by showing there is an absence of evidence to support the non-movant's case, *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

Once the movant meets its burden, the burden shifts to the non-movant to demonstrate a genuine issue for trial on a material matter. *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991).  In making its summary judgment determination, the court looks at the pleadings and documentary evidence in the light most favorable to the non-movant, *Deepwater Invs., v. Jackson Hole Ski Corp.* 938 F.2d 1105, 1110 (10th Cir. 1991), and the movant must show beyond a reasonable doubt it is entitled to summary judgment, *Hicks v. City of Watonga, Okla.*, 942 F.2d 737, 743 (10th Cir. 1991).  However, once the burden shifts to the non-movant, that party may not rest on its pleadings but must set forth specific facts showing there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof.  *Celotex Corp.*, 477 U.S. at 324. However, "the mere existence of some factual dispute between the parties will not defeat an otherwise properly supported motion." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48(1986).  "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*  If the non-movant cannot make such a showing, after adequate time for discovery, summary judgment is mandated. *Id.* at 322.  The Court will consider Defendants' motion for summary judgment in light of these standards.

### III.  Discussion

### A.  Motion to Dismiss Plaintiff P&A  for Lack of Standing

Defendants contend Plaintiff P&A lacks standing to bring this action seeking declaratory and prospective injunctive relief.  As grounds for their motion, Defendants argue (1) P&A lacks standing to sue in its own name because it has not alleged it has suffered any injury in fact resulting from the Defendants' actions or omissions because P&A is not an individual that can receive DD or D & E services; (2) P&A does not have members on whose behalf it could be asserting a claim; and (3) P&A is not authorized by statute to maintain a lawsuit on behalf of groups of unspecified individuals.

P&A counters it has standing under the principles of representational standing, which it asserts apply to this case, and also pursuant to its statutory authority to sue on behalf of persons with disabilities.  P&A relies on *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333 (1977), *United Food and Commercial Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544 (1996), and *Haven Realty Corp. v. Coleman*, 455 U.S. 363 (1982) for the proposition that, even in the absence of injury to itself, an association may have standing solely as the representative of its members.  Additionally, P&A contends it is a "protection and advocacy system" authorized by "federal statutes" to sue on behalf of persons with disabilities.  Specifically, P&A claims it is the agency designated by the state of New Mexico to carry out the duties specified in the Developmental Disabilities Assistance and Bill of Rights Act (the DD Act), 42 U.S.C. §§ 15001 *et seq.* (2000), the Protection and Advocacy of Individual Rights (the PAIR Act), 29 U.S.C. § 794e (1994) and the Protection and Advocacy for Mentally Ill Individuals Act (the PAMII Act), 42 U.S.C. §§ 10801 *et seq.* (1997).  Plaintiff contends one of the duties listed in these Acts is to purse legal remedies on behalf of persons with disabilities.

### 1.  Standing Requirements–Generally

"The requirement of standing 'involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise.'"  *State of Utah v. Babbitt*, 137 F.3d 1193, 1201 (10th Cir. 1998)(quoting *Bennett v. Spear*, 520 U.S. 154, 162 (1997)).  Federal courts are courts of limited jurisdiction and are empowered to hear only such cases as are within the judicial power as defined in the Constitution and entrusted to them by Congress.  *See* Const. Art. III, § 2.  Article III of the Constitution restricts federal court adjudication to actual cases or controversies.  *Raines v. Byrd*, 521 U.S. 811, 818 (1997).  "One element of the case or controversy requirement is that [the

plaintiff], based on [its] complaint, must establish that [it] has standing to sue." *Id.*   To satisfy the

standing requirements of Article III, Plaintiff must demonstrate the following:

> First, the plaintiff must have suffered an "injury in fact" – an invasion of a legally
> protected interest which is (a) concrete and particularized, and (b) "actual or
> imminent, not 'conjectural' or 'hypothetical.'   Second, there must be a causal
> connection between the injury and the conduct complained of – the injury has to be
> "fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e]
> result [of] the independent action of some third party not before the court."   Third,
> it must be "likely," as opposed to merely "speculative," that the injury will be
> "redressed by a favorable decision.

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)(internal citations omitted).  "The party

invoking federal jurisdiction bears the burden of establishing these elements."  *Id.* at 561.  Plaintiff

bears the burden "clearly to allege facts demonstrating that [it] is a proper party to invoke judicial

resolution of the dispute . . . ."  *Warth v. Seldin*, 422 U.S. 490, 518 (1975).

"In addition to the immutable requirements of Article III, 'the federal judiciary has also

adhered to a set of prudential principles that bear on the question of standing.'"  *Bennett,* 520 U.S.

at 160 (quoting *Valley Forge,* 454 U.S. 464, 474-75 (1982)).  "These prudential principles include

'the general prohibition on a litigant's raising another person's legal rights [and] the rule barring

adjudication of generalized grievances more appropriately addressed in the representative branches.'"

*State of Utah v. Babbitt*, 137 F.3d at 1203 (quoting *Allen v. Wright*, 468 U.S. 737,

 751 (1984)).  However, unlike their constitutional counterparts, prudential requirements can be

modified or abrogated by Congress.  *Bennett*, 520 U.S. at 162.

## 2.  Associational Standing

"There is no question that an association may have standing in its own right to seek judicial

relief from injury to itself and to vindicate whatever rights and immunities the association itself may

enjoy."  *Warth*, 422 U.S. at 511.  In its endeavor to secure relief from injury to itself, "an association

may assert the rights of its members, at least so long as the challenged infractions adversely affect its

members' associational ties." *Id.* In *Warth*, the Court explained:

> Even in the absence of injury to itself, an association may have standing solely as the
> representative of its members . . . . The association must allege that its members, or
> any one of them, are suffering immediate or threatened injury as a result of the
> challenged action of the sort that would make out a justiciable case had the members
> themselves brought suit. So long as this can be established, and so long as the nature
> of the claim and of the relief sought does not make the individual participation of each
> injured party indispensable to proper resolution of the cause, the association may be
> an appropriate representative of its members, entitled to invoke the court's
> jurisdiction.

422 U.S. at 511 (internal citations omitted). The Supreme Court then set out a three-prong

associational standing test in *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333

(1977). The plaintiff organization must demonstrate that: (a) its members would otherwise have

standing to sue in their own right; (b) the interests it seeks to protect are germane to the

organization's purpose; and (c) neither the claim asserted nor the relief requested requires the

participation of individual members in the lawsuit. *Id.* at 343.

Subsequently, in *United Food and Commercial Workers Union Local 751 v. Brown Group,

Inc.*, 517 U.S. 544 (1996), the Supreme Court explained that the Article III limitations on standing

required the satisfaction of only the first two prongs of the *Hunt* test. *Id.* at 554-555. "[O]nce an

association has satisfied *Hunt's* first and second prongs assuring adversarial vigor in pursuing a claim

for which members Article III standing exists, it is difficult to see a constitutional necessity for

anything more." *Id.* at 556. Thus, an association may have standing to sue on behalf of its members

as long as the members would have standing to sue in their own behalf and the litigation is germane

to the group's purpose. *Id.*

Congress also has granted agencies like P&A the authority to sue on behalf of persons with

disabilities. Under the DD Act, P&A is authorized to "pursue legal, administrative, and other

appropriate remedies or approaches to ensure the protection of, and advocacy for, the rights of such individuals with the State who are or who may be eligible for treatment, services, or habilitation . . . ."  42 U.S.C. §15043(a)(2)(A)(i).   Under the PAMII Act, P&A is authorized to "pursue administrative, legal, and other appropriate remedies to ensure the protection of individuals with mental illness who are receiving care or treatment in the State."  42 U.S.C. § 10805((a)(1)(B).  The PAIR Act has the same general authorities as set forth in the DD Act.  29 U.S.C. § 794e(f).  Notably, as Plaintiff points out, in the legislative history of the 1994 reauthorization of the federal DD Act, the Senate Committee on Labor and Human Resources made clear that P&A systems had standing to pursue legal remedies on behalf of individuals with developmental disabilities.  The Committee stated:

> The Committee heard testimony about the waste of scarce resources that are expended in litigating the issue of whether P&A systems have standing to bring suit. The Committee wishes to make it clear that we have reviewed this issue and have decided that no statutory fix is necessary because the current statute is clear that P&A systems have standing to pursue legal remedies to ensure the protection and advocacy for the right of individuals with developmental disabilities in the state.  The Committee has reviewed and concurs with the holdings and rationale in *Goldstein v. Coughlin*, 83 F.R.D. 613 (1979) and *Rubenstein v. Benedictine Hospital*, 790 F.Supp. 396 (N.D.N.Y. 1992).

S.Rep. 103-120, at 39- 40 (1993), *reprinted in* 1994 U.S.C.C.A.N. 164, 202-203.[1]  In *Goldstein*, defendants argued the Protection and Advocacy System for Developmental Disabilities, Inc. (PASDD) lacked standing to bring the lawsuit on behalf of a mentally disabled individual because it alleged "no violation of its own rights or interests."  *Goldstein v. Coughlin,* 83 F.R.D 613, 614 (W.D.N.Y.1979).  Relying on the DD Act, the Court held PASDD was the designated advocacy system for the state with the responsibility to provide mentally disabled individuals with legal

---

[1] Plaintiffs contend the legislative history of the 1994 reauthorization of the DD Act also applies to the PAMII Act and the PAIR Act because the relevant language of the statutes is virtually identical and cases commonly rely on decisions under one act to support rulings on the others.  Significantly, the statement by the Senate Committee on Labor and Human Resources is instructive in that it cites to a DD Act case (*Goldstein*) and a PAMII Act case (*Rubenstein*).

representation and therefore PASDD "need show no injury to itself in order to have standing . . . ."
*Id.*

In *Rubenstein*, plaintiffs sued a private hospital and a physician, alleging several violations of their civil rights when they were involuntarily committed.  Defendants moved to dismiss Plaintiff Disability Advocates, Inc. (DAI) for lack of standing, alleging it did not and could not assert it had personally suffered an "injury in fact."  *Rubenstein,* 790 F.Supp at 408.  DAI asserted it had standing as a protection and advocacy agency pursuant to the PAMII Act.  Relying on the PAMII Act and *Goldstein*, the Court held DAI had standing to pursue legal remedies on behalf of the plaintiffs without showing injury to itself.  *Id.* at 409.   These cases, upon which the Committee relied, make clear that P & A, the agency designated by the State of New Mexico to carry out the duties specified in the DD Act, PAIR Act, and the PAMII Act, is authorized to purse legal remedies on behalf of its constituents and has standing to do so without showing injury to itself.

Nonetheless, Defendants argue P&A cannot demonstrate associational standing because it is not a "traditional membership" organization.  In support of this argument, Defendants rely on *Association for Retarded Citizens of Dallas v. Dallas County Mental Health and Mental Retardation Center Board of Trustees*, 19 F.3d 241 (5th Cir. 1994).  In *Association for Retarded Citizens of Dallas*, the Court of Appeals for the Fifth Circuit found Advocacy Inc., the advocacy organization, did not have standing in its own right to litigate the alleged claims against defendants because it failed to establish the first prong of the required inquiry because the named plaintiff, a minor with mental retardation, was not a "member" of Advocacy Inc.  *Id.* at 244.  The Fifth Circuit further found Advocacy Inc. did not have associational standing because it bore no relationship to traditional membership groups, noting that most of its clients– handicapped and disabled persons– were unable to participate in and guide the organizations' efforts.  *Id.*

By contrast, the Eleventh Circuit, in *Doe v. Stincer*, 175 F.3d 879, 885 (11th Cir. 1999), held that the fact that an advocacy organization has constituents rather than members did not deprive it of Article III standing. Relying on *Hunt,* the Eleventh Circuit rejected the Fifth Circuit's reasoning in *Association for Retarded Citizens of Dallas.* In *Hunt,* the Supreme Court held that the Washington State Apple Advertising Commission had standing to challenge a North Carolina statute prohibiting the display of Washington State apple grades even though the Commission was not a "membership organization." The Court found the Apple Advertising Commission was established by the Washington Legislature to protect and advance the interests of the State's apple growers and dealers. The Court explained the Apple Advertising Commission "perform[ed] the function of a traditional trade association representing the Washington apple industry . . . . It serv[ed] a specialized segment of the State's economic community which [was] the primary beneficiary of its activities, including the prosecution of this kind of litigation." *Hunt*, 432 U.S. at 344. The Court found the apple growers and dealers, while not members of the Apple Advertising Commission, "possess[ed] all of the indicia of membership in an organization." *Id.* The Court came to this conclusion inasmuch as the apple growers and dealers "alone elect[ed] the members of the commission; they alone serve[d] on the Commission; they alone finance[d] its activities, including the costs of this lawsuit, through the assessments levied upon them." *Id.* at 344-45. Finally, the Court stated that "the interests of the Commission itself may be adversely affected by the outcome of this litigation" since a reduction in apple sales would result in reduced assessments due to the Commission. *Id.* at 345.

In *Doe*, Chris Doe sued the Attorney General of Florida, Mercy Hospital and two psychiatrists who had treated her at Mercy Hospital, claiming the hospital and the psychiatrists violated the ADA when they failed to provide her with her medical records. In her Amended Complaint, Doe added as plaintiff the Advocacy Center, a federally-authorized protection and advocacy organization

established under the PAMII and PAIR.  The Eleventh Circuit  found the Advocacy Center to be analogous to the Apple Advertising Commission in *Hunt*.  The Eleventh Circuit found Congress had designated the Advocacy Center, "like other protection and advocacy systems, to 'serve[ ] a specialized segment of the . . . community which is the primary beneficiary of its activities, including prosecution of this kind of litigation.'"  *Doe*, 175 F.3d at 886 (quoting *Hunt*, 432 U.S. at 344).  The Eleventh Circuit reasoned that under PAMII, Congress authorized protection and advocacy organizations to act as agencies to protect and enforce the rights of individuals with mental illness, "'perform[ing] the functions of a traditional  . . . association representing [individuals with mental illness].'"  *Id.* (quoting *Hunt*, 432 U.S. at 344).

Relying on the PAMII Act and its implementing regulations, the Eleventh Circuit found "individuals with mental illness possessed 'the indicia of membership in an organization.'"  *Id.* Specifically, the Eleventh Circuit relied on §10805(c)(1)(B)[2]  which requires "that multi-member

---

[2]  Section 10805(c)(1)(B) states:

In States in which the governing authority is organized as a private non-profit entity with a multi-member governing board, or a public system with a multi-member governing board, such governing board shall be selected according to the policies and procedures of the system.  The governing board shall be composed of

(i)        members [ ] who broadly represent or are knowledgeable about the needs of the clients served by the system; and

(ii)       in the case of a governing authority organized as a private non-profit entity, members who broadly represent or are knowledgeable about the needs of the clients served by the system including the chairperson of the advisory council of such system.

As used in this subparagraph, the term "members who broadly represent or are knowledgeable about the needs of the clients served by the system" shall be construed to include individuals who have received or are receiving mental health services and family members of such individuals.

42 U.S.C. § 10805(c)(1)(B)

governing boards of protection and advocacy organizations . . . be composed of "members who broadly represent or are knowledgeable about the needs of clients served by the system" and must "include individuals who have received or are receiving mental health services and family members of such individuals." 42 U.S.C. § 10805(c)(1)(B). In addition, the Eleventh Circuit noted that "protection and advocacy organizations must have advisory councils, sixty percent of whose membership as well as the chair of the council must be 'comprised of individuals who have received or are receiving mental health services or who are family members of such individuals.'" *Doe*, 175 F.3d at 886 (quoting 42 U.S.C. § 10805(a)(6)(B), (C); 42 C.F.R. § 51.23(b)(1), (2)).

Finally, the Eleventh Circuit considered that the PAMII Act required the protection and advocacy organization to provide the public with an opportunity to comment on the priorities and activities of the protection and advocacy system and establish a grievance procedure for clients and prospective clients "to assure that individuals with mental illness have full access to the services of the system . . . and assure that the eligible system is operating in compliance with [PAMII]." *Id.* (quoting § 10805(a)(8), (9); 42 C.F.R. §§ 51.24, 51.25). The Eleventh Circuit found the constituents of the Advocacy Center, much like members of a traditional association, possessed the means to influence the priorities and activities of the Advocacy Center and "represented the State's '[individuals with mental illness] and provide[d] the means by which they expresse[d] their collective views and protect[ed] their collective interests.'" *Doe*, 175 F.3d at 886 (quoting *Hunt*, 432 U.S. at 345). Therefore, the Eleventh Circuit concluded that "the Advocacy Center may sue on behalf of its constituents like a more traditional association may sue on behalf of its members." *Id.*

The Court finds the reasoning in *Doe* persuasive. Given the Supreme Court's reasoning in *Hunt* and the "indicia of membership" evidenced by the statutory scheme in the PAMII Act, the PAIR

Act, 29 U.S.C. § 794e(f)(5), and the DD Act, 42 U.S.C. § 15001(b), providing for the participation

of the beneficiaries of P&A's activities, the Court finds that P&A's status as a nonmembership

organization does not deprive it of standing to sue on behalf of its constituents.          Defendants

also contend P&A "is not authorized by statute to maintain a lawsuit on behalf of groups of

unspecified individuals, and therefore cannot satisfy prudential limitations on standing." Defs.' Mem.

in Supp. of Mot. to Dismiss at 2. The Eleventh Circuit in *Doe* also rejected this argument and stated;

> Nothing in the PAMII can reasonably be read to require the Advocacy Center to name
> a specific individual in bringing suit to redress violations of the rights of individuals
> with mental illness. The text of PAMII grants standing to protection and advocacy
> systems to pursue legal remedies to 'ensure protection of individuals with mental
> illness.' Considering the statute as a whole, we cannot read this language to require
> a protection and advocacy system to name a specific individual in order to have
> standing to sue. The very purpose of PAMII was to confer standing on protection
> and advocacy systems, such as the Advocacy Center, as representative bodies charged
> with the authority to protect and litigate the rights of individuals with mental illness.

> \*   \*   \*   \*   \*   \*

> Moreover, under Article III's established doctrines of representational standing, we
> have never held that a party suing as a representative must specifically name the
> individual on whose behalf the suit is brought and we decline to create such a
> requirement in PAMII.

175 F.3d at 884 (internal citations omitted). The Court agrees with the Eleventh Circuit's conclusion.

"It is enough for the representative entity to allege that one of its members or constituents has

suffered an injury that would allow it to bring suit in its own right." *Id.* at 885.

Additionally, in cases such as this one, it may be impractical to identify an individual plaintiff–

precisely because of the potential violations to legal rights that must be addressed. The population

served by the PAIR Act, the DD Act and the PAMII Act has special needs, often severe physical and

mental limitations. *See* 42 U.S.C. §§ 10801, 15001. In many instances, the intended beneficiaries

of these statutes cannot recognize violations of their own rights. *See* 42 U.S.C. § 10801(a)(3)(4);

42 U.S.C. § 15001(a)(4)-(6).  The mentally ill and mentally impaired are vulnerable to abuse and neglect specifically because they are incompetent to make decisions or to challenge discrimination in their treatment.  *See* 42 U.S.C. § 10801(a)(1),(3); 42 U.S.C. § 15001(a)(5).  Individuals with developmental disabilities attributable to physical impairments also are vulnerable to abuse, neglect, exploitation, and violation of their legal and human rights. *See* 42 U.S.C. § 15001(a)(5).  Moreover, "[s]tate systems for monitoring compliance with respect to the rights of individuals with mental illness vary widely and are frequently inadequate."  42 U.S.C. § 10801(a)(4).  And, "a substantial portion of individuals with developmental disabilities . . . do not have access to appropriate support and services . . . and remain unserved and underserved."  42 U.S.C. § 15001(a)(6).  The Congressional findings and statements of purpose of the PAMII and DD Acts reflect that, in addressing these problems, Congress was cognizant of the fact that without independent standing of P&A systems, many mentally ill and disabled individuals' legal rights may be infringed.  In view of these factors, the Court finds that P&A has standing to bring this lawsuit pursuant to the DD Act, the PAIR Act and the PAMII Act without suing on behalf of a specific individual.

## Conclusion

In light of the statement by the Senate Committee on Labor and Human Resources, addressing the issue of standing by protection and advocacy systems, the cases cited by the Committee in support of standing, and the principles of representational standing, the Court finds that P&A has demonstrated associational standing to challenge New Mexico's Medicaid waiver programs' application process.  P&A alleges that "the slow and arbitrary manner in which Defendants process applications" for the DD and/or D & E services violates applicants' rights under the federal Medicaid Act and their rights under the Fifth and Fourteenth Amendments as protected by 42 U.S.C. § 1983.  Therefore, P&A can demonstrate its members have standing to sue in their own right in order to

address these violations and the interests P&A seeks to protect, i.e., that its members receive DD

and/or D&E services in a reasonably prompt manner, are germane to its purpose.  Accordingly,

Defendants' Motion to Dismiss Plaintiff New Mexico Protection and Advocacy System, Inc. for Lack

of Standing is denied.

### B.  Defendants' Motion for Summary Judgment

Defendants contend they are entitled to summary judgment on the claims of Ben Lewis, Aaron

Norrid, Fred Romero, Faye Morgan and Deborah Eminger.  As grounds for their motion, Defendants

claim (1) Aaron Norrid has been allocated and is receiving DD waiver services; (2)   Faye Morgan

had been allocated and was receiving D&E waiver services at the time of her death on November 7,

1999; (3) Fred Romero and Ben Lewis had been allocated DD waiver services at the time of their

deaths.[3]; and (4) Deborah Eminger has been allocated and is receiving D&E waiver services.  In their

Amended Complaint, Plaintiffs "seek to remedy . . . the failure of the Defendants to provide them and

other individuals with disabilities with medically necessary services in a reasonably prompt manner

in sufficient quantity to meet their needs . . . ."  Am. Compl. ¶ 1.  Defendants contend that because

Plaintiffs are now receiving the home and community-based waiver services sought in the lawsuit their

claims are moot.

Plaintiffs concede the claims as to Faye Morgan should be dismissed due to her death.  With

respect to the remaining Plaintiffs, they contend their claims are not moot because there is still relief

the Court can provide.  Plaintiffs argue they did not "sue exclusively to obtain services" but also "seek

a declaratory judgment to ascertain their legal rights to obtain Medicaid DD and D & E Waiver

Services, with reasonable promptness . . . ."  Pls.' Mem. in Opposition to Defs.' Mot. for Summ. J.

---

[3] Since the filing of Defendants' Motion for Summary Judgment, Ben Lewis and Fred
Romero have also died.  *See* October 8, 2002 Pretrial Order [Doc. No. 174].  Therefore, their
claims are moot and are dismissed.

at 5.  In addition, Plaintiffs contend Defendants' alleged unlawful conduct which is the basis for this

action is "capable of repetition, yet evading review."   Plaintiffs rely on Ramona Flores-Lopez'

affidavit which states in part, "So long as these Plaintiffs continue to satisfy the service requirements

for the DD and D & E waiver programs, their services cannot be involuntarily terminated." *See*

Flores-Lopez Aff. Ex. B at ¶ 8.  Plaintiffs claim Ms. Flores-Lopez' statement supports their position

because Defendants can terminate their waiver services if Plaintiffs for some reason cannot meet the

eligibility requirements for Medicaid and for the waiver services.  Plaintiffs contend this would require

they reapply and go back on the waiting lists.  Plaintiffs also claim there are genuine issues of material

fact which preclude the Court from granting summary judgment.

### 1.  The Doctrine of Mootness

As previously noted, under Article III of the Constitution, federal courts may only adjudicate

live controversies.  *Raines,* 521 U.S. at 818.  Generally, "the doctrine of mootness can be described

as 'the doctrine of standing set in a time frame: The requisite personal interest that must exist at the

commencement of the litigation (standing) must continue throughout its existence (mootness).'"

*Friends of the Earth, Inc. v. Laidlaw Environmental Services*, 528 U.S. 167, 187 (2000)(quoting

*Arizonans for Official English v. Arizona*, 520 U.S. 43, 68 n.22 (1997)).  If no such controversy

exists, the action is moot.  "A federal court has no power to give opinions upon moot questions or

declare principles of law which cannot affect the matter in issue in the case before it."  *Southern Utah*

*Wilderness Alliance v. Smith*, 110 F.3d 724, 727 (10th Cir. 1997).

An exception to the mootness doctrine arises in cases which are "capable of repetition, yet

evading review."  *Fischbach v. New Mexico Activities Ass'n*, 38 F.3d 1159 (1994).  The capable-of-

repetition doctrine applies only in exceptional situations.  *Spencer v. Kemna,* 523 U.S. 1, 17 (1998).

An issue is "capable of repetition, yet evading review" when: "(1) the challenged action [is] in its

duration too short to be fully litigated prior to its cessation or expiration, and (2) there [is] a reasonable expectation that the same complaining party will be subjected to the same action again." *Id.*

Plaintiffs contend they meet both conditions for application of the capable-of-repetition doctrine because they received waiver services before this litigation could be fully litigated and there is a reasonable expectation they again may be subjected to the violations that are the basis for their lawsuit. Plaintiffs contend they were "suddenly provided with the services shortly after this lawsuit was filed." Pls.' Mem. in Opposition to Defs.' Mot. for Summ. J. at 5. Plaintiffs question why out of approximately 1700 persons on waiting lists for DD waiver services and 2880 persons on waiting lists for D & E waiver services they received services following the filing of this lawsuit. *Id.* Moreover, Plaintiffs argue that because Defendants "point to no published regulations or policy provisions which clarify why these Plaintiffs had the right to the DD and D & E Waiver services at the time it was provided" . . . "there is no assurance that the same unexplained agency policies and actions which granted them the services could not take them away." *Id.* Plaintiffs also complain that Defendants "took as long as five months simply to process their applications after they were 'allocated' slots." *Id.* at 7.

Plaintiffs further maintain that in order to retain their waiver services they must remain eligible for Medicaid and also meet eligibility requirements specific to the DD and D & E waiver services. Plaintiffs contend Medicaid eligibility is dependent upon compliance with a variety of strict income and resource requirements and fluctuations in income can result in loss of coverage. *See* Sally Faubion Aff. at ¶¶ 5, 6. Moreover, under Defendants' policies "a person hospitalized for more than one full calendar month [is] removed from Waiver services . . . ." *See* Flores-Lopez Aff. Ex. B at ¶ 25. Plaintiffs contend their medical conditions place them at high risk of requiring temporary hospital

and/or nursing care which can result in termination of waiver services.  According to Sally Faubion, the Director of Guardianship for Arc of New Mexico, one of her clients was hospitalized in 1998 for over thirty days, and she was notified by a representative of DOH's Long Term Services Division that the client would lose waiver services and would have to reapply.  *See* Sally Faubion Aff. at ¶7.  For these reasons, Plaintiffs argue that if they lose their waiver services they will again be subjected to the challenged action, i.e., the "general manner in which  Defendants administer the DD and D & E Waiver program; in particular their failure to provide services with reasonable promptness . . . ."  Pls.' Mem. in Opposition to Defs.' Mot. for Summ. J. at 13.

Defendants contend Plaintiffs have not demonstrated there is a reasonable expectation  they again will be subjected to the same challenged action.  In support of their contention, Defendants assert that in the event a person loses his or her eligibility requirement under the Medicaid Act or the eligibility requirements specific to the DD and D & E waiver services, New Mexico's Department of Health's (DOH) policy is to restore waiver services immediately upon the person regaining financial eligibility if the circumstances warrant holding their allocation slot open.  *See* Flores-Lopez Aff. Ex. B at ¶¶ 24, 27.

As to Plaintiffs' claims that they may lose waiver services because of temporary hospitalization or placement in a nursing home, Defendants contend Plaintiffs offer no facts to support this claim.  Defendants have submitted an affidavit from Paul Schwalje, DOH's  Resource Support Division Chief, to counter Plaintiffs' allegations regarding this issue.  According to Mr. Schwalje, he is aware of the client Ms. Faubion is referring to in her affidavit and disputes her statement.  Mr. Schwalje maintains he worked closely with Ms. Faubion to apprise her of DOH's policy and process and to insure that her client not lose his DD waiver services because of his hospitalization.  *See* Paul Schwalje Aff. Ex. A at ¶¶ 3-8.

Defendants also have submitted Ms. Flores-Lopez' affidavit, outlining the process by which DOH determines the order in which it allocates waiver services and the process used to allocate waiver services to Plaintiffs Lewis, Norrid, Romero, Eminger and Morgan.  Defs.' Ex. B, Flores-Lopez Aff.¶¶ 12-22.[4]  Ms. Flores-Lopez' affidavit also sets out the process followed by DOH to remove a person from waiver services.  *Id.* at  ¶¶ 23-27.  According to Ms. Flores-Lopez, "the allocation process for applicants for the waiver programs are (sic) based on policy set by the DOH and funding received from the Legislature."  *Id.* at ¶2.  Ms. Flores-Lopez points out that DOH consults with two advisory boards regarding its policy changes affecting the waiver programs at issue in this lawsuit.  For the DD Waiver, the advisory group, which is created by statute, is the State Wide Adult Services Task Force (Task Force)."  *Id.* at ¶ 3.  Both P&A and the Arc of New Mexico have representative members on the Task Force.  *Id.*   For the D & E Waiver, the Long Term Care Advisory Committee (Committee) serves as the advisory body.  *Id.*  Doris Husted of the Arc of New Mexico is a member of the Committee.  *Id.*  "No modifications to DOH's polices for allocations are made without consultation with and advice from these advisory bodies."  *Id.* at ¶ 4.

---

[4]  Ms. Flores-Lopez' affidavit indicates a "date allocated" as 7/1/99 for Plaintiff Lewis and "date first received services" as 11/22/99.  However, Mr. Lewis applied for DD Waiver services in 1994.  There is no explanation for the waiting period from 1994 to1999.  Plaintiff Norrid has a "date allocated" as 4/15/99 and "date first received services" as 9/21/99.  Mr. Norrid applied for DD Waiver services in 1993.  Again there is no explanation for the waiting period between 1993 and 1999.  Plaintiff Romero has a "date allocated" as 7/22/99 and "date first received services" as 10/28/1999.  Mr. Romero applied for DD waiver services in 1994.  No explanation is given for the period between 1994 and 1999.  Plaintiff Eminger has a "date allocated" as 7/11/99 and "date first received services" as 7/22/99.  Plaintiff Morgan has a "date allocated" as 1/6/99 and "date first received services" as 1/17/99.  Both Ms. Eminger and Ms. Morgan applied for D & E Waiver services sometime in 1997.  No explanation is given for the period between 1997 and 1999.  However, from Ms. Flores-Lopez' affidavit, it appears to the Court that persons applying (an applicant) for waiver services are placed on a list called the Central Registry and wait until they receive an "allocation letter."   An allocation letter does not go out until DOH determines there is adequate funding and the recipient is next in line to receive waiver services.

Prior to November 1998, the allocation process generally was based on the date an applicant was placed on the Central Registry. *Id.* ¶ 5. Presently, the allocation process is based upon the proportion of people on the Central Registry from a region and upon the date a person was placed on the Central Registry. *Id.* at¶ 6. For example, if 65% of the people on the Central Registry are from the region including Bernalillo County, 65% of the allocations would be to individuals in that region with the order of allocations within the region based on the date the applicant was placed on the Central Registry. *Id.* There are two exceptions to this allocation process, crisis allocations to address emergency situations and allocations based upon elderly caregivers, which comes into play when an applicant's caregiver becomes elderly or disabled. *Id.* ¶ 7. The Task Force and the Committee approved these exceptions to the allocation process. *Id.* Another exception to the allocation process were allocations to persons leaving state institutions for the developmentally disabled into community placements pursuant to the court ordered process in *Jackson v. Valdez*, CIV No. 87-0839. *Id.* at ¶ 8. These allocations are no longer being made since the deinstitutionalization process is complete. *Id.* However, if persons receiving DD waiver services as a result of the *Jackson* lawsuit deinstitutionalization process lose eligibility for waiver services due to hospitalization or other Medicaid requirements, upon discharge from hospitalization or otherwise regaining eligibility, they are immediately restored to DD waiver services. *Id.*

In response to Ms. Faubion's remarks that she was aware of individuals receiving waiver services before individuals who had been on the waiting lists for a longer period of time, Ms. Flores-Lopez claims that has happened in three instances: (1) the allocations made pursuant to the court-ordered process in *Jackson*; (2) allocations made as an exception to the allocation process in order to move persons from institutional placement at Sun Village, another facility that was closed, to DD Waiver Services; and (3) pursuant to a legislative policy directive to maximize the leverage of federal

Medicaid funds, DOH transferred individuals supported by state general funding to the DD Waiver program. *Id.* at ¶ 9.

In cases where an individual believes he or she should have an earlier registration date on the Central Registry than the one DOH has recorded, that individual may provide DOH with evidence of the original date, usually in the form of a notice letter or application from Income Support Division. *Id.* at ¶ 11. The individual's original date will be substituted and given his/her rightful place on the Central Registry. *Id.* Ms. Flores-Lopez further attests to the fact that, "[a]side from the circumstances listed above, "there are no instances in which an individual jumps ahead of another person on the Central Registry." *Id.* at ¶ 10. Finally, Ms. Flores-Lopez contends Plaintiffs Lewis and Norrid were allocated waiver services in accordance with DOH's allocation process; Plaintiffs Eminger and Morgan were allocated waiver services in accordance with the crisis exception allocation; and Plaintiff Romero was considered for a crisis exception allocation and was denied but later allocated DD Waiver services in the normal sequence. *Id.*

Defendants also have filed an affidavit from Michael Hainer, the Chief of the Community Programs Bureau Long Term Services Division of DOH, to rebut Ms. Faubion's statement that during her efforts to obtain waiver services for Plaintiff Romero she was informed that individuals residing in Intermediate Care for Mentally Retarded (ICF/MR) did not need waiver services and were not routinely placed on the waiting list, yet he received the services after filing this lawsuit even though he still resided in ICF/MR. According to Mr. Hainer he received a letter from Ms. Faubion, requesting that Mr. Romero be considered for a crisis allocation under the DD Waiver program. Defs.' Ex. C, Michael Hainer Aff. at ¶ 2. Mr. Hainer advised Ms. Faubion that Mr. Romero did not meet the criteria for crisis allocation to the DD Waiver program because Mr. Romero was receiving services at the ICF/MR. *Id.* at ¶¶ 2-7. Mr. Hainer contends the fact Mr. Romero resided in an

ICF/MR affects crisis placement determinations but does not affect a person's right to register for DD Waiver services on the Central Registry or to receive an allocation to the DD Waiver through the regular process. *Id.* at ¶ 8. Finally, Mr. Hainer contends Mr. Romero was allocated DD Waiver services through the regular process. *Id.* at ¶ 9.

As to Plaintiffs' allegation that it took Defendants as long as five months to process their applications for waiver services after receiving their allocation dates, Defendants have submitted a summary of the reasons for these delays. *See* Flores-Lopez Aff. ¶¶ 18-22. After allocation and before an applicant can receive waiver services, the State must determine whether the applicant meets both financial and medical eligibility requirements. *Id.* at ¶ 14. In addition, a plan of care or Individual Service Plan (ISP) must be completed and approved. *Id.* First, the applicant (or guardian) must notify DOH of his or her choice of case management agency and set up an appointment with the Department of Human Services (HSD) to determine his or her financial and medical eligibility. *Id.* It is the applicant's responsibility to provide the necessary information for determining eligibility and approval of the ISP. *Id.* For DD Waiver services, the Medicaid utilization review contractor (Blue Cross/Blue Shield) approves the ISP. *Id.* For D & E Waiver services the case manager or DOH, depending upon the budgeted level of support, approves the ISP. *Id.* Once ISD and HSD have received the requested information, they decide whether eligibility is met, provide notice and place the individual in the appropriate program. *Id.* In Mr. Lewis' case, his guardian and case management agency did not complete the ISP until November 6, 1999. *Id.* at ¶ 18. Mr. Lewis received DD waiver services on November 22, 1999. *Id.* In Mr. Norrid's case, his guardian and case management agency did not complete the ISP until September 15, 1999. *Id.* at ¶ 19. He received DD Waiver services on September 21, 1999. *Id.* Mr. Romero's delay also was due to the ISP being filed shortly before the date he first received services. *Id.* at ¶ 20. There were no delays in the

allocation process for Plaintiffs Eminger or Morgan since they were crisis exception allocations. *Id.*
at ¶ 22. Defendants have shown they were not responsible for any delays in providing waiver services
after the allocation dates and that any delays were due to the Plaintiffs or their guardians.

## Conclusion

The Court finds Plaintiffs Norrid and Eminger have not demonstrated there is a reasonable
expectation they again will be subjected to the same challenged action. Defendants have met their
burden of showing that as to these Plaintiffs, Norrid and Eminger, their claims are moot. Plaintiff
P&A has standing to litigate the issue of whether Defendants are complying with the requirements
of the federal Medicaid Act on behalf of its constituents. A partial judgment in accordance with this
Memorandum Opinion and Order will be entered.

## C.  Plaintiffs' Motion to File a Second Amended Complaint

Plaintiffs move the Court to allow them to file a Second Amended Complaint. Plaintiffs seek
to join additional parties as Plaintiffs, add claims under the Rehabilitation Act of 1973, 29 U.S.C. §
794, and make four non-substantive changes. On November 27, 2001, the parties filed an Unopposed
Motion to Substitute Second Amended Complaint, which the Court will grant.

Rule 15(a) of the Federal Rules of Civil Procedure directs the Court to grant leave to amend
"when justice so requires." Fed.R.Civ.P. 15(a). The grant of leave to amend the complaint is within
the discretion of the trial court. *Ketchum v. Cruz*, 961 F.2d 916, 920 (10th Cir. 1992). Refusing
leave to amend is generally justified only upon a showing of "undue delay, bad faith or dilatory
motive, . . . repeated failure to cure deficiencies by amendments previously allowed, undue prejudice
to the opposing party, . . . [or] futility of amendments." *Foman v. Davis*, 371 U.S. 178, 182 (1962).

In this case, Defendants have not answered the Amended Complaint and will not be unduly prejudiced.  Plaintiffs in good faith "seek to add claims under Section 504 of the Rehabilitation Act of 1973 to clarify the full range of legal mandates which apply to the defendants' administration of the Medicaid waiver programs."  Pls.' Mot. for Leave of Court to File a Second Am. Compl. at 3. Defendants contend Plaintiffs' claims under the Rehabilitation Act also fail to state a claim, and they will file a motion to dismiss if the Court grants Plaintiffs' motion to amend.  The Court has reviewed the Proposed Second Amended Complaint and cannot say it would be futile to allow the amendment. In light of the Court's rulings on standing and mootness, and the applicable law, Plaintiffs' Motion for Leave of Court to File a Second Amended Complaint is granted.  Plaintiffs' may file their Proposed Revised Second Amended Complaint for Violation of Civil Rights and Injunctive Relief as submitted, except for the addition of new plaintiffs.

**IT IS THEREFORE ORDERED** that Defendants' Motion to Dismiss Plaintiff New Mexico Protection and Advocacy System, Inc. for Lack of Standing **[Doc. No. 66]** is denied; (2) Defendants' Motion for Summary Judgment on Claims of Plaintiffs Ben Lewis, Aaron Norrid, Fred Romero, Faye Morgan and Deborah Eminge **[Doc. No. 58]** is granted; (3) Plaintiffs' Motion for Leave of Court to File Second Amended Complaint **[Doc. No. 70  ]** is granted, and (4) the Parties' Unopposed Motion to Substitute Second Amended Complaint **[Doc. No. 105]** is granted.

**Dated** this 5th day of November, 2002.

_____

**MARTHA VÁZQUEZ**
**UNITED STATES DISTRICT JUDGE**

**<u>Attorneys for Plaintiffs:</u>**
Duff Westbrook
Michael C. Parks
V. Colleen Miller

**<u>Attorneys for Defendants:</u>**
Charles A. Pharris
Kurt Wihl
Margaret Davidson
Gary J. Van Luchene