# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

BEN LEWIS, AARON NORRID, BILLY
JO QUISENBERRY and FRED ROMERO,
by and through their legal guardian and next
friend THE ARC OF NEW MEXICO,
BREANNE LIDDELL, by and through her
parent and legal guardian JUDY LIDDELL,
MATTHEW ALLEN, by and through his
parents and legal guardians JIM and
ANGELA ALLEN, FAY MORGAN,
DEBORAH EMINGER and PROTECTION
AND ADVOCACY SYSTEM, INC.,

        Plaintiffs,

vs.                                       No. CIV 99-0021 MV/JHG

NEW MEXICO DEPARTMENT OF
HEALTH, NEW MEXICO  DEPARTMENT
OF HUMAN SERVICES, J. ALEX VALDEZ,
Secretary of the Department of Health and
Secretary Designee of the Department of
Human Services in his official capacities, and
GOVERNOR GARY JOHNSON in his
official capacity,

        Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** is before the Court on Plaintiffs' Motion for Summary Judgment on

Counts I and II of the Amended Complaint **[Doc. No. 133]**, filed July 10, 2002, and fully briefed

on August 9, 2002; Defendant Governor Gary Johnson's Motion for Summary Judgment on

Grounds of Legislative Immunity **[Doc. No. 136]**, filed July 15, 2002, and fully briefed on August

9, 2002; Defendants' Motion to Strike all Claims Seeking Class Action-Like Relief **[Doc. No.**

**134]**, filed July 15, 2002, and fully briefed on August 9, 2002; and Plaintiffs' Motion to Strike

Affidavits Supporting Defendants' Opposition to Plaintiffs' Motion for Summary Judgment **[Doc.**

**No. 159]**, filed August 20, 2002, and fully briefed on September 20, 2002.  Having considered the

motions, the memoranda in support and in opposition, and the relevant law and being otherwise

fully informed, the Court finds that (1) Plaintiffs' Motion for Summary Judgment on Counts I and

II of the Amended Complaint is well taken and will be granted; (2) Defendant Governor Gary

Johnson's Motion for Summary Judgment on Grounds of Legislative Immunity is well taken and

will be granted; (3) Defendants' Motion to Strike all Claims Seeking Class Action-Like Relief is

not well taken and will be denied; and (4) Plaintiffs' Motion to Strike Affidavits Supporting

Defendants' Opposition to Plaintiffs' Motion for Summary Judgment is not well taken and will be

denied.

## I.  Background[1]

Plaintiffs filed this declaratory action against the New Mexico Department of Health

(DOH) and the New Mexico Department of Human Services (HSD), alleging violations under both

the Medicaid Act, 42 U.S.C. §§ 1396 *et seq.*, and the Americans with Disabilities Act (ADA), 42

U.S.C. §§ 1201 *et seq.*, as well as due process violations actionable under 42 U.S.C. § 1983.[2]

Initially, the Plaintiffs in this case were Protection and Advocacy (P&A), an advocacy group, and

individuals who were eligible to participate in Medicaid programs because of their physical or

---

[1] The underlying facts are set forth in more detail in the Court's April 24, 2000 Amended
Memorandum Opinion and Order.  *See, Lewis v. New Mexico Dep't of Health*, 94 F. Supp.2d
1217 (D.N.M. 2000).

[2] Since the filing of the action, Plaintiffs have voluntarily dismissed their ADA claims.

developmental disabilities or because of their advanced age.  Plaintiffs alleged they were entitled

to less restrictive home and community-based services with "reasonable promptness" instead of

the

 institutional care they were receiving.  Instead, they had been on waiting lists to receive these

waiver services for as many as seven years.

On June 14, 1999, Defendants filed a Motion to Dismiss Based on Sovereign Immunity, a

Motion to Dismiss Pursuant to Rule 12(b)(6), and a Motion to Dismiss Governor Gary Johnson.

Defendants claimed sovereign immunity under the Eleventh Amendment and argued that Plaintiffs

failed to state a claim upon which relief could be granted.  Defendant Governor Johnson moved to

dismiss for failure to state a claim against him.  By Amended Memorandum Opinion and Order,

filed April 24, 2000, the Court denied in part and granted in part Defendants' motion to dismiss

based on sovereign immunity.  The Court found the state agency defendants, DOH and HSD, did

not have a state sovereign immunity defense from the ADA claims.  As to the state officials,

Defendants Valdez and Governor Johnson, the Court found Plaintiffs could not maintain ADA

claims against them.  However, the Court found Plaintiffs' § 1983 claims against the state official

defendants were proper under the *Ex parte Young* doctrine.  Finally, the Court found Plaintiffs'

allegations, which the Court assumed to be true under a 12(b)(6) motion, were sufficient to

maintain their §1983 claims against Governor Johnson for failing to provide waiver services.

Because some of the individually named Plaintiffs in the case had received the waiver

services and others had passed away, leaving only P&A as a party in the case, on March 2, 2000,

Defendants filed their motion for summary judgment on the claims of the individual plaintiffs on

the grounds of mootness, and on March 13, 2000, Defendants filed their motion to dismiss P&A

for lack of standing.  On March 14, 2000, Plaintiffs filed a Motion for Leave of Court to File Second Amended Complaint.

On May 2, 2000, Defendants appealed the Court's denial of their motions to dismiss based on Eleventh Amendment immunity and Federal Rule of Civil Procedure 12(b)(6).  On August 16, 2001, the Court of Appeals for the Tenth Circuit affirmed the Court's denial of Defendants' motion asserting Eleventh Amendment immunity but declined to exercise pendant appellate jurisdiction over the Court's denial of Defendants' 12(b)(6) motion.  Thereafter, the parties filed the motions that are the subject of this Memorandum Opinion and Order.

 By Memorandum Opinion and Order, filed November 5, 2002, the Court denied Defendants' motion to dismiss P&A for lack of standing.  The Court granted Defendants' summary judgment motion as to the claims of Ben Lewis, Aaron Norrid, Fred Romero and Deborah Eminger.  The Court also granted Plaintiffs' motion to file a second amended complaint, except for the addition of new plaintiffs.

On January 3, 2003, Plaintiffs filed a Notice, advising the Court they did not intend to file the Second Amended Complaint that was the subject of their March 14, 2000 Motion to Amend. However, Plaintiffs reserved the right to appeal the Court's ruling not to allow the addition of new plaintiffs. On January 14, 2003, the parties filed a Joint Motion for Dismissal of Claims of Plaintiffs Breanne Liddell and Matthew Allen, and for Entry of Partial Judgment with Respect to Their Claims.  On January 29, 2003, the Court entered its Order, granting the parties' Joint Motion and dismissing the claims of Plaintiffs Breanne Liddell and Matthew Allen.  On the same day, the Court entered partial judgment in favor of Defendants on the claims of Plaintiffs Liddell and Allen.

## II.  Standard of Review

This Court will grant summary judgment when there is no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(c).  The movant carries the burden of establishing there are no genuine issues of material fact, *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970), but may discharge its burden by showing there is an absence of evidence to support the non-movant's case, *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  Once the movant meets its burden, the burden shifts to the non-movant to demonstrate a genuine issue for trial on a material matter.  *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991).  In making its summary judgment determination, the court looks at the pleadings and documentary evidence in the light most favorable to the non-movant, *Deepwater Invs., v. Jackson Hole Ski Corp.* 938 F.2d 1105, 1110 (10th Cir. 1991), and the movant must show beyond a reasonable doubt it is entitled to summary judgment, *Hicks v. City of Watonga, Okla.*, 942 F.2d 737, 743 (10th Cir. 1991).  However, once the burden shifts to the non-movant, that party may not rest on its pleadings but must set forth specific facts showing there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof.  *Celotex Corp.*, 477 U.S. at 324.  However, "the mere existence of some factual dispute between the parties will not defeat an otherwise properly supported motion."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  "Factual disputes that are irrelevant or unnecessary will not be counted."  *Id.*  If the non-movant cannot make such a showing, after adequate time for discovery, summary judgment is mandated.  *Id.* at 322.  The Court will consider the parties' motions for summary judgment in light of these standards.

### III.  Discussion

### A.  Motion for Summary Judgment on Grounds of Legislative Immunity

The well settled doctrine of absolute legislative immunity bars actions against legislators on the basis of their roles in enacting or signing legislation.  *Supreme Court of Virginia v. Consumers Union of United States, Inc.,* 446 U.S. 719, 731-34 (1980).  "The Supreme Court, however, 'has been careful not to extend the scope of [legislative immunity] protection further than its purposes require,' and the government official seeking immunity bears the burden of showing that an exemption from personal liability is justified."  *Kamplain v. Curry County Board of Commissioners*, 159 F.3d 1248, 1251 (10th Cir. 1998)(quoting *Forrester v. White*, 484 U.S. 219, 224 (1988)).  Legislative immunity applies to legislators engaged "in the sphere of legitimate legislative activity," *Tenney v. Brandhove*, 341 U.S. 367, 376 (1951), and protects legislators "not only from the consequences of litigation's results but also from the burden of defending themselves."  *Dombrowski v. Eastland*, 387 U.S. 82, 85 (1967).  Legislative immunity applies to § 1983 actions seeking damages and declaratory or injunctive relief.  *Consumers Union*, 446 U.S. at 732.

Moreover, officials outside the legislative branch are entitled to legislative immunity when they perform legislative functions.  *Id.* at 731-734.  To determine whether a particular task is legislative, executive or judicial for purposes of extending immunity, the Court looks to the function performed by the defendant and not his title.  *Forrester,* 484 U.S. at 227 ("[I]mmunity is justified and defined by the functions it protects and serves not by the person to whom it attaches.").  Additionally, "whether an act is legislative turns on the nature of the act itself, rather

than on the motive or intent of the official performing it."  *Bogan v. Scott-Harris*, 523 U.S. 44, 54 (1998).

Therefore, in order to determine whether Defendant Governor Johnson is entitled to legislative immunity, the Court looks to the function he was performing when the actions at issue took place and examines the nature of those actions.  *See, Kamplain,*159 F.3d at 1251-52.  If  the function in question is legislative, then he is entitled to absolute legislative immunity.  "[A]t its core, the legislative function involves determining, formulating, and making policy."  *Id.* at 1251.

Plaintiffs contend "Johnson's activities at issue are neither 'legislative' nor 'legitimate' and therefore not entitled to legislative immunity."  Pls.' Resp. in Opp'n to Def. Gary Johnson's Mot. for Summ. J. at 1.  Plaintiffs do not dispute, however, that at all times relevant to the allegations made in this action against him, Defendant Governor Johnson was the governor of the State of New Mexico and was responsible for compiling and submitting a proposed budget to the New Mexico Legislature.  There is also no dispute that the New Mexico Legislature is vested with the ultimate power to establish state policy by appropriating funds.  Plaintiffs also acknowledge "that the actual process of departmental funding is collaborative and includes input from each department, the governor and the legislature."  *Id.* at 2.

Plaintiffs contend Defendant Governor Johnson had supervisory authority over the DOH and the HSD and was responsible for assuring that these departments complied with federal law. However, Plaintiffs acknowledge that Defendant Governor Johnson was not involved in the day-to-day operations of these departments, particularly the administration of the Developmental Disabilities Home and Community-Based Services Waiver (DD Waiver) and the Disabled and Elderly Home and Community-Based  Services Waiver (D&E Waiver) (together "waiver

programs" or "waiver services").  Sections 9-7-6A and 9-8-6A of Chapter 9 of the New Mexico

Statutes which governs the Executive Department state: "The secretary is responsible to the

governor for the operation of the department.  It is his duty to manage all operations of the

department and to administer and enforce the laws with which he or the department is charged."

N.M.Stat.Ann §§ 9-7-6A & 9-8-6A (Michie 2001 Repl. Pamp.).  Section 9-7-6A applies to the

DOH and § 9-8-6A applies to the HSD.  Plaintiffs contend that "nothing in these sections

indicates that the functions are limited to legislative matters."  *Id.* at 10.  Plaintiffs argue that

because Defendant Governor Johnson is ultimately responsible for the operation of the DOH and

the HSD he is liable for any violation of federal law by these departments.

Additionally, Plaintiffs argue that "Johnson's actions with regard to the Waiver programs

do not come within the purview of 'legislative function.'" *Id.* at 11. For example, Plaintiffs claim

that "following the closure of Los Lunas, Johnson placed the previously institutionalized

individuals from that facility into the DD Waiver program."  *Id.* at 9.  Plaintiffs claim this action

significantly increased state expenditures.  However, state funding for the waiver programs did

not increase and, as a consequence, the number of individuals that could be served through the

waiver programs decreased.  Plaintiffs also claim Defendant Governor Johnson "advised Valdez

and his predecessors to plan for limited growth in the Waiver programs."  *Id.* at 10.  Plaintiffs

further claim "Governor Johnson issued a policy objective precipitating the revamping of the state

personnel system, which necessarily affect (sic) people working in Waiver programs." *Id.* at 11.

Plaintiffs argue these actions "go beyond budgetary actions" and are not legislative in nature.

Finally, Plaintiffs claim Defendant Governor Johnson "has continually requested less

money for Waiver services than the legislature appropriated" and vetoed a budget line item calling

for one million dollars to provide additional waiver services. *Id.* at 13. Accordingly, Plaintiffs argue Defendant Governor Johnson's budgetary decisions have "made it impossible for the state to meet its federal obligation to provide waiver services with reasonable promptness." *Id.* at 12.

Plaintiffs' allegations regarding Defendant Governor Johnson's actions, either directly or indirectly, concern what they perceive to be inadequate funding and support of the waiver programs. Defendant Governor Johnson asserts that his actions of which Plaintiffs complain in this case are indistinguishable from the acts of the mayor in *Bogan*, acts which the Supreme Court found to be legislative in nature and thus were accorded legislative immunity.

In *Bogan*, Plaintiff Scott-Harris was the Administrator of the Fall River Department of Health and Human Services (DHHS). During her tenure, she received a complaint that one of her temporary employees had made several racial and ethnic slurs about the employee's colleagues. Scott-Harris prepared termination charges against the employee. The employee was able to forestall termination by using her political connections to press her case with several state and local officials, including Defendant Roderick, the vice president of the Fall River City Council. The city council held a hearing on the charges brought against the employee. As a result of the hearing, the employee agreed to be suspended without pay for sixty days. Defendant Bogan, the mayor of Fall River, eventually reduced the length of the suspension.

While the charges against the employee were pending, Mayor Bogan had prepared his annual city budget proposal. Anticipating a reduction in revenue, Mayor Bogan proposed freezing municipal employee salaries and eliminating 135 jobs. Included in his proposal was the elimination of the DHHS, of which Scott-Harris was the sole employee. After the city council adopted the ordinance, Mayor Bogan signed it into law.

9

Thereafter, Scott-Harris filed a § 1983 action against Fall River, Mayor Bogan, Roderick, and others.  Scott-Harris alleged "the elimination of her position was motivated by racial animus and a desire to retaliate against her for exercising her First Amendment rights in filing the complaint against [the employee]."  *Bogan*, 523 U.S. at 47.  The district court denied Bogan's and Roderick's motion to dismiss on the basis of legislative immunity.  On appeal, the First Circuit affirmed, holding the challenged conduct was administrative, not legislative.  *See Scott-Harris v. City of Fall River*, 134 F.3d 427 (1st Cir. 1997), *rev'd*, 523 U.S. 44 (1998) .

The Supreme Court reversed, holding "local legislators are . . . absolutely immune from suit under § 1983 for their legislative activities."  *Bogan*, 523 U.S. at 49.  The Court made clear the determination of whether an activity is "legislative" must be made without regard to the legislators' subjective intent.  *Id.* at 54.  The Court stated the proper inquiry was "whether, stripped of all considerations of intent and motive, [the] actions were legislative."  *Id.* at 55.  The Court then found Bogan and Roderick were entitled to legislative immunity:

> Most evidently, petitioner Roderick's acts of voting for an ordinance were, in form, quintessentially legislative.  Petitioner Bogan's introduction of a budget and signing into law an ordinance also were formally legislative, even though he was an executive official. We have recognized that officials outside the legislative branch are entitled to legislative immunity when they perform legislative functions.  Bogan's actions were legislative because they were integral steps in the legislative process.

*Id.*  The Court found "[t]he ordinance reflected a discretionary, policymaking decision implicating the budgetary priorities of the city and the services the city provides to its constituents."  *Id.* at 55-56. The Court also recognized a governor's signing or vetoing of a bill constituted part of the legislative process.  *Id.*

Similarly, the actions taken by Defendant Governor Johnson in this case are legislative in nature.  Funding for any state program is a budgetary and policy decision for the state to make.

10

Defendant Governor Johnson's actions in preparing a budget are "an integral part of the legislative process."   In his deposition, Defendant Valdez, the DOH Secretary, testified he made the decision to close Los Lunas and shift that facility's budget to the DD Waiver program. However, even if that decision had been made by Defendant Governor Johnson, as a budgetary decision, he is entitled to legislative immunity.  *See e.g., Burtnick v. McLean*, 76 F.3d 611 (4th Cir. 1996)(budgetary decisions are generally legislative acts).  Defendant Governor Johnson's "request for less money for Waiver services than the legislature appropriated" and his "veto of a budget line item calling for one million dollars to provide additional waiver services" also constitute actions of a legislative nature.

Finally, Defendant Governor Johnson's "policy objective precipitating the revamping of the state personnel system" and his "advice to Valdez and his predecessors to plan for limited growth in the Waiver programs, " also are legislative in nature.  In planning and formulating the state budget, Defendant Governor Johnson, like the mayor in *Bogan,* had the discretion to streamline or "revamp" the state personnel system and to curtail the growth of the waiver programs.

**Conclusion**

Having examined the actions taken by Defendant Governor Johnson which Plaintiffs argue do not fall within the purview of legislative function, the Court finds all of the actions at issue involved "determining, formulating, and making policy," and therefore were legislative in nature. Thus, Defendant Governor Johnson is entitled to legislative immunity.  Accordingly, Defendant Governor Gary Johnson's motion for summary judgment is granted.

**B.  Plaintiffs' Motion to Strike Affidavits**

11

In addition to their motion for summary judgment, Plaintiffs move the Court to strike all or portions of the affidavits of Ramona Flores-Lopez, Roger Auerbach and Roger Gillespie. Defendants submitted affidavits from these individuals in support of their response in opposition to Plaintiffs' motion for summary judgment.  Consequently, the Court will address this motion before ruling on Plaintiffs' motion for summary judgment.  Plaintiffs contend that all or portions of these affidavits are not admissible under Federal Rule of Civil Procedure 56(e).  Specifically, Plaintiffs claim the affidavits are inadmissible because they contain statements which are either irrelevant, conclusory, based upon information and belief or constitute legal opinions.

When submitted to support or oppose a summary judgment motion, an affidavit must be based on personal knowledge, must set forth facts that would be admissible at time of trial, and must establish the affiant's competence to testify.  Fed.R.Civ.P. 56(e).  Accordingly, "[u]nder Fed.R.Civ.P.  Rule 56(e), "only statements 'made on personal knowledge' will support a motion for summary judgment; statements of mere belief must be disregarded."  *Tavery v. United States,* 32 F.3d 1423, 1427 n. 4 (10th Cir. 1994).

Relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.  Fed.R.Evid. 401.  Rule 401 uses a lenient standard for relevance.  *See e.g., In Re A.H. Robins Co., Inc.*, 575 F. Supp. 718, 723 (D. Kan. 1983). Moreover, "an affidavit should be excluded only when its irrelevance is clear." 10B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2738 (3d ed. 1998).   The Court also notes that the Advisory Committee Notes on Rule 401 state that "[e]vidence which is essentially background in nature can scarcely be said to involve disputed matter, yet it is

universally offered and admitted as an aid to understanding."  *See* Fed.R.Evid. 401, Advisory

Committee Notes.

**1.  Affidavit of Ramona Flores-Lopez**

Plaintiffs claim paragraph 6 of Ms. Flores-Lopez' affidavit contains statements which "are

irrelevant and based upon information and belief and not Ms. Flores-Lopez' personal knowledge."

Pls.' Mem. Br. in Supp. of Mot. to Strike at 2.  Plaintiffs also move the Court to strike paragraphs

10 and 11 of the Flores-Lopez affidavit.  Plaintiffs contend paragraph 10 sets forth irrelevant

information about the closure of New Mexico's public institutions, and the first four sentences of

paragraph 11 concern a Medicaid program not at issue in this case.  According to Plaintiffs, this

testimony is not relevant to any of the issues in this case.  Finally, Plaintiffs contend the final

sentence of paragraph 11 is not admissible because it is based on speculation and conjecture.

Paragraph 6 of the Flores-Lopez affidavit states: "The predicted waiting times set forth in

the strategic plans also are affected by other factors.  For example, on information and belief,

individuals often are offered allocations, but they elect to defer their determination of financial and

clinical eligibility and entry into services.  Thus, for State Fiscal Year 2002, the actual wait for DD

Waiver services was 40 months, not 60 months as targeted."  Defs.' Opp'n to Pls.' Mot. for

Summ. J., Ex. A,  Flores-Lopez Aff. ¶ 6.

Paragraph 10 states: "New Mexico closed its public institutions in 1997, with the

exception of two small Intermediate Care Facilities for the Mentally Retarded ("ICF/MR's"),

which are home to a few individuals for whom community placement generally is not

appropriate."  *Id.*, Flores-Lopez Aff.  ¶ 10. Paragraph 11 states:

> In addition to the DD Waiver Program, DOH has also initiated the Family Support/Self-
> Directed Services Project, which provided state general funds to 98 individuals and their

families in FY 2000.  Participants were selected within each Long Term Services Division region from the DD Waiver Program Central Registry based on their date of application. Each participant received $2,600.00 to spend in accordance with a self-directed plan. Community coordinators provided training to participants about the program and assisted with the development of service plans.  It is anticipated that many of the FY 2002 participants will be allocated to the DD Waiver in FY 2003, allowing designated funds to be used to serve new individuals from the Central Registry.

*Id.*, Flores-Lopez Aff. ¶ 11.

Defendants contend all of Ms. Flores-Lopez' testimony is relevant because it goes to demonstrate "the environment in which waiver services [are] provided" and "for the purpose of providing necessary background information and context in which to determine Defendants' reasonableness."  Defs.' Opp'n to Pls.' Mot. to Strike Aff. at 4-5.  Defendants argue it is relevant for the Court to know the number of individuals on the Central Registry that elect to defer the determination of their financial and clinical eligibility for waiver services in favor of remaining on the Central Registry.  *Id.*  According to Defendants, it is equally relevant for the Court to be apprised of the State's multiple non-waiver services which provide needed services to individuals on the Central Registry prior to allocation into waiver services.  Defendants contend this goes to show the quality of life enjoyed by individuals on the Central Registry prior to receiving waiver services since Plaintiffs have asserted these individuals do not receive assistance in their basic needs, i.e., toileting, eating, and bathing.  Defendants also contend the evidence regarding the closure of New Mexico's ICF/MR's demonstrates there are more individuals in need of services and less available providers.

As to paragraph 6 of Ms. Flores-Lopez' affidavit, Defendants contend the challenged testimony is confirmed by Mr. Arturo Rangel's affidavit and is not critical to her testimony.  Mr. Rangel is the Chief of the Program Development Bureau within the Long-Term Services Division

and reports directly to Ms. Flores-Lopez. *See* Defs.' Opp'n to Pls.' Mot. for Summ J., Ex. C, Rangel Aff. ¶ 4. According to Defendants, as Mr. Rangel's supervisor, this information is within Ms. Flores-Lopez' personal knowledge and may not be stricken.

The Court has reviewed the challenged testimony in Ms. Flores-Lopez' affidavit and finds it is relevant, within her personal knowledge and not speculative. The fact it took 40 months instead of 60 months for an individual to receive DD Waiver services in 2002 is certainly relevant to the issues in this case. Equally relevant is the fact New Mexico closed its public institutions in 1997, requiring more home and community-based services. The testimony regarding the State's multiple non-waiver services which provide needed services to individuals on the Central Registry prior to allocation into waiver services is also relevant background information. Accordingly, Ms. Flores-Lopez' testimony will not be stricken.

## 2. Affidavit of Roger Auerbach

Plaintiffs contend Roger Auerbach's affidavit contains several statements that are either conclusory, irrelevant or constitute legal opinions about which he is not competent to testify. Plaintiffs contend Mr. Auerbach is not qualified to render legal opinions because he has no legal training or experience. Plaintiffs also contend that, under Rule 702 of the Federal Rules of Evidence, Mr. Auerbach's opinion testimony regarding the applicability of the reasonable promptness requirement set forth in 42 U.S.C. § 1396a(a)(8) to the waiver programs at issue in this case is inadmissible because such testimony "inappropriately invades the province of the fact finder and will not assist the trier of fact." Pls.' Reply to Defs.' Opp'n to Pls.' Mot. to Strike Aff. Supp. Defs.' Opp'n to Pls.' Mot. for Summ. J. at 9. Specifically, Plaintiffs contend the following statements in Mr. Auerbach's affidavit constitute legal opinions and should be stricken: "waivers

15

are not entitlement programs" and "all persons who are eligible for Medicaid State Plan services are not 'entitled to waiver services.'" Pls.' Mem. Br. in Supp. of Pls.' Mot. to Strike Aff. Supp. Defs.' Opp'n to Pls.' Mot. for Summ. J. at 3-4. According to Plaintiffs, these opinions go to the issue of whether Plaintiffs are entitled to receive waiver services with reasonable promptness. *Id.* at 3. Plaintiffs also argue that under *Specht v. Jensen*, 853 F.2d 805 (10th Cir. 1988), experts may not testify on an ultimate issue of law. Therefore, Plaintiffs move the Court to strike paragraphs 16-31 of Mr. Auerbach's affidavit.

Mr. Auerbach is one of Defendants' expert witnesses and has extensive experience in both the administration and evaluation of home and community-based waiver programs. *See,* Defs.' Mot. for Summ. J., Ex. I, Auerbach Aff. ¶¶ 3-10. Contrary to Plaintiffs' assertion, Mr. Auerbach is an attorney. According to Defendants, Mr. Auerbach's affidavit is relevant to the question of reasonableness. The evidence Mr. Auerbach offers illustrates the State of New Mexico's commitment to the waiver programs. Mr. Auerbach's testimony shows the percentage of New Mexico's budget set aside for home and community-based waiver services is one of the highest in the United States. Mr. Auerbach's testimony also demonstrates the State's commitment to providing waiver services to more individuals.

In response to Defendants' arguments, Plaintiffs counter that Defendants mischaracterize the issue before the Court as whether the Defendants' actions as a whole are reasonable. Plaintiffs argue the issue before the Court is whether the State has or has not failed to provide waiver services to eligible individuals with reasonable promptness not whether the States' "other actions are reasonable." Pls.' Mem. Br. in Supp. of Pls.' Mot. to Strike Aff. Supp. Defs.' Opp'n

to Pls.' Mot. for Summ. J. at 5.  Plaintiffs contend Mr. Auerbach's testimony is not relevant to this issue and "will only serve to confuse the issues . . . ."  *Id* at 8.

The Court has reviewed Mr. Auerbach's affidavit, specifically paragraphs 16 through 31 and finds the testimony is relevant.  Mr. Auerbach's testimony is essentially about the customs and practices in working with Centers for Medicare and Medicaid (CMS) and administering waiver programs.  Rule 704(a) of the Federal Rules of Evidence allows an expert witness to testify in the form of an opinion or inference even if that opinion or inference embraces an ultimate issue to be determined by the trier of fact.  *A.E., By and Through Evans v. Independent Sch. Dist. No. 25*, 936 F.2d 472, 476 (10th Cir. 1991); *see also, Phillips v. Calhoun*, 956 F.2d 949, 952 (10th Cir. 1992).  However, an expert may not state legal conclusions drawn by applying the law to the facts.  *Id.*  Nevertheless, an expert may refer to the law in expressing his or her opinion.  *Id.*  Thus, "[a]lthough the role of a witness is to produce factual testimony, 'a witness may refer to the law in expressing an opinion without that reference rendering the testimony inadmissible.'"  *Unites States v. Oles*, 994 F.2d 1519, 1523 (10th Cir. 1993)(quoting *Specht*, 853 F.2d at 810).  Moreover, doubts about the usefulness of expert testimony should generally be resolved in favor of admissibility.  *Sil-Flo, Inc. v. SFHC, Inc.*, 917 F.2d 1507, 1517 (10th Cir. 1990).  Mr. Auerbach's testimony covers the history of long-term care services and the differences between Medicaid state plan services and waiver programs.  This testimony will assist the Court in ruling on Plaintiffs' motion for summary judgment, and since this case is being tried by the Court, there is little danger the evidence will confuse the issues.  Accordingly, the Court will not strike any of Mr. Auerbach's testimony.

**3.  Affidavit of Roger Gillespie**

Plaintiffs move the Court to strike paragraphs 2 through 8 of Mr. Gillespie's affidavit on the grounds the testimony contained therein is wholly irrelevant to the issues before the Court. Mr. Gillespie is the Deputy Director of the Medical Assistance Division, HSD.  Mr. Gillespie is responsible for the oversight of the Benefits Bureau, the Contracts Administration Bureau and the Planning and Program Operation Bureau.  The Planning and Program Operations Bureau supervises the Fee for Service Long Term Care Programs and the Waiver programs, including the D&E Waiver.

Paragraphs 2-6 concern the Personal Care Option program.  "The Personal Care Option was added as a Medicaid benefit in September 1999 with the goal of enabling elderly and/or disabled clients to live in the comfort of their own homes and achieve the highest possible level of independence.  The Personal Care Option allows clients choice and flexibility in how their care is delivered."  Defs.' Opp'n to Pls.' Mot. for Summ. J., Ex. J, Gillespie Aff. ¶¶ 3, 4.

Plaintiffs also move the Court to strike paragraphs 7 and 8 of Mr. Gillespie's affidavit on the grounds the testimony is irrelevant to the issues in the case and is speculative in nature. Paragraphs 7 and 8 concern the HSD's proposal to CMS for a Global Funding Waiver.  The Global Funding Waiver would combine nursing home and D&E Waiver budgets into one Global Fund so that Medicaid reimbursement would follow the consumer whether he chooses nursing home services or D&E Waiver services and not tie the consumer to a nursing home bed or a D&E Waiver slot.

Defendants contend Mr. Gillespie's testimony goes to Defendants' efforts to maintain waiver programs and non-waiver alternatives given the limitations of the waiver programs. Defendants claim Plaintiffs have put in issue the conditions individuals experience while waiting to

18

receive waiver services.  *See,* Pretrial Order at 3-4.  Defendants contend Mr. Gillespie's testimony demonstrates Plaintiffs are aware of Defendants' efforts to ease the burden on individuals waiting for waiver services since Doris Husted, the Public Policy Director of the ARC of New Mexico, provided assistance in developing this program.  Therefore, Defendants contend Mr. Gillespie's testimony is relevant.

The Court finds this evidence is relevant to the issues in this case and will not be stricken. Moreover, Mr. Gillespie's testimony regarding the proposed Global Funding Waiver is not speculative.  The Global Funding Waiver has already been developed.  Defendants have already submitted the proposal to CMS, and there is no evidence CMS will not approve it.

**Conclusion**

The Court finds the testimony Plaintiffs move the Court to strike is relevant, based on personal knowledge, not speculative or conclusive and will therefore not be stricken.

### C.  Plaintiffs' Motion for Summary Judgment

Plaintiffs move the Court for summary judgment on Counts I and II of the Amended Complaint.  In Count I, Plaintiffs allege a violation of 42 U.S.C. § 1983 for failure to provide Medicaid DD Waiver services with reasonable promptness.  In Count II, Plaintiffs allege a violation of 42 U.S.C. § 1983 for failure to provide Medicaid D&E waiver services with reasonable promptness.  According to Plaintiffs, federal law requires any State which has elected to participate in the Medicaid program under 42 U.S.C. §§ 1396 *et seq.*, to provide all services, including DD and D&E Waiver services, to all eligible persons with reasonable promptness. Plaintiffs claim "[t]his case presents a simple, straight forward question of law: Are the Defendants required to provide Medicaid waiver services to all eligible individuals with reasonable

promptness?  The law is clear and unequivocal: the defendants are so required."  Mem. in Supp. of Pls.' Mot. for Summ. J. at 1.  Plaintiffs also contend "[t]he facts are likewise clear and beyond dispute: the Defendants are not providing those services with reasonable promptness."  *Id.*  Accordingly, Plaintiffs move the Court for an Order, enjoining Defendants from failing to provide waiver services with reasonable promptness.

In their June 14, 1999 Motion to Dismiss Pursuant to Rule 12(b)(6), Defendants argued that Plaintiffs' claims alleging failure to provide waiver services with reasonable promptness be dismissed because Plaintiffs did not have the right to waiver services under either the Medicaid Act or the Due Process Clause.  Defendants claimed Plaintiffs could not maintain their § 1983 action for violations of the Medicaid Act because the Act did not create a federal statutory right to waiver services.  Defendants further argued the provision of waiver services was optional and thus the "reasonable promptness" provision, 42 U.S.C. § 1396a(a)(8), did not apply to waiver services.

In an Amended Memorandum Opinion and Order, dated April 24, 2000, the Court framed the issue as "whether the Medicaid Act's 'reasonable promptness' requirement applies to waiver services, and if so, whether it creates a federal right enforceable under § 1983."  *Lewis v. New Mexico Dep't of Health*, 94 F. Supp.2d 1217, 1233 (D.N.M. 2000).  Applying the test articulated in *Blessing v. Freestone*, 520 U.S. 329 (1997), the Court found the "reasonable promptness" requirement applied to waiver services and created a federal right enforceable under §1983. *Lewis*, 94 F. Supp.2d at 1236.

Under *Blessing*, the Court's first inquiry was whether Congress intended the relevant provisions to benefit Plaintiffs.  *Id.* at 1233.  After analyzing the relevant provisions of the

Medicaid Act, the Court concluded "Congress intended the 'reasonable promptness' requirement to apply to waiver services." *Id.* at 1234. The Court's second inquiry was whether "the right assertedly protected by the statute was not so 'vague and amorphous' that its enforcement would strain judicial competence." *Id. (citing Blessing* 520 U.S. at 340-41). The Court found "Plaintiffs' right to receive medical assistance, including waiver services, with 'reasonable promptness' [was] not so vague and amorphous that it could not be enforced by the courts." *Id.* at 1236. Finally, the Court's third inquiry was whether the reasonable promptness provision unambiguously imposed a binding obligation on the states. The Court found the Medicaid Act's "reasonable promptness" requirement was judicially enforceable and unambiguously imposed a binding obligation on the states. *Id.* Therefore, the Court found Plaintiffs could maintain their § 1983 claims for Defendants' alleged failure to provide waiver services with reasonable promptness as required by the Medicaid Act. *Id.* at 1236.[3]

The Court, however, did not address the more difficult question of when Plaintiffs become "eligible individuals" to receive waiver services so as to trigger the Medicaid Act's "reasonable promptness" provision. Plaintiffs argue the "reasonable promptness" provision is triggered the moment an individual applies for DD or D&E Waiver services. On the other hand, Defendants contend that only when the individual is determined "eligible" for waiver services does the "reasonable promptness" provision of the Medicaid Act apply.

---

[3] As to Plaintiffs' due process claim, Defendants argued Plaintiffs had no protected property interests because they were "merely applicants" for government services. The Court found the weight of authority held that applicants do have a constitutionally protected interest in government benefits for which they have applied. *Lewis*, 94 F. Supp.2d at 1237. Accordingly, the Court denied Defendants' motion to dismiss Plaintiffs' § 1983 claims for due process violations on this basis.

According to Defendants, in the State of New Mexico, individuals who apply for waiver services are entered on the State's Central Registry and are considered "registrants," i.e., individuals who have applied to be <u>considered</u> for waiver services.  Defendants contend that, unlike Medicaid services, waiver services were never intended to serve all eligible individuals.  For this reason, Defendants maintain a Central Registry.[4]  Defendants contend the Central Registry is more than simply a "waiting list" because it contains "information" regarding individuals already receiving services.  Plaintiffs characterize it as a waiting list comprised of individuals desiring waiver services, individuals who may or may not be eligible for the services.

Notably, an individual on the Central Registry (a "registrant") is not even considered for waiver services until an opening or "unduplicated recipient" slot[5] in the desired waiver program becomes available, and the individual is allocated that slot.  Once a slot is allocated to an individual, he becomes an "applicant" for waiver services.  Presently, the allocation process is based upon the proportion of people on the Central Registry from a region and upon the date a

---

[4] In 2001, the D&E Waiver was transferred to the HSD.  Thus, the DD and D&E Waivers have separate Central Registries.  The Central Registries are not used to determine priority for allocations in cases of crisis or emergency placement into the waiver programs, or placement into the waiver programs upon the closure of ICF/MR's or other facilities.  Defs.' Opp'n to Pls.' Mot. for Summ. J. at 6.

[5] Defendants use the term "unduplicated recipient" slot to indicate an opening in either waiver program that is available for allocation.  Medicaid regulations require Defendants to remove an individual who has been hospitalized for a full calendar month from waiver services in order to ensure the individual receives funding for his/her hospitalization under other programs. It is the DOH's policy to put on hold allocated slots for individuals who require hospitalization for less than a full calendar month. The DOH works closely with the individual to ensure that waiver services are immediately restored upon discharge from the hospital.  These slots are not considered available for allocation.   Reply Br. in Supp. of Defs.' Mot. for Sum. J. on the Claims of Pls. Ben Lewis, Aaron Norrid, Fred Romero, Faye Morgan, and Deborah Eminger, Ex. B, Flores-Lopez Aff. ¶¶ 24-27.

person was placed on the Central Registry. Consequently, Defendants do not start the eligibility process[6] until an individual is <u>allocated</u> an unduplicated recipient slot in the waiver program.[7] Defendants assert that it is not until the DOH determines that the individual is "eligible" for waiver services that the reasonable promptness provision applies, if it applies at all. Therefore, under New Mexico's waiver programs, an individual desiring waiver services must first be allocated a slot. Second, the State must determine the individual is eligible for waiver services. It is after these two events occur that Defendants contend the reasonable promptness provision applies to delivery of waiver services. In order to resolve the question of whether the reasonable promptness provision applies to waiver services <u>prior</u> to an individual's allocation to the program, the Court must examine the Medicaid Act and its waiver of State Plan requirements.

### 1. The Statutory Scheme

_____

[6] Section 435.911 governs the timely determination of eligibility. *See* 42 C.F.R. § 435.911. Under this section, Defendants must establish time standards for determining eligibility and inform the applicant of what they are; these standards may not exceed ninety days for applicants who apply for Medicaid on the basis of disability and forty-five days for all other applicants. 42 C.F.R. § 435.911(a)(1) & (2).

[7] Until approximately November 1, 1999, the registration process for the Central Registry and the formal application for Medicaid were both part of a dual process, with registration through the DOH onto a Central Registry for all DD waiver services and formal application to the HSD to determine eligibility for Medicaid assistance going forward within the same period. In 1999, Defendants decided to defer the Medicaid financial and other eligibility determinations until there was an unduplicated recipient slot available for an individual in the requested waiver program to avoid duplication of effort by the HSD and the applicant. According to Defendants, processing the formal application for Medicaid financial and other clinical eligibility at the time of registration could result in a denial of eligibility because of the lack of an unduplicated recipient slot or for failure to meet Medicaid financial or clinical eligibility. Thus, when a slot subsequently became available the applicant would have to provide a complete new application and the HSD would have to redetermine Medicaid financial and clinical eligibility. Defs.' Opp'n to Pls.' Mot. for Summ. J., Ex. E, Medrano Aff. ¶¶ 4 and 5.

The DD and D&E Waiver programs operate under the Medicaid Act.  *See* 42 U.S.C. § 1396 *et seq.*  Under the Medicaid Act, the federal government provides financial assistance to states to enable them to provide necessary medical services to the needy.  *See* 42 U.S.C. § 1396.[8] States may choose whether or not to participate.  However, once a state chooses to participate in Medicaid, the state must comply with the requirements of the Act.  *Alexander v. Choate*, 469 U.S. 287,  290 n.1 (1985).

Pursuant to § 1396a, a state wishing to participate in the Medicaid program must submit a State plan, providing that the State plan be "in effect in all political subdivisions of the State, and, if administered by them, be mandatory upon them."  42 U.S.C. § 1396a(1).  However, not everyone is eligible for Medicaid services.  In order to be eligible for these services, an individual must have limited resources and fit into an eligibility category.  Section 1396a(2) governs the financial participation required of the State.  42 U.S.C. § 1396a(2).  Section 1396a(a)(8) provides "that all individuals wishing to make application for medical assistance under the plan shall have opportunity to do so, and that such assistance shall be furnished with reasonable promptness to all eligible individuals."  42 U.S.C. § 1396a(a)(8)  Two regulations provide guidance regarding what

---

[8] Section 1396 states:

For the purpose of enabling each State, as far as practicable under the conditions in such State, to furnish (1) medical assistance on behalf of families with dependent children and of aged, blind, or disabled individuals, whose income and resources are insufficient to meet the costs of necessary medical services, and (2) rehabilitation and other services to help such families and individuals attain or retain capability for independence or self-care, there is hereby authorized to be appropriated for each fiscal year a sum sufficient to carry out the purpose of this subchapter.  The sums made available under this section shall be used for making payments to States which have submitted, and had approved by the Secretary, State plans for medical assistance.  42 U.S.C.  § 1396.

constitutes "reasonable promptness."  One regulation provides that "[t]he agency must establish

time standards for determining eligibility which may not exceed– (1) Ninety days for applicants

who apply for Medicaid on the basis of disability; and (2) Forty-five days for all other applicants."

42 C.F.R. § 435.911(a).  Another provision requires state agencies to "furnish Medicaid promptly

without any delay caused by the agency's administrative procedures."  42 C.F.R. § 435.930(a).


In 1981, Congress amended the Social Security Act, adding §1915(c), which gave the

Secretary of the Department of Health and Human Services (DHHS) the power to waive certain

requirements of Medicaid law.  *See* Omnibus Reconciliation Act of 1981, Pub. L. No. 97-35,

§2176, 95 Stat. 812-13 (codified as amended at 42 U.S.C. § 1396n(c)).  Section 1915(c) of the

Act permits states to offer an array of home and community-based services an individual needs to

avoid institutionalization.  *See* 42 C.F.R. § 441.300.  The waiver program allows states to deviate

from Medicaid requirements in the following ways: (1) services do not have to be provided

statewide; (2) states can use more liberal financial eligibility criteria; and (3) designated groups

can be given benefits that other groups are not eligible to receive.[9]  *See* 42 U.S.C. § 1396n(c)(3);

42 C.F.R. § 430.25.  Consequently, states can use federal and state monies to fund the provision

of home and community-based services and bring a broader range of services into Medicaid

---

[9] The final rule implementing § 2176 of the Omnibus Budget Reconciliation Act of 1981
makes clear that under the waiver, unlike a State plan, "home and community-based services do
not have to be provided throughout the State."  *See* 50 FR 10013 (1985).  Moreover, "a State can
choose to provide home and community-based services to a limited group of eligibles, such as the
developmentally disabled."  *Id.*  Significantly, "[t]he State is not required to provide the services
to all eligible individuals who require an ICF (intermediate care facility) or SNF (skilled nursing
facility) level of care."  *Id.*  The State also may exclude those individuals for whom there is
reasonable expectation that home and community-based services would be more expensive than
the Medicaid services the individual would otherwise receive.  *Id.*

coverage without adhering to the strict mandates of the Medicaid system.  *See* 42 C.F.R. §

430.25.[10]  However, states have to meet certain requirements to receive federal funding.  For

example, the state must demonstrate that the program is "cost neutral."  *See* 42 U.S.C. §

1396n(c)(2)(D); *see also*, Auerbach Aff., Ex. C, pg. 2 (Lewin Report– Review of the Medicaid

1915(c) Home and Community Based Services Waiver Program Literature and Program Data).

Essentially, the cost neutrality test requires that the average costs with the waiver must be equal

to or less than the average costs without the waiver.

     To participate in the waiver program, states must apply to the federal Centers for

Medicaid and Medicare Services (CMS), formerly known as the Health Care Financing

Administration (HCFA).  42 C.F.R. § 430.25(e).  The Administrator of CMS has the authority to

approve or deny requests but must consult with the Secretary of DHSS before denying a request.

*S*ee 42 C.F.R. § 430.25(f)(2)(ii).

**2.  New Mexico's State Plan and Waiver Programs**

     In accordance with the Medicaid program, the State of New Mexico offers services and

treatment for eligible individuals with developmental disabilities through intermediate care

facilities for the mentally retarded (ICF/MR's).  *See* 42 U.S.C. § 1396a(a)(10)(C)(iv).  ICF/MR's

---

[10] Section 430.25(b) states:

    Waivers are intended to provide the flexibility needed to enable States to try new or
    different approaches to the efficient and cost-effective delivery of health care services, or
    to adapt their programs to the special needs of particular areas or groups of recipients.
    Waivers allow exceptions to State plan requirements and permit a State to implement
    innovative programs or activities on a time-limited basis, and subject to specific
    safeguards for the protection of recipients and the program.

42 C.F.R. § 430.25(b).

provide food, shelter, health or rehabilitative and active treatment for the developmentally

disabled or individuals with related conditions.  Defs. Mem. in Supp. of Mot. to Dismiss at 5.

According to Defendants, as of 1999, six provider agencies are licensed to operate ICF/MR's in

New Mexico.  *Id.*  These agencies operate thirty-seven facilities or residences, each facility

serving between four and sixteen residents, with most facilities serving four or eight persons.  *Id.*

Similarly, nursing facilities provide state and federally financed services to elderly individuals with

disabilities who meet qualification criteria.  *Id.*  In this case, Plaintiffs allege they are receiving

these services or are qualified to receive these services.

     Although there is now a separate statutory section for the provision of certain home and

community-based services for the elderly, see 42 U.S.C. § 1396n(d),[11] in 1984, the State of New

Mexico applied for and received approval of its DD and D&E waiver programs under §

1396n(c).[12]  The availability of waiver services in New Mexico is specifically limited by "the

---

[11] Section 1396n(d)(1) provides in pertinent part:

> Subject to paragraph (2), the Secretary shall grant a waiver to provide that a State plan
> approved under this subchapter shall include as "medical assistance" under such plan
> payment for part or all of the cost of home or community-based services (other than room
> and board) which are provided pursuant to a written plan of care to individuals 65 years of
> age or older with respect to whom there has been a determination that but for the provision
> of such services the individuals would be likely to require the level of care provided in a
> skilled nursing facility or intermediate care facility the cost of which could be reimbursed
> under the State plan.

42 U.S.C. § 1396n(d)(1).

[12] Section 42 U.S.C. § 1396n(c)(1) provides in pertinent part:

> The Secretary may by waiver provide that a State plan approved under this subchapter
> may include as "medical assistance" under such plan payment for part or all of the cost of
> home or community-based services (other than room and board) approved by the Secretary
> which are provided pursuant to a written plan of care to individuals with respect to whom
> there has been a determination that but for the provision of such services the individuals

availability of appropriations provided expressly for this purpose . . . ."  N.M.Stat.Ann § 28-16A-13 (Michie Repl. Pamp. 1993).  As previously noted, referral for these services is through a centralized registry of individuals seeking waiver services.  The State of New Mexico is currently authorized to serve 3200 persons under the DD waiver and 1950 persons under the D&E waiver.  However, the State does not provide waiver services to that number of individuals under either waiver.

Plaintiffs complain the State is only providing DD waiver services to 2,500 individuals and only 1500 individuals are receiving D&E waiver services.[13]   Additionally, Plaintiffs assert the State may also request an increase in the number of persons the waivers may serve.  Plaintiffs argue that in spite of the State's authority to serve more individuals under both waivers, it has chosen to maintain a waiting list for waiver services.  According to Plaintiffs, there are 2,600 individuals currently waiting to receive DD waiver services and 2,500 individuals waiting to receive D&E waiver services.  Plaintiffs stress the majority of these individuals have been waiting to receive waiver services for periods in excess of ninety days in violation of § 1396a(a)8 (the "reasonable promptness" provision).  Plaintiffs claim that almost five hundred individuals have waited for more than three years to receive DD waiver services, while others have waited as long

---

would require the level of care provided in a hospital or a nursing facility or intermediate care facility for the mentally retarded the cost of which could be reimbursed under the State plan.

42 U.S.C. § 1396n(c)(1).

[13] As of June 30, 2002, approximately 2,837 individuals had approved plans of care for the DD Waiver program and 1,512 individuals were receiving D&E Waiver services.  Defs.' Opp'n to Pls.' Mot. for Summ. J. at 4.

as ten years.  And, approximately 430 individuals have waited for D&E waiver services for more

than two years, while some have waited as long as twelve years.

Finally, Plaintiffs claim Governor Johnson has consistently requested less money than the

legislature appropriated to the DD and D&E Waiver programs, and the DOH in many years failed

to use all the money appropriated for these programs.  Plaintiffs claim that in 1995, Governor

Johnson requested $3.5 million for the D&E Waiver program, and the legislature appropriated $4

million.  In 1996, Governor Johnson requested $4 million for the D&E Waiver program and $1

million for the DD Waiver program; the legislature appropriated $4.9 million and $8.5 million,

respectively.  In 1997, Governor Johnson requested $4.5 million for the D&E Waiver program

and $13.7 million for the DD Waiver program; the legislature appropriated $4.9 million and $14.1

million, respectively.  In 1999, Governor Johnson requested $16.3 million for the DD Waiver

program; the legislature appropriated $18.1 million.  In 2000, Governor Johnson requested $4.9

million for the D&E Waiver program and $18.1 million for the DD Waiver program; the

legislature appropriated $6.7 million and $33.9 million, respectively.  In 2002, Governor Johnson

requested $6.9 million for the D&E Waiver program and $40 million for the DD Waiver program;

the legislature appropriated $7.8 million and $44 million, respectively.  Additionally, the DOH

failed to spend $447,000 in 1998, $183,000 in 1999, $3,963,000 in 2000, and $718,000 in fiscal

year 2001 for the DD Waiver program.  The DOH also failed to spend $1,583,000 in 2000 and

$995,000 in 2001 for the D&E Waiver program.

Defendants dispute Plaintiffs' assertions.  Defendants claim Plaintiffs "misrepresent the

terms of the waiver renewal applications and approvals."  Defs.' Opp'n to Pls.' Mot. for Summ. J.

at 2.  Defendants maintain the current letter from CMS approving the waivers as proposed by the

State in its DD Waiver renewal application states: "The approval is subject to your agreement to serve no more individuals [sic:than] indicated on your Factor "C" in your approved per capita expenditure estimate."   Defs.' Mem. in Supp. of Def. Governor Gary Johnson's Mot. for Summ. J., Maruca Aff. ¶ 5, and Ex. A.  In turn, Factor "C" for the DD Waiver program indicates 3,100 as the number of unduplicated recipients for the waiver year 2000-2001.  This number is designated on a form provided by the HCFA and states: "The State will make waiver services available to individuals in the target group up to the lesser of the number of individuals indicated as Factor C for the waiver year, or the number authorized by the State legislature for that time period."  Maruca Aff. ¶ 6, and Ex. B.

Similarly, the CMS letter approving the D&E Waiver currently in effect as proposed by the State in its waiver renewal application states: "This approval is subject to your agreement to provide home and community-based services to no more individuals than those indicated on the estimate of Factor C in your approved per capita expenditure estimates."   Maruca Aff. ¶ 7 and Ex. C.  In turn, Factor "C" for the D&E Waiver indicates 1,950 as the number of unduplicated recipients for the latest waiver year.  Again, this number is designated on a form provided by the HCFA and states: "The State will make waiver services available to individuals in the target group up to the lesser of the number of individuals indicated as Factor C for the waiver year, or the number authorized by the State legislature for that time period."  Maruca Aff. ¶ 8, and Ex. C. Defendants construe this language to mean that the State is authorized to serve only the number of individuals for which the legislature chooses to authorize funding, up to 3,100 DD recipients and up to 1,950 D&E recipients.

Defendants also dispute the number of individuals Plaintiffs claim are currently waiting for DD and D&E waiver services.  Defendants contend the numbers cited by Plaintiffs for individuals waiting for waiver services were accurate "estimates" of the number of active cases on the State's Central Registry.  Defendants provided this information in discovery but contend the estimates do not accurately represent the number of  individuals who "have been waiting to receive waiver services."  Defs.' Opp'n to Pls.' Mot. for Summ. J. at 5.   Defendants claim that as to DD waiver services the only way to know the number of individuals waiting to receive services would be to contact everyone on the registry and inquire as to (1) whether they are still alive; (2) whether they still desire the services; (3) whether they qualify financially for the program; and (4) whether they still reside in the State.  *Id.*

Additionally, Defendants contend that approximately twenty percent of the individuals on the Central Registry who are offered allocations to the DD Waiver program do not complete the process for obtaining waiver services because they either refuse services, do not meet Medicaid's eligibility requirements, or because they do not respond to the offer and the State cannot locate them.  The Central Registry also includes a number of individuals who have applied for DD waiver services and have been offered the services, but they have elected to defer completing the process for determining Medicaid financial and clinical eligibility on a year-to-year basis.  Defs.' Opp'n to Summ. J., Rangel Aff. ¶ 4 & Ex. C.  Defendants maintain Arc of New Mexico advocated for this "deferral option."

In terms of the D&E Waiver program, Defendants contend a significant percentage of individuals on the Central Registry do not respond to letters advising them of allocations to the program.  Defendants claim this is due to a variety of reasons, such as death, ineligibility, or

refusal of services.  For example, in June of 1999, 411 individuals were allocated to the D&E

Waiver program.  Of this number, 96 individuals did not respond and at least 155 individuals were

denied waiver services because of ineligibility or because they declined services.   Mem. in Supp.

Defs.' Mot. for Summ. J. on Claims of Plaintiffs Ben Lewis, Aaron Norrid, Fred Romero, Faye

Morgan and Deborah Eminger, Ex. B., Flores-Lopez Aff. ¶ 16.  Moreover, in calendar year 1999,

of the 654 individuals who were sent allocation letters, 81 failed to respond, 95 declined waiver

services, and at least 8 failed Medicaid's eligibility standards.  *Id.* ¶ 17.

    Defendants also dispute that the DOH failed to spend all waiver appropriations.

Defendants maintain that "while not all waiver appropriations were spent during the fiscal years

they were appropriated, those funds were obligated to be used as allocations were made during

the fiscal years, usually beyond the level of appropriation."   Defs.' Opp'n to Pls.' Mot. for Summ.

J. at 11.  According to Defendants, this occurred because of the time it took to place individuals

into waiver services after allocation.  Additionally, Defendants explain that because DD and D&E

waivers are included on the same budget line item, deficits for the D&E waiver program would be

paid from the unliquidated funds set aside for the DD Waiver program. *Id.* at 12.   At other times,

unliquidated waiver funds were used for other valid items either related to the waivers or

otherwise authorized by the legislature.  Defendants, however, admit that "[d]espite the

Department of Health's best effort, the entire appropriation in certain fiscal years was not spent."

*Id.,* Ex. G.  Defendants further admit that when appropriated funds were not spent during a fiscal

year, "they either reverted to the General Fund or were reappropriated as cash to the DD Waiver

program in addition to the General Fund appropriation the following year."   *Id.*

It is evident to the Court that § 1396n(c) contemplates State waiver plans with definite limits on the number of individuals served.  For example, § 1396n(c)(9) states, "In the case of any waiver under this subsection which contains a limit on the number of individuals who shall receive home or community-based services, the State may substitute additional individuals to receive such services to replace any individuals who die or become ineligible for services under the State plan." 42 U.S.C. § 1396n(c)(9).  Section 1396n(c)(10) also allows caps to no fewer than 200 individuals in the State who may receive home and community-based services under a waiver.  42 U.S.C. 1396n(c)(10).  *See also,* 42 C.F.R. § 441.303(6) ("The State must indicate the number of unduplicated beneficiaries to which it intends to provide wavier services in each year of its program. This number will constitute a limit on the size of the waiver program . . . .").

Moreover, unlike State Medicaid plans which are required to provide the same services (in amount, duration, and scope) to all needy individuals throughout the State, home and community-based services do not have to be provided throughout the State and the services can be  provided to a limited group of eligibles.  *See* 50 F.R. 10013 (1985).  As previously noted, "the State is not required to provide the [waiver] services to all eligible individuals who require an ICF or SNF level of care."  *Id.*  Section 1396n(c)(4) specifically authorizes States to "limit the individuals with respect to whom the State has determined that there is a reasonable expectation that the amount of medical assistance provided with respect to the individual under such waiver will not exceed the amount of such medical assistance provided for such individual if the waiver did not apply." 42 U.S.C. § 1396n(c)(4)(A).

Furthermore, the cases on which Plaintiffs rely do not support their position.  Plaintiffs cite to *Boulet v. Cellucci*, 107 F. Supp.2d 61 (D. Mass. 2000), *Cramer v. Chiles*, 33 F. Supp.2d 1342

33

(S.D. Fla. 1999), *Doe v. Chiles*, 136 F.3d 709 (11th Cir. 1998), and *Boudreau v. Ryan,* 2001 WL

840583 (N.D. Ill. 2001), *vacated in part sub nom.*, *Bruggeman v. Blagojevich*, 324 F.3d 906 (7th

Cir. 2003), for the proposition that "maintaining waiting lists for home and community-based

waivers violate federal requirements of reasonable promptness."  Mem. in Supp. of Pls.' Mot. for

Summ. J. at 15.  *Boudreau* does not stand for the proposition advanced by Plaintiffs.  The

*Boudreau* court found it could not grant defendants' motion to dismiss because it needed more

facts regarding the appropriateness of  Illinois' practice of keeping individuals who desired waiver

service waiting even though there were open slots available.  *Chiles* did not address waiver

programs, so it is not applicable to this case.

 *Cramer* addressed waiver programs in a different context.  *Cramer* addressed the notice

provisions and the "freedom of choice" provision of the Medicaid Act.  Under the Medicaid Act,

the state must provide individuals with an opportunity for a hearing before the governmental

agency when a claim for medical assistance is denied or is not acted upon with reasonable

promptness, including when the Medicaid agency takes action to suspend, terminate, or reduce

services.  See 42 U.S.C. § 1396a(a)(3); 42 C.F.R. § 431.200.  Under the freedom of choice

provision, 42 U.S.C. § 1396n(c)(2)(C), "individuals with developmental disabilities have, within

cost limitations, freedom of choice regarding services."  *Cramer*, 33 F. Supp.2d at 1352.

 *Cramer* involved developmentally disabled individuals residing in private intermediate care

facilities (ICF/DD).  The State of Florida, by legislation, intended to terminate private ICF/DD

facilities and replace them with home and community-based waiver services.  However, the State

of Florida's 1996-1997 state budget reduced funding for the existing Home and Community-

Based Waiver and provided that large state-operated institutions with ICF/DD services could

provide services under the Home and Community-Based Waiver in the same institutions and

nursing home type facilities but without the regulatory requirements of ICF/DDs.  Under the

legislation, ICF/DD services were to be available only in state-operated Development Services

Institutions (DSIs).  However, there were only four DSIs located in four counties in the State.

The Court found that in denying plaintiffs adequate notice and an opportunity for a hearing to

challenge the termination of the private ICF/DD program and continued benefits pending their

appeals, defendants had violated federal Medicaid law and fundamental due process.  *Id*. at 1352.

The Court further found the legislation and the underfunding of the Home and Community-Based

Waiver effectively eliminated a choice between ICF/DDs and home and community-based waiver

services.  Therefore, the Court found the legislation violated federal Medicaid law.  *Id*. at 1352.

Because defendants intended to use Home and Community-Based Waiver funds to provide

services in populated institutions and nursing homes, the Court also found the legislation and

defendants violated the Americans with Disabilities Act.  *Id*. at 1354.        The Court in *Boulet*

addressed the issue before the Court.  In *Boulet*, mentally retarded individuals sued the State of

Massachusetts and other state officials under § 1983, alleging they had not received the medical

assistance they were entitled to under Medicaid with reasonable promptness.  Specifically, the

plaintiffs sought placement in "small community-based 24-hour residential settings" under

Massachusetts' waiver program.  As in this case, defendants argued that while the state had the

option of providing waiver services, plaintiffs "had no legal entitlement to such services and

therefore [could] not demand that the services be furnished promptly."  *Id.* at 76. Rejecting

defendants' argument, the Court held that "Plaintiffs [were] entitled to those waiver services

which they [had] requested and for which they [were] eligible and further that § 1396a(a)(8)

applied to waiver services as well as to services under the state plan." *Id.* at 78.

Nonetheless, the Court agreed with defendants that Congress intended the waiver

provision "to expand, not restrict, the horizons of what states may do in providing services to

eligible people." *Id.* at 76.  The State of Massachusetts' waiver program called for providing

services to 11,280 individuals in 1999, 10,514 in 2000, 11,139 in 2001 and 11,764 in 2002.  The

Court characterized these limitations on waiver services as a "cap on waiver services"  which the

statute permitted.  The Court recognized that "while all eligible individuals [were] entitled to

waiver services, the statutory scheme allow[ed] a cap which may prevent some of those eligible

individuals from receiving the services they request[ed]." *Id.*  The Court stated the cap was

"simply a constraint on eligibility." *Id.* at 77.  The Court reasoned that individuals who applied

for waiver services after the cap had been reached were not eligible or alternatively the waiver

services were not feasible for them until the cap had risen to include them. *Id.*  Therefore, the

Court found the state's waiver services "to be an entitlement for eligible individuals at least up to

the cap." *Id.* at 78.  The Court further found the waiting list violated the "reasonable

promptness" requirement <u>if settings were available</u> for the services plaintiffs requested. *Id.* at 80

(emphasis added).

Plaintiffs cite to *Makin v. Hawaii,* 114 F. Supp.2d 1017 (D. Haw. 1999), for the

proposition that inadequate funding does not excuse failure to comply with the reasonable

promptness requirement.  Mem. in Supp. of Pls.' Mot. for Summ. J. at 17.  However, it is also

instructive on the issue before the Court.  In *Makin*, mentally retarded individuals challenged the

State of Hawaii's administration of its home and community-based waiver services for the

developmentally disabled or mentally retarded.  The objective of Hawaii's home and community-based waiver was to offer mentally retarded individuals an alternative to institutionalization in ICF-MR's.  Plaintiffs were mentally retarded individuals living at home who had requested home and community-based services but because of lack of state funding for the services were placed on waiting lists.  The waiting list was comprised of individuals requesting waiver services and who met the waiver programs' requirements but for whom a space in the program was not available.

In the State of Hawaii, the Department of Human Services (DHS) administers the Medicaid program pursuant to HRS § 346-17(7).  The Department of Health (DOH) administers the waiver program and the waiting list. Under Hawaii's statutory scheme, Hawaii sets "population limits" on the home and community-based waiver program "to the extent of its appropriations."  *Id.* 1022.  Defendants claimed its "population limit" was determined by the State's renewal application to HCFA.[14]   In HCFA's approval of Hawaii's waiver renewal, HCFA indicated the approval was "subject to [the State's] agreement to provide services for the lesser of the number of individuals listed in column "C" below (the number listed as the estimated amount of individuals to be served by the waiver program), or the number authorized by the State legislature and/or the State DOH by appropriation for that time period."  *Id.*  (emphasis added). Defendants claimed "this 'number' sets the 'population limit' on the number of individuals able to be served by the state HCBS-MR program."  *Id.*  Plaintiffs countered that defendants had

---

[14] A portion of the renewal application requested an estimate of the number of "unduplicated individuals" that the state expected to serve during the relevant years of the program.  In its most recent application, the State of Hawaii estimated in column "C" of the application that it expected to serve 863 individuals during the fiscal year 1997-98, 976 individuals during fiscal year 1998-99, 1089 individuals during fiscal year 1999-2000, and 1200 individuals during fiscal year 2000-01.  *Makin*, 114 F. Supp.2d at 1022.

returned $47,776 to the state treasury from the DOH fund that funded the waiver program and therefore there was not a lack of funding for some of the individuals on the waiting list.

Taking into consideration that the services the plaintiffs sought were available in institutions but were refused by plaintiffs in favor of a community setting, the Court found the statute and regulations provided for limits to home and community-based waiver services. *Id.* at 1027. The Court examined the statute and the agency regulations and concluded that once the HCFA approved the number of individuals to whom the state intended to grant waiver services in each of the years covered by the wavier application, it became the "population limit" on the waiver services. *Id.* at 1027-28. The Court concluded that the home and community-based waiver program was not an entitlement and nothing in the statute required the State to provide waiver services beyond the population limit. *Id.* at 1028. The Court found defendants had not violated the reasonable promptness provision by maintaining waiting lists because under the statute the State was only required to provide available medical assistance with reasonable promptness and the waiver services were not "available" once the population limits were reached. *Id.* 1030-31. However, the Court denied defendants' motion for summary judgment as to the "unfilled" slots because defendants had not provided any justification for their failure to fill them. *Id.* at 1031.

In this case, Defendants advance the same arguments as did the defendants in *Boulet* and *Makin.* In New Mexico, pursuant to the Developmental Disabilities Act, the State authorizes the DOH to provide community-based services for developmentally disabled individuals "subject to the availability of appropriations." *See* N.M.Stat.Ann. § 28-16A-13 (Michie Repl. Pamp.1993). Defendants also rely on the waiver renewal applications and approvals to support their argument

that the federal government has authorized the State to serve only the number of individuals for which the legislature has authorized funding, up to 3,100 DD recipients and up to 1,950 D&E recipients.  Def. Governor Gary Johnson's Mot. for Summ. J. on Grounds of Legislative Immunity, Maruca Aff. ¶ 5 and Ex. A.  Defendants further claim waiver programs are not entitlement programs specifically because the states are authorized to restrict the number of individuals they serve and the amount of money they spend.  Defs.' Opp'n to Pls.' Mot. for Summ. J., Ex. I, Auerbach Aff.¶ 15;  Defs.' Opp'n to Pls.' Mot. in Limine, Ex. A, Milligan Aff. ¶ 11.  Accordingly, Defendants contend "the waiver statutes, regulations, and the terms of New Mexico's waivers themselves preclude § 1396a(a)(8) from benefitting individuals who have not been allocated to an unduplicated recipient slot in the program."  Defs.'s Opp'n to Pls.' Mot for Summ. J. at 20.

Section 1396n(c) and the implementing regulations support Defendants' position regarding the State's right to limit waiver services.  However, the courts that have addressed the issue of whether the reasonable promptness provision applies once the state determines an individual is eligible for waiver services and a slot is available for that individual have found that the provision does apply.  In this case, the State of New Mexico limits waiver services to those individuals it determines eligible for waiver services and for whom an unduplicated recipient slot is available.  Whether the Court construes this limitation on waiver services as "caps" or "population limits," the result is the same.  For those individuals who are determined to be eligible for waiver services but for whom there is no available unduplicated recipient slot, the reasonable promptness provision does not apply.

In this case, the State does not determine eligibility until an unduplicated recipient slot is available in its waiver program and the individual is allocated that slot . Under the statute and its implementing regulations, the State is authorized and encouraged to try "new or different approaches to the efficient and cost-effective delivery of health care services." *See* 42 C.F.R. § 430.25(b). Defendants have advanced a reasonable and cost-effective explanation for not determining eligibility until an individual is allocated a slot in the desired waiver program. Moreover, even if Defendants determined eligibility when the individual registered for waiver services, under the statute and the regulations, the State would not have to provide waiver services until there was an available unduplicated recipient slot.

Having found the reasonable promptness provision applies to waiver services once an individual is allocated an unduplicated recipient slot and the individual is eligible for the waiver services, the Court will address Plaintiffs' claims that (1) the State has failed to allocate available unduplicated recipient slots in a reasonably prompt manner, and (2) for several years the State has failed to use all the money appropriated for waiver programs. In other words, Plaintiffs claim Defendants are not providing Medicaid waiver services to eligible individuals with reasonable promptness in violation of § 1396a(a)(8).

As previously noted, the CMS letters approving the waiver programs as proposed by the State in its waiver renewal applications state: "The State will make waiver services available to individuals in the target group up to the lesser of the number of individuals indicated as Factor C for the waiver year, or the number authorized by the State legislature for that time period." Maruca Aff. ¶a 6, and Ex. B (emphasis added). Factor C for the DD waiver program is 3100 and factor C for the D&E waiver program is 1,950. Additionally, the State of New Mexico limits it

40

waiver services by "the availability of appropriations provided <u>expressly</u> for this purpose . . . ."
N.M.Stat.Ann. § 28-16A-13 (Michie Repl. Pamp. 1993)(emphasis added).  Relying on the above

language in its waiver renewal applications and on § 28-16A-13, Defendants maintain the State is

authorized to serve only the number of individuals for which the legislature chooses to authorize

funding, up to 3,100 DD recipients and up to 1,950 D&E recipients.  According to Defendants

"regular allocations to the DD waiver occur at least twice a year when the DOH conducts a

<u>budget review</u>" and "[r]egular allocations to the D&E waiver are made periodically throughout

each fiscal year according to the <u>availability of funds</u>."  Defs.' Opp'n to Pls.' Mot. for Summ. J. at

18, undisputed facts 22 & 23 (emphasis added).

Plaintiffs assert the State has not always spent the appropriations provided expressly for

waiver services.  Defendants do not dispute this assertion.  Defendants admit that "Despite the

Department of Health's best efforts, the entire appropriation in certain fiscal years was not spent."

Defs.' Opp'n to Pls.' Mot. for Summ. J., Ex. G.  In 2000, the unexpended balance was

$3,963,000.  This is a significant amount of money Defendants could have used to create more

unduplicated recipient slots for individuals registered for waiver services.  Defendants have

advanced different reasons why appropriations were not spent during the fiscal years they were

appropriated.  *See* Defs.' Opp'n to Pls.' Mot. for Summ. J. at 11.  Defendants admit, for example,

that "[t]he funds were not always liquidated during the fiscal years they were appropriated

because of the time it took to place people into services <u>after allocation</u> . . . ."  *Id*. (emphasis

added).  Defendants further admit that, in some instances, "individuals who were allocated to the

DD and D&E Waiver programs would not come into services until the following year, or not at

all.  This occurred for a number of reasons, including difficulties in contacting those individuals, in

verifying financial eligibility, and the existence of individuals who were not deemed eligible for the programs."  Defs.' Opp'n to Pls.' Mot. for Summ. J., Ex. G.

Since the filing of this action, Defendants have taken remedial steps to "shorten the time between allocation and the provision of services."  Defs.' Opp'n to Pls.' Mot. for Summ. J., Ex. H. Defendants have made the following changes to the process: (1) improved its method in procuring psychological and physical examinations and other evaluations needed for determining eligibility; (2) identified staff member "champions" in each of its regional offices to act as point persons to assist allocated individuals and their families through the eligibility process; (3) the DOH has begun the allocation process in the fiscal year 2000 prior to when new fiscal year 2001 funds were available; (4) the Long Term Services Division (LTSD) sends reports to regional offices on outstanding open allocations so the regional office can follow up with the individuals and their families; and (5) in fiscal year 1999, the LTSD began to review expenditures on a monthly basis and to make allocations no less than quarterly (Defendants claim this level of review kept funds flowing for client services and did not overwhelm the provider system).  Defs.' Opp'n to Pls.' Mot. for Summ. J., Ex. H.

The Court recognizes the State has great discretion in developing its waiver programs, including setting eligibility requirements and limitations for waiver services.  Nonetheless, this discretion is not unfettered.  Once the State sets up its waiver programs, it is obligated to implement the waiver programs as it has fashioned them.  In this case, the State has set limits for waiver services up to the "availability of appropriations provided expressly for this purpose."  By not spending the appropriations earmarked for waiver service, Defendants are not fulfilling their obligation.  And, although Defendants presented evidence that they have provided other non-

42

waiver services to individuals on the Central Registry, this does not excuse Defendants' failure to

use available funds for waiver services and to provides those services with reasonable promptness.

*Cf., Boulet*, 107 F. Supp.2d at 79 ("The fact that they have been receiving other services and that

they might be able to receive placement in large institutions . . . cannot be sufficient to satisfy §

1396a(a)(8)."). Defendants have advanced several reasons for the delays in providing waiver

services <u>after allocation</u> to the desired waiver program. Most appear to be due to their

administrative procedures. However, the regulations require state agencies to "furnish Medicaid

promptly without any delay caused by the agency's administrative procedures." 42 C.F.R. §

435.930(a). Though it may be difficult to determine exactly what is meant by "reasonable

promptness" in the provision of waiver services, in this case, individuals remain on the Central

Registry for years. Moreover, Defendants admit that, in some instances, individuals allocated to

the waive programs would not receive the services until the following year. Accordingly, the

Court will grant Plaintiffs' Motion for Summary Judgment as to Count I and II as to those eligible

individuals for whom there is an available unduplicated recipient slot.

**Conclusion**

Based on § 1396n(c) and the implementing regulations, the Court finds that the reasonable

promptness provision, § 1396a(a)(8), applies to individuals on the Central Registry who are

determined eligible for waiver services and for whom there is an available unduplicated recipient

slot. Because Plaintiffs' claims that the State has failed to fill available unduplicated recipient

slots in a reasonably prompt manner and has failed to use all the money appropriated for waiver

programs are not in dispute, summary judgment will be granted. Therefore, Plaintiffs' motion for

summary judgment as to Count I and II is granted.

### D.  Defendants' Motion to Strike all Claims Seeking Class Action-Like Relief

Defendants move the Court for an order denying class action-like relief.  According to Defendants, the Court should strike claims made on behalf of persons who are "similarly situated" to Plaintiffs because Plaintiffs have not brought this suit as a class action.  Defendants complain that "Plaintiffs have failed to include class allegations, propose a class definition, or move for class certification."  Defs.' Mem. in Supp. of Mot. to Strike All Claims Seeking Class Action-Like Relief at 2.

According to Plaintiffs, they "seek a declaration that the waiting periods maintained by the State of New Mexico violate the Medicaid Act and seek an injunction directing Defendants to provide Waiver services with reasonable promptness."  Pls.' Opp'n to Mot. to Strike at 2. Plaintiffs argue that, if the Court grants the relief sought, the relief will benefit all persons on the waiting list thus making class certification unnecessary.  *Id.*

Defendants filed this motion prior to the Court ruling on Defendants' Motion to Dismiss P&A for lack of standing.  In its November 5, 2002 Memorandum Opinion and Order, the Court denied Defendants' motion to dismiss and found P&A has standing to bring this action on behalf of its constituents.  Therefore, many of Defendants' arguments are moot.  Specifically, in its November 5, 2002 Memorandum Opinion and Order, the Court rejected Defendants' claim that P&A did not have statutory authority to represent "the unidentified and unknown persons" in the present case.  Defendants raise this same argument in their motion to strike and contend Plaintiffs "must resort to the class action requirements in Rule 23 in order to bring claims on behalf of others."  Defs.' Mem. in Supp. of Mot. to Strike All Claims Seeking Class Action-Like Relief at 8.

In addressing Plaintiffs' Motion for Summary Judgment as to Counts I and II, the Court found Defendants must provide waiver services with reasonable promptness to eligible individuals for whom an unduplicated recipient slot is available.  This ruling will benefit all individuals on the Central Registry.  Proceeding as a class action would serve no useful purpose.  *See e.g., Kansas Health Care Association v. Kansas Department of Social and Rehabilitation Servs.*, 31 F.3d 1536, 1548 (10th Cir. 1994)(action by nursing homes challenging Kansas Medicaid reimbursement rates; relief would affect the interests of all the potential class members, regardless of whether a class was formally certified ); *Martinez v. Richardson*, 472 F.2d 1121, 1126 (10th Cir. 1973)(action for injunctive relief by Medicare recipients against Secretary of Health, seeking to prevent termination of benefits without a prior hearing; class action not necessary because the same relief would be afforded all potential class members); *Bennet v. Butz*, 386 F. Supp. 1059, 1072 n.1 (D. Minn. 1974)(action seeking declaratory and injunctive relief by food stamp recipients; because the relief sought would be identical regardless of whether or not a class action was maintained, court found no useful purpose for proceeding as a class).  Accordingly, Defendants' motion to strike is denied.

**IT IS THEREFORE ORDERED** that Plaintiffs' Motion for Summary Judgment on Counts I and II of the Amended Complaint **[Doc. No. 133]** is granted; Defendant Governor Gary Johnson's Motion for Summary Judgment on Grounds of Legislative Immunity **[Doc. No. 136]** is granted; Defendants' Motion to Strike all Claims Seeking Class Action-Like Relief **[Doc. No. 134]** is denied; and Plaintiffs' Motion to Strike Affidavits Supporting Defendants' Opposition to Plaintiffs' Motion for Summary Judgment **[Doc. No. 159]** is denied.

**Dated** this 5th day of August, 2003.

_____
**MARTHA VÁZQUEZ**
**UNITED STATES DISTRICT JUDGE**

<u>**Attorneys for Plaintiffs:**</u>
Duff Westbrook
Michael C. Parks
V. Colleen Miller

<u>**Attorneys for Defendants:**</u>
Charles A. Pharris
Kurt Wihl
Margaret Davidson
Gary J. Van Luchene