# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

**BEN LEWIS, AARON NORRID, BILLY
JO QUISENBERRY and FRED ROMERO,
by and through their legal guardian and next
friend THE ARC OF NEW MEXICO,
BREANNE LIDDELL, by and through her
parent and legal guardian JUDY LIDDELL,
MATTHEW ALLEN, by and through his
parents and legal guardians JIM and
ANGELA ALLEN, FAY MORGAN,
DEBORAH EMINGER and PROTECTION
AND ADVOCACY SYSTEM, INC.,**

                      **Plaintiffs,**

**vs.**                                             **No. CIV 99-0021 MV/JHG**

**NEW MEXICO DEPARTMENT OF
HEALTH, NEW MEXICO  DEPARTMENT
OF HUMAN SERVICES, J. ALEX VALDEZ,
Secretary of the Department of Health and
Secretary Designee of the Department of
Human Services in his official capacities, and
GOVERNOR GARY JOHNSON in his
official capacity,**

                      **Defendants.**

## MEMORANDUM OPINION AND ORDER

      **THIS MATTER** is before the Court on the following motions: (1) Plaintiff's *Corrected
Motion for Order to Show Cause Why Defendants Should not be Held in Contempt of Court for
Failing to Comply With This Court's February 5, 2004 Order and Memorandum Brief in Support
Thereof* **[Doc. No. 222]**, filed September 27, 2004; and (2) Plaintiff's *Second Motion for Order to
Show Cause Why Defendants Should Not be Held in Contempt of Court for Failing to Comply*

With This Court's February 5, 2004 Judgment and Memorandum Brief in Support Thereof **[Doc. No. 232]**, filed January 13, 2005.  Having reviewed the motions, the memoranda in support and in opposition, and having reviewed the transcript of the February 18, 2005 hearing held before the Honorable Joe H. Galvan, the Court finds that the motions are not well taken and will be denied.

## I.  Discussion

### A.  Plaintiff's Corrected Motion for Order to Show Cause

In Plaintiff's *Corrected* Motion for Order to Show Cause, Plaintiff contends Defendants have failed to comply with the Court's February 5, 2004 Judgment by not allocating all available, unduplicated recipient slots, by failing to determine the eligibility of applicants for available slots, and by failing to provide services to eligible individuals for whom an unduplicated recipient slot is available.  Defendants oppose the motion arguing Plaintiff's motion is an untimely attempt to seek reconsideration of the Court's Judgment.

Plaintiff contends Defendants have failed to allocate all available, unduplicated recipient slots for both waiver programs.  According to Plaintiff, Defendants "intend to allocate only 300 of the approximately 1,102 available unduplicated DD waiver slots (sic) recipient slots in the 2004-2005 fiscal year."  Pl.'s *Corrected* Mot. for Order to Show Cause at 2.  Additionally, Plaintiff claims Defendants are only serving 2,000 individuals on the D& E waiver, yet there are 2,500 unduplicated recipient slots in the D&E waiver.  Thus, Plaintiff contends there are "500 available unduplicated recipient slots in the D&E program which the Defendants have failed to fill."  *Id.*

Plaintiff bases its claims on its understanding of "unduplicated recipient slots."  Plaintiff asserts "[t]he number of unduplicated recipient slots is determined by taking the number of recipient slots set forth in the State's plan, 4,300, and subtracting from it the number of persons

receiving DD Waiver services under the State's DD waiver program.  The difference between

these two numbers equals the number of available unduplicated recipient slots."  *Id.* at 4.

Therefore, Plaintiff argues Defendants are not in compliance with the Court's Judgment because

only 3,288 individuals are receiving DD waiver services.  Plaintiff contends there are 1,102

(4,300-3,288) unduplicated recipient slots in the DD waiver program which Defendants have

failed to allocate.  Plaintiff advances similar arguments to support its claim that Defendants are

not complying with the Court's Judgment as to the D&E waiver.  *Id.* at 6.

Defendants maintain the State "can limit the number of waiver recipients to the number of

people for whom the Legislature has provided funding, and the State can await allocating an

unduplicated recipient slot until legislative funding is available."  Defs.' Resp. to *Corrected* Mot.

for Order to Show Cause at 7.  Additionally, Defendants contend "there is no requirement that the

State determine the eligibility of a potential recipient of waiver services before allocating an

unduplicated recipient slot to the individual."  *Id.*

Plaintiff's motion is based on its misunderstanding of the Court's August 5, 2003

Memorandum Opinion and the Court's February 5, 2004 Judgment.  At the inception of this

action, Plaintiffs maintained Defendants were required to provide home and community-based

services to *all* eligible individuals seeking Medicaid Waiver services.  *See e.g*, Pls.' Reply to

Defs.' Resp. to Mot. for Summ. J. at 10-12 [Doc. No. 151].  Thus, Plaintiffs argued that "waiting

lists violated Medicaid requirements."  Pls.' Mot. for Summ. J. at 15 [Doc. No. 133].  Plaintiffs

next argued Defendants were required to provide waiver services to all eligible individuals up to

the numerical caps contained in the approved waiver applications.

On the other hand, Defendants maintained the State could limit the individuals it can serve on the waiver programs according to the amount of money appropriated by the legislature. Defendants argued the State had "caps built into its waivers– caps that have been approved by CMS." Defs.' Opp. to Pls.' Mot. for Summ. J. at 21 [Doc. No. 147]. Defendants further argued "these caps include a numerical number of unduplicated recipient (UDR) slots, and further, limit the size of the waivers to the number funded by the New Mexico Legislature." *Id.* Therefore, Defendants maintained the state legislature could limit the number of people served by making appropriations to the waiver programs in amounts less than necessary to fund the full number of unduplicated recipient slots shown in Factor C of the State's waiver application. *Id.*

After thorough analysis of the evidence submitted by the parties, the Court agreed with Defendants' position. The Court found §1396n(c) contemplated State waiver plans with definite limits on the number of individuals served. *See* Court's August 5, 2003 Memorandum Opinion at 33. Specifically, the Court found:

> It is evident to the Court that §1396n(c) contemplates State waiver plans with definite limits on the number of individuals served. For example, §1396n(c)(9) states, "In the case of any waiver under this subsection which contains a limit on the number of individuals who shall receive home or community-based services, the State may substitute additional individuals to receive such services to replace any individuals who die or become ineligible for services under the State plan." 42 U.S.C. §1396n(c)(9). Section 1396n(c)(10) also allows caps to no fewer than 200 individuals in the State who may receive home and community-based services under a waiver. 42 U.S.C. §1396n(c)(10). *See also,* 42 C.F.R. §441.303(6)("The State must indicate the number of unduplicated beneficiaries to which it intends to provide waiver services in each year of its program. This number will constitute a limit on the size of the waiver program . . . .").
>
> Moreover, unlike State Medicaid plans which are required to provide the same services (in amount, duration, and scope) to all needy individuals throughout the State, home and community-based services do not have to be provided throughout the State and the services can be provided to a limited group of eligibles. *See* 50 F.R. 10013 (1985). As previously noted, "the State is not required to provide the [waiver] services to all eligible individuals who require an ICF or SNF level of care." *Id.* Section 1396n(c)(4) specifically authorizes States to "limit the individuals provided benefits under such waiver to individuals with respect to

4

> whom the State has determined that there is a reasonable expectation that the amount of
> medical assistance provided with respect to the individual under such waiver will not exceed
> the amount of such medical assistance provided for such individual if the waiver did not
> apply." 42 U.S.C. §1396n(c)(4)(A).

*Id.*  The Court also analyzed the cases cited by Plaintiffs and found they did not support their

position.  After setting forth all the factors it considered and its rationale, the Court concluded:

"Section 1396n(c) and the implementing regulations support Defendants' position regarding the

State's right to limit waiver services."  *Id.* at 33-39.

The confusion stems from the following language in the Court's August 5, 2003

Memorandum Opinion: "In this case, the State has set limits for waiver services up to the

"availability of appropriations provided expressly for this purpose."  *Id.* at 42.  This language

tracks the language of the Developmental Disabilities Act which Defendants cited in their

response to support their position.  In its Memorandum Opinion, the Court cited to this statute,

stating:

> In this case, Defendants advance the same arguments as did the defendants in *Boulet* and
> *Makin.*  **In New Mexico, pursuant to the Developmental Disabilities Act, the State
> authorizes the DOH to provide community-based services for developmentally disabled
> individuals "subject to the availability of appropriations."  *See* N.M.Stat.Ann. § 28-16A-
> 13 (Michie Repl. Pamp. 1993).**  Defendants also rely on the waiver renewal applications and
> approvals to support their argument that the federal government has authorized the State to
> serve only the number of individuals for which the legislature has authorized funding, up to
> 3,100 DD recipients and up to 1,950 D&E recipients. Def. Governor Gary Johnson's Mot.
> for Summ. J. on Grounds of Legislative Immunity, Maruca Aff. ¶ 5 and Ex. A.  Defendants
> further claim waiver programs are not entitlement programs specifically because the states are
> authorized to restrict the number of individuals they serve and the amount of money they
> spend.  Defs.' Opp'n to Pls.' Mot. for Summ. J., Ex. I, Auerbach Aff. ¶15; Defs.' Opp'n to
> Pls.' Mot. in Limine, Ex. A, Milligan Aff. ¶ 11.  Accordingly, Defendants contend "the waiver
> statues, regulations, and the terms of New Mexico's waivers themselves preclude
> §1396a(a)(8) from benefitting individuals who have not been allocated to an unduplicated
> recipient slot in the program."  Defs.' Opp'n to Pls.' Mot. for Summ. J. at 20.

> Section 1396n(c) and the implementing regulations support Defendants' position regarding the
> State's right to limit waiver services.  However, the courts that have addressed the issue
> of whether the reasonable promptness provision applies once the state determines an individual

is eligible for waiver services and a slot is available for that individual have found that the provision does apply.  In this case, the State of New Mexico limits waiver services to those individuals it determines eligible for waiver services and for whom an unduplicated recipient slot is available.  Whether the Court construes this limitations on waiver services as "caps" or "population limits," the result is the same. For those individuals who are determined to be eligible for waiver services but for whom there is no available unduplicated recipient slot, the reasonable promptness provision does not apply.

*Id.* at 42 (emphasis added).  After entry of the Court's Memorandum Opinion, Plaintiffs pointed

out to the Court that the Developmental Disabilities Act did not address the DD waiver program.

*See* Mem. in Support of Pls.' Mot. for Entry of Judgment at 3 n.3 [Doc. No. 194].  Plaintiffs also

argued the statute did not set a *specific number* of individuals to whom the State intended to

provide waiver services.  *Id.*  The Court considered Plaintiffs' arguments.  Nonetheless, the Court

based its conclusion that §1396n(c) allowed the State to restrict the number of individuals it

serves and the amount of money it spends on waiver programs on several factors and was not

persuaded that Plaintiffs' contrary position was supported by the evidence.  Accordingly, the

Court entered its Judgment.

In terms of a "cap" based on legislative funding, the Court found Defendants' arguments

compelling.  *See* August 5, 2003 Memorandum Opinion at 29-30.  The letter from CMS

approving the waiver as proposed by New Mexico in its renewal applications for the DD Waiver

states: "The approval is subject to your agreement to serve no more individuals [sic:than]

indicated on your Factor "C" in your approved per capita expenditure estimate."  *See* Maruca Aff.

¶5 (filed in support of Governor Gary Johnson's Motion for Summ. J. on Grounds of Legislative

Immunity [Doc. No. 137], Ex. B).  In turn, Factor "C" for the DD Waiver indicated 3,100 as the

number of unduplicated recipients for the waiver year 2000-2001.  *Id.*  This number is designated

on a form provided by the HCFA and states: "The State will make waiver services available to

individuals in the target group *up to the lesser* of the number of individuals indicated as Factor C

for the waiver year, or the number authorized by the State legislature for that time period."

Maruca Aff. ¶6 (emphasis added), Ex. B.

      Similarly, the CMS letter approving the D&E Waiver as proposed by New Mexico in its

waiver renewal application states: "This approval is subject to your agreement to provide home

and community-based services to no more individuals than those indicated on the estimate of

Factor C in your approved per capita expenditure estimates."  Maruca Aff. ¶7, Ex. C.  In turn

"Factor C" for the D&E Waiver indicated 1,950 as the number of unduplicated recipients for the

latest waiver year (2002).  Again, this number is designated on a form provided by HCFA and

states: "The State will make waiver services available to individuals in the target group *up to the*

*lesser* of the number of individuals indicated in Factor C for the waiver year, or the number

authorized by the State legislature for that time period."  *Id.* (emphasis added).

      Based on the language of the CMS letters approving the waivers, Defendants argued the

federal government had authorized New Mexico to serve only the number of individuals for which

the legislature chose to authorize funding, up to 3,100 DD recipients and 1,950 D&E recipients.

To further support their argument, Defendants submitted numerous exhibits.  For example, a

January 10, 2000 HCFA Update to State Medical Directors states in pertinent part:

> In this attachment, we discuss limits that States may place on the number of persons served
> and on services provided under an HCBS waiver.  Current law requires States to identify the
> total number of people who *may be served* in an HCBS waiver in any year.  *States may*
> *derive this overall enrollment limit from the amount of funding the legislature has*
> *appropriated.*
>
>              ** ** ** ** ** ** **
>
> If a State finds that it is likely to exceed the number of approved participants, it may request
> a waiver amendment at any time during the waiver year.  Waiver amendments may be
> retroactive to the first day of the waiver year in which the request was submitted.

** ** ** ** ** ** **

> HCFA has allowed States to indicate that the total number of people to be served may be the *lesser of either (a) a specific number pre-determined by the State and approved by HCFA (the approved "factor C" value), or (b) a number derived from the amount of money the legislature has made available (together with corresponding Federal match).* The current HCBS waiver pre-print used by Stated to apply for waivers contain both options.  States sometimes use the second option because of the need to seek Federal waiver approval prior to the appropriation process, and sometimes the legislative appropriations are less than the amount originally anticipated.  In addition, the rate of turnover and the average cost per enrollee may turn out to be different than planned, thereby affecting the total number of people who may be served.

Defs.' Opp. to Pls.' Mot. for Summ. J. [Doc. No. 147], Ex. L.  Therefore, the State is required to indicate the total number of people who *may be served* and this may be the *lesser* of that number or the number derived from the money the legislature makes available for its waiver programs.

As Defendants pointed out in their brief in opposition to Plaintiffs' motion for summary judgment, "the legislative prerogative to cap the program by limiting appropriations also is embedded in state regulation . . . ."  *Id.*  In their brief, Defendants cited to New Mexico's Administrative Code to support their position.  Title 8, Chapter 314, Part 2 addresses the Disabled and Elderly Home and Community-Based Services Waiver.  In addressing the Disabled and Elderly Home and Community-Based Services Waiver, the code states:

> The New Mexico medicaid program (Medicaid) pays for medically necessary services furnished to eligible recipients.  To help Medicaid recipients receive necessary services in a cost-effective manner, the New Mexico Medical Assistance division (MAD) has obtained a waiver of certain federal regulations to provide home and community-based services waiver (HCBSW) programs to recipients as an alternative to institutionalization. See Section 2176 of the Omnibus Budget Reconciliation Act of 1981, codified at 42 C.F.R. § 441.300 Subpart G.  This section [part] describes home and community-based services for recipients who are elderly or disabled, eligible providers, covered waiver services, service limitations, and general reimbursement methodology.

*See* N.M. ADMIN. CODE 8.314.2, Subpart § 733 (2002).  The code further states, "This Medicaid waiver covers services for a specified number of recipients who are eligible for waiver services as

an alternative to institutionalization in a nursing facility. **The program is limited to the number**

**of federally authorized unduplicated recipient (UDRs) positions <u>and</u>** *state funding*." *See*

N.M. ADMIN. CODE 8.314.2, Subpart § 733.4 (emphasis added).

Title 8, Chapter 314, Part 5 governs the DD Home and Community-Based Services

Waiver and contains similar language:

> DEVELOPMENTAL DISABILITIES HOME AND COMMUNITY-BASED SERVICES
> WAIVER: The New Mexico Medicaid program (Medicaid) pays for medically necessary
> services furnished to eligible recipients. To help New Mexico recipients receive services in
> a cost-effective manner, the New Mexico Medical Assistance Division (MAD) has obtained
> a waiver of certain federal regulations to provide Home and Community-Based Services
> Waiver (HCBSW) programs to recipients as an alternative to institutionalization. See Section
> 2176 of the Omnibus Budget Reconciliation Act of 1981, codified at 42 C.F.R. § 441.300
> Subpart G.

N.M. ADMIN. CODE 8.314.5.9 (2002). The code also states, "This Medicaid waiver covers the

following services for a specified and limited number of waiver recipients as a cost effective

alternative to institutionalization in an ICF-MR. **The program is limited to the number of**

**federally authorized unduplicated recipient (UDR) positions <u>and</u>** *program funding*." N.M.

ADMIN. CODE 8.314.5.13 (2002)(emphasis added).

As the Court found in its August 5, 2003 Memorandum Opinion, the evidence supports

Defendants' position that §1396n(c) allows the State to restrict the number of individuals it serves

and the amount of money it spends on waiver programs. If the State appropriates sufficient funds

to serve the individuals indicated as Factor C, then the cap is reached. However, the cap is also

reached when all appropriations are expended, even if not all the individuals indicated as Factor C

are receiving waiver services.

At the February 18, 2005 hearing, Defendants asserted the State had reached the

numerical cap with respect to the D&E waiver but, at that time, did not know whether the State

had reached the expenditure cap for the DD waiver.  Transcript at 64.  Defendants shall provide

the Court with this information.  Accordingly, the Court will deny Plaintiff's *Corrected* Motion

for Order to Show Cause at this time.

**B.  Plaintiff's Second Motion for Order to Show Cause**

Plaintiff also claims Defendants are in contempt of the Court's February 5, 2004 Judgment

because they have failed to "spend all funds appropriated by the State Legislature for DD and

D&E waiver services in the fiscal year in which the funds are appropriated."  Pl.'s Br. in  Supp. of

Second Mot. for Order to Show Cause at 2 (quoting February 5, 2004 Judgment).  Specifically,

Plaintiff contends Defendants will not spend all funds appropriated for the D&E waiver program

for the fiscal year 2005 within that fiscal year.

In 2004, the New Mexico Legislature enacted the Aging and Long-Term Services

Department Act which provided for the formation of a new department, the Aging and Long

Term Services Department (ALTSD).  Defs.' Resp., Ex. B, Parks Aff. ¶6.[1]  The ALTSD would

be responsible for administering the D&E Waiver beginning in 2005.  *Id.*  Accordingly,  the New

Mexico Human Services Department (HSD) delegated the responsibility of administering the

D&E waiver program to ALTSD.  However, until the ALTSD was operational, the HSD/Medical

Assistance Division remained responsible for the day-to-day administration of the D&E waiver

program.  *Id.* at ¶7.  Secretary Designate Debbie Armstrong heads the ALTSD.  The Long Term

Care Division of ALTSD administers the D&E waiver program.  Marise McFadden is the director

of the Long Term Care Division and oversees the ALTSD's administration of the D&E Waiver.

---

[1] Judith Parks is the Unit Program manager of the Medical Assistance Division of the
HSD.

In addition, the New Mexico Legislature passed the General Appropriations Act of 2004, which was signed into law in March 2004. Pl.'s Mem. Br., Ex. 2, Jackson Aff. ¶5. The Act provided for a special $4.9 million appropriation to the New Mexico Department of Finance and Administration (DFA) for "direct services to increase the number of persons served by the developmental disabilities Medicaid waiver at the Department of Health and the disabled and elderly Medicaid waiver program at the Human Services Department." *Id.* at ¶6. The expenditure of this special appropriation by the agencies responsible for administering the DD and D&E waiver programs was contingent on the DFA approving an "increase in services plan." *Id.* at ¶8. The HSD and the Department of Health (DOH) were responsible for developing the "increase in service plan," which the Board of Finance had to approve. *Id.* at ¶10. Thus, the agencies responsible for administering the DD and D&E waiver programs could not spend the money until the Board of Finance approved the "increase in service plan." *Id.* Moreover, ALTSD had no budgetary authority to hire additional staff to administer the D&E Waiver until all the contingencies were met. Defs.' Resp., Ex. B, McFadden Aff. ¶6.

Plaintiff claims Defendants did not submit the increase in service plan until September 20, 2004, six months after the State Legislature appropriated the $4.9 million. Defendants' increase in service plan allocated $4.0 million to ALTSD to provide services under the D&E waiver. Pl.'s Mem. Br., Ex. 2, Jackson Aff. ¶13. The Board of Finance approved the increase in service plan on October 12, 2004. Plaintiff complains Defendants' delay in submitting the increase in services plan resulted in the $4.0 million not being available for D&E waiver services until October 2004. *Id.* at ¶11. This resulted in Defendants having eight months to spend $4.0 million for D&E waiver services to new recipients for the months of November 2004 through June 30, 2005.

11

In December 2004, ALTSD reported it had allocated 200 new slots on the D&E waiver to individuals entered on the Central Registry prior to January 1, 2001. *Id.* at ¶22. ALTSD sent "notices of allocation" to 200 people. By December 2004, eighty-nine (89) individuals had responded to the notices. *Id.* at ¶25. ALTSD's allocation of the 200 new slots for D&E waiver services constituted the first phase of ALTSD's plan to use the $4.0 million. *Id.* at ¶ 23. ALTSD also plans to allocate up to 400 more unduplicated recipient slots in the D&E waiver program on a periodic basis starting in December 2004 until June 30, 2005, the end of the fiscal year. *Id.*

Plaintiff claims the $4.0 million appropriated for the provision of D&E waiver services would pay the State's share of the cost of providing waiver services to 641 new recipients for a twelve month period. *Id.* at ¶15. Because ALTSD did not allocate the 200 slots until October 2004, Plaintiff claims Defendants will not be able to provide waiver services to these individuals for twelve months in this fiscal year. Plaintiff contends these individuals were not receiving services on December 2004. According to Plaintiff, as of December 1, 2004, Defendants had not determined eligibility and service planning for any of the 200 people to whom Defendants sent notices of allocation. Thus, Plaintiff claims it is impossible for any of these 200 individuals to receive D&E waiver services for more than six months in the current fiscal year.

Plaintiff further claims the cost to the State for providing six months of D&E waiver services to 200 individuals is $624,000. Thus, Plaintiff argues it is impossible for ALTSD to spend the remaining $3,376 million by June 30, 2005, given the time required to determine eligibility, level of care, and develop individual service plans. Plaintiff contends that, even if Defendants immediately allocates 400 of the individual slots in this fiscal year, Defendants will only spend another $1.248 million by June 30, 2005. Hence, Plaintiff contends over $2 million in

unspent D&E waiver appropriations will remain at the end of the fiscal year 2005. Based on these contentions, Plaintiff claims Defendants are in contempt of the Court's Judgment, requiring them to "spend all funds appropriated by the State Legislature for DD and D&E waiver services in the fiscal year in which the funds are appropriated." *See* February 5, 2004 Judgment at 2.

Defendants oppose the motion and maintain the State is in compliance with the Court's Judgment. According to Defendants, "[t]he availability of slots in the D&E waiver is determined by Factor C in the CMS-approved waiver plan." Defs.' Resp. at 3. For fiscal year 2005, the numerical cap in Factor C of the approved D&E waiver plan is 2400 Unduplicated Individuals or the number of individuals authorized by the State legislature for that time period, whichever is less. Defs.' Resp., Ex. A, McFadden Aff. ¶12. Defendants contend that "any individual receiving D&E services during a plan year is an 'Unduplicated Individual.'" *Id.* at ¶13. Defendants claim "the number of Unduplicated Individuals served during a plan year is cumulative . . . ." Defs.' Resp. at 3. Hence, Defendants contend the number of unduplicated individuals "is the sum total of unduplicated individuals who received services at any time during the year." Defendants claim the State already projects serving 2,523 Unduplicated Individuals in the D&E waiver for Fiscal Year 2005. *Id*. at ¶14. This number is more than is permitted under the State's D&E waiver plan. Therefore, Defendants have applied for an amendment to the CMS-approved D&E waiver plan to permit the State to provide D&E waiver services up to 3,200 Unduplicated Individuals. *Id.*

Defendants also contend Plaintiff's motion is based on inaccurate facts. Defendants argue that, although the 2004 Legislative Session passed the bill appropriating an additional $4.9 million for providing services to persons awaiting services under the D&E Waiver and the DD Waiver, the appropriation was contingent upon four distinct steps taking place. *Id*. at ¶5. First, the

Secretaries of the DOH and HSD had to develop a plan for increasing services under both

waivers.  Second, the HSD and DOH had to submit that plan to the Secretary of the DFA.  Third,

the Board of Finance had to approve the plan.  Finally, the Legislative Finance Committee also

had to approve the plan.  Thus, before funding would become available, Defendants had to

complete all these steps.  *Id.*  Because the plan had to be approved by these independent

authorities and because the D&E Waiver was transferred from HSD to ALTSD, it took time to

develop an acceptable plan.  *Id.*

      Defendants also take issue with Plaintiff's claim that HSD and DOH did not submit a plan

to the DFA until September 20, 2004.  Defendants assert that HSD and DOH submitted proposed

budgets to DFA for the DD waiver by March 30, 2004, and for the D&E waiver by April 13,

2004.  *See* Defs.' Resp., Ex. B, Parks Aff.¶¶ 9 and 12.  DFA reviewed the proposed budgets and

informed HSD that it required a narrative plan explaining how the funds would be used and

proposals for improving the DD and D&E waiver programs.  *Id.* at  ¶10.  HSD, DOH and

ALTSD submitted a narrative plan to DFA on July 9, 2004.  *Id.*  DFA did not accept this

narrative plan.  *Id.* at ¶11.  Therefore, representatives from HSD, DOH, and ALTSD met on a

number of occasions to refine the plan.  These agencies submitted several drafts to DFA.  On

September 2004, HSD, DOH, and ALTSD submitted what they believed to be an acceptable plan.

DFA, the Board of Finance and the Legislative Finance Committee approved the plan on October

12, 2004.  *Id.*

      Plaintiff disagrees with Defendants' method "of counting the number of available,

unduplicated recipient slots."  Pl.'s Reply at 2.  Plaintiff argues "unduplicated recipient slots" are

spaces in the State's waiver program, analogous to a seat in a restaurant.  Although a restaurant

may have a cap, i.e., a limit on the number of persons it may seat at any one time, each seat may

be used several times over a period of time.  *Id.* at 4.  Hence, Plaintiff contends an unduplicated

recipient slot in the D&E waiver program becomes available every time a person leaves the waiver

program, whether through death, hospitalization, or for some other reason.

Plaintiff is correct that the State may replace recipients who leave the program, but the

State's ability to do so is limited.  Pursuant to federal regulation, the State may replace recipients

as follows:

> A State's estimate of the number of individuals who may receive home and community-
> based services **must** include those who will replace recipients who leave the program for
> **any** reason.  A State **may replace** recipients who leave the program due to death or loss of
> eligibility under the State plan **without regard** to any federally-imposed **limit** on
> utilization, but must maintain a record of recipients replaced on this basis.

42 C.F.R. §441.305(a)(emphasis added).  Therefore, the State *may* only replace recipients who

leave the program due to death or loss of eligibility under the State plan *without* regard to the

caps.  However, people who leave the program for any other reason are subject to the CMS limit

stated in the waiver.  In addition, as Defendants point out, replacing recipients is permissive under

federal regulation when replacing a recipient who leaves the program due to death or loss of

eligibility.

Defendants's argument that the availability of slots in the D&E waiver is determined by

Factor C in the CMS-approved waiver plan is supported by the language in the CMS letter

approving the State's D&E Waiver.  The CMS letter states: "This approval is subject to your

agreement to provide home and community-based services to **no more individuals** than those

indicated on the estimate of Factor C in your approved per capita expenditure estimates."  Defs.'

Mem. in Supp. of Def. Governor Gary Johnson's Mot. for Summ. J., Maruca Aff. ¶7 and Ex.C

(emphasis added).  The CMS letter is clear that the State may not serve more **individuals** than those indicated as Factor C in the State's D&E Waiver renewal application.  For fiscal year 2005, the numerical cap in Factor C of the approved D&E Waiver is 2400, the number of unduplicated recipients.   McFadden Aff. ¶12.  The D&E waiver program already projects serving 2,523 unduplicated recipients.  *Id.*

 In order to serve individuals above the 2400 cap, the State must amend the D&E Waiver. Defendants contend the State has applied for this amendment.  Because the State is providing services to the maximum number of CMS-approved unduplicated recipients and, in fact, the State will exceed that number, Defendants contend the State is administering the D&E Waiver in compliance with the Court's Judgment.  The Court agrees.  Although the State may replace recipients who die or lose their eligibility *without* regard to the caps, the State has the discretion not to do so.  As the Court previously noted, the State has great discretion in developing its waiver programs.  Moreover, the State has taken the required steps to create more unduplicated recipient slots to serve more individuals registered for D&E waiver services by requesting a waiver amendment.

 The Court also considered the legislature's atypical program appropriation in this case. The legislative 2004 appropriation was not made directly to the departments operating the DD and D&E waiver programs.  The appropriation was made to the DFA and subject to the contingencies discussed above.  Due to these contingencies and the resultant delay, the ALTSD could not begin the allocation process for D&E waiver services until October 2004.  At that time, the ALTSD sent "notices of allocation" to 200  individuals entered on the Central Registry prior

16

to January 1, 2001.[2]  McFadden Aff. ¶ 9.  Only eighty-nine (89) individuals responded to these

notices.  Accordingly, the ALTSD sent out an additional 1,200 "notices of allocation" to potential

D&E Waiver recipients for the purpose of identifying people for further allocation.  *Id.* at ¶11.

This was to take place by March 30, 2005.  *Id.*  This was done to achieve the anticipated

numerical cap of 3,200 unduplicated recipients requested in the State's amendment to the D&E

Waiver.  *Id.* at ¶14.

       The Court is well aware that Defendants must work within the constraints of federal law

in providing waiver services.  Defendants cannot serve more individuals than allowed by the

federal cap even if, as in this instance, the New Mexico Legislature provides funding for additional

services.  However, once the legislature provides appropriations for additional waiver services,

Defendants must take the required action to ensure that more individuals receive waiver services.

Given the circumstance of the atypical program appropriation that is at issue in this case,

Defendants presented evidence showing they acted diligently in meeting the contingencies set

forth in the special appropriation and in their effort to utilize the special $4.0 million appropriation

once they met those contingencies.  Based on all the evidence, the Court finds that Defendants are

serving the federally permitted number of unduplicated recipients in the D&E waiver program.

Accordingly, Plaintiff's Second Motion for Order to Show Cause is denied.          **NOW,**

**THEREFORE,**

_____

      [2] Since October 12, 2004, ALTSD took over the responsibility for administering the D&E
Central Registry.  McFadden Aff. ¶10.  Previously, LTC Link, an independent contractor,
administered the registry.  *Id.* at ¶8.  ALTSD believes in-house administration of the Central
Registry will give it better control over the registry, enable it to develop new and innovative
systems, improve the function and accuracy of the registry, and allow it to coordinate and provide
other resources and services to individuals awaiting allocations from the D&E Waiver.  *Id.*

**IT IS HEREBY ORDERED** that Plaintiff's *Corrected* Motion for Order to Show Cause Why Defendants Should not be Held in Contempt of Court for Failing to Comply with This Court's February 5, 2004 Order and Memorandum Brief in Support Thereof **[Doc. No. 222]**, filed September 27, 2004, is DENIED.

**IT IS FURTHER ORDERED** that Plaintiff's Second Motion for Order to Show Cause Why Defendants Should Not be Held in Contempt of Court for Failing to Comply With This Court's February 5, 2004 Judgment and Memorandum Brief in Support Thereof **[Doc. No. 232]**, filed January 13, 2005, is DENIED.

_____

**MARTHA VÁZQUEZ**
**UNITED STATES DISTRICT JUDGE**

**Attorneys for Plaintiffs:**
Duff Westbrook
Maureen Sanders
Nancy Koenigsberg

**Attorneys for Defendants:**
Kurt Wihl
Nathan Adams
Jennifer Stone